THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

IN RE: AMAZON RETURN POLICY LITIGATION

Case No. 2:23-cv-01372-JNW

**ERIN WEILER OBJECTION AND NOTICE OF INTENTION TO APPEAR**

# TABLE OF CONTENTS


Page

I. INTRODUCTION ... 1
II. THE *WEILER V AMAZON* COMPLAINT ... 6
III. BACKGROUND OF *IN RE: AMAZON RETURN POLICY LITIGATION* ... 9
- A. The Complaints Have Nothing To Do With Return Fees ... 9
- B. The Parties Did Not Seek Discovery Concerning Return Fees ... 12

IV. EXPLANATION OF *IN RE: AMAZON RETURN* SETTLEMENT ... 14
- A. Class Definitions ... 14
- B. Class Release ... 15
- C. Consideration ... 16
- D. Transactions Within Subclasses A and B ... 19
- E. Claims Process ... 22
- F. Class Notice ... 23
- G. Preliminary Approval ... 24
  - 1. Misleading Statements And Omissions ... 24
  - 2. Class Counsel Identify No Subclass A or B Representatives ... 25
  - 3. The Preliminary Approval Hearing and Defective Preliminary Approval Order ... 26
- H. The Claim Form Does Not Permit Recovery For Claims In *Weiler* ... 29

V. THE *IN RE: AMAZON RETURN* SETTLEMENT SHOULD NOT BE APPROVED ... 34
- A. The Release Violates The Identical Factual Predicate Rule ... 34
- B. Under *Briseño*, Consideration For The Release Is Illusory ... 39
- C. The Subclasses Were Not Certified, And No Class Representatives Or Class Counsel Were Appointed ... 39
- D. There Are Material Conflicts Between Class Members ... 42
  - 1. Material Conflicts Between Subclass A and Subclass B Members ... 43
  - 2. Material Conflicts Between Subclass B Subgroups ... 44
  - 3. Material Conflicts Within The Unified Class Without Structural Assurances To Assuage Conflict ... 45
- E. Subclass B Is An Impermissible Failsafe Class ... 49
- F. The Claims Made Process Is Unnecessary For Subclass B ... 52
- G. The Notice Is Defective ... 53
- H. The Attorneys' Fees Are Out Of Proportion To The True Amount Of Relief ... 54

I. The Court Does Not Have Sufficient Information To Evaluate Valuation of Subclass B Because The Classes Were Not Adequately Represented ........ 55

VI. CONCLUSION ........ 58

## I. INTRODUCTION

Plaintiff Erin Weiler is the putative class representative in *Weiler v. Amazon.com, Inc.*, Case No 2:26-cv-00378 (W.D. Wash.), a related matter before this Court, where she challenges Amazon's breach of its Return Fee policies by improperly charging Return Fees, Restocking Fees, Late Fees, and Damage Fees (collectively, "Return Fees"). After filing her complaint, Amazon and plaintiffs' counsel in this case, *In re Amazon Return Policy Litigation*, told Ms. Weiler that her claims, and those of putative class member she seeks to represent, were already purportedly settled as part of a global settlement in *In re Amazon Return Policy Litigation*. Upon investigation into the proposed settlement *In re Amazon Return Policy Litigation*, Ms. Weiler objects because the proposed class settlement is deeply flawed, is rife with red flags, exposes massive conflicts amongst class members and class counsel, offers illusory relief, and settlement approval would never withstand appellate review. Further, despite Amazon and appointed Class Counsel telling the Court that Ms. Weiler could submit a claim for the Return Fees at issue in *Weiler*, this appears to be false. Accordingly, the Settlement forces Ms. Weiler and class members like her to release claims for *nothing* in return for the fees at issue in *Weiler*. Ms. Weiler hereby also provides notice of intention to appear at the Final Approval Hearing.

The very first sentence of the motion for preliminary approval in *In re Amazon Return Policy Litigation* is a false statement: namely, that the settlement provides "in excess of $1 billion of benefits for the class." ECF No. 171, at 1:3-4. The total new money actually provided by the settlement is a fraction of that, *if anything*. But that one, easily exposed misrepresentation should be enough for this Court to pause and ask a lot of questions about what really is going on here. The list of irregularities is extensive, but for starters, a few bullet points are illustrative:

- ✓ This settlement is a case study in how to violate the **identical factual predicate rule**. *See*, *e.g.*, *In re Western States Wholesale Natural Gas Antitrust Lit.*, 725 Fed. Appx. 560, 563 (9th Cir. 2018). The allegations in the complaint have nothing to do with Return Fees or Amazon's policy concerning the fees at issue in *Weiler*; those fees were not the focus of discovery; there is no class representative who was charged the fees; they are not referenced in the settlement notice; and the list goes on. Further, Ms. Weiler is not able to make a claim for the Return Fees at issue in Weiler through the Settlement.

- ✓ **The consideration for the release is illusory**. Under *Briseño v. Henderson*, 998 F.3d 1014, 1028 (9th Cir. 2021), settlement consideration is illusory—and approval is an abuse of discretion—when the relief "does not obligate [the bound party] to do anything it was not already doing voluntarily for its own business reasons," and "not because of any court - or settlement-imposed obligation." (cleaned up). Before the settlement, Amazon already publicly committed to returning $1.1 billion dollars in improperly denied refunds—an amount that uncoincidentally looks a lot like the "excess of $1 billion" in settlement "benefits" touted here. Further, Ms. Weiler is not able to submit a claim for the Return Fees at issue in Weiler through the Settlement, thereby providing her no consideration for the release of those claims.

- ✓ **There is no identified class member for Subclass B**. A court can't approve a settlement class without a representative. Amazon has gone on record that Ms. Weiler is a member of Subclass B, but it has repeatedly dodged questions about which of the plaintiffs in the *In re Amazon* matter are in that subclass too. Nor was that information disclosed in the preliminary approval brief, or at the preliminary approval hearing, and that fact alone is enough to support denial of final approval. Indeed, at preliminary approval, the Court never appointed a specific class representative to represent the interests of either Subclass A or B.

- ✓ There are obvious **conflicts of interest between the two Subclasses**, and between Subclass B class members. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods Liab. Lit*., 895 F.3d 597, 606 (9th Cir. 2018). Subclass B members' claims were sold off for pennies on the dollar, while Subclass A members stand to receive treble damages. The representation in the preliminary approval brief that Subclass B members "are expected to receive a full refund plus interest" is not true. ECF No. 171, at 13:28-14:1. Relatedly, Class Counsel is not adequate and has an inherent conflict in representing both subclasses.

- ✓ **Subclass B members are required to submit a claim form, but Subclass A members are not**. For individuals like Weiler, this is further evidence of inequitable treatment because Amazon already has all the information it needs to refund Return Fees to class members who paid them. Worse, the claim form does not allow Ms. Weiler to submit a claim for the transactions at issue in *Weiler*.

- ✓ There are obvious **conflicts within Subclass B** because the settlement lumps together people like Ms. Weiler who were clearly charged a fee that violates Amazon's Terms, with other people placed in the "ineligible refund" category who must *prove* that they were improperly charged via the claims submission procedure. The claims of people like Ms. Weiler are worth far more than the claims asserted by people who Amazon contends are presumptively not entitled to any refund at all. There is a further conflict because some class members like Ms. Weiler are unable to submit claims for the transactions at issue in *Weiler*, while other class members are able to submit claims for all purported Subclass B transactions.

- ✓ Subclass B is an improper **fail-safe class**.

- ✓ **Notice is defective** because there is no information allowing people to determine for themselves whether they are in Subclass A or B. Instead, they must rely on Amazon's say-so, when Amazon has a conflict of interest in lumping as many people in Subclass B as it can. The notice describing the nature of the lawsuit says nothing about Return Fees or Amazon's Return Fee policy.

- ✓ **Claim Form is defective** because it does not allow Ms. Weiler and other class members like her to submit claims for the Return Fees at issue in *Weiler*.

- ✓ Because the "$1 billion" settlement amount is a sham, interim lead class counsel have vastly understated the percentage of recovery for fees. Worse still from the perspective of Subclass B class members like Weiler, the **$100 million in fees is almost six and half times more than Subclass B members could ever recover under the best-case scenario**.

The *In re Amazon Return Policy Lit.* case was filed in 2023 concerning observed errors in Amazon's returns processing systems. Amazon has a well-known "free return" policy. However, plaintiffs in *In re Amazon Return Policy Lit.* alleged that Amazon's returns processes were suffering unexplained glitches. Customers would return an item to Amazon, receive a then-novel (to Amazon) "instant refund" instantly upon return, but would then be "retrocharged" for the returned item because Amazon's software believed that the item had been lost or was never returned. In early 2025, outside of any settlement, Amazon effectively admitted that its refunds processing was encountering errors and began processing hundreds of millions of refunds for such incorrect "retrocharges" dating back to 2017. At the time, Amazon announced that "[t]here is no action required from customers to receive the refunds, and we have fixed the payment issue and made process changes to more promptly contact customers about unresolved returns going forward."[1] Amazon also announced that it took a "one-time charge of about $1.1 billion" to account for this process.[2] By the end of 2025, outside any settlement process, Amazon had refunded nearly $600 million such transactions, and appeared committed to refund any other such transactions that it could identify.

---

[1] *"Wild!": Amazon Is Refunding Some Customers For Purchases Made As Far Back As 2018*, USA TODAY, Mike Snider, May 21, 2025, available at https://www.usatoday.com/story/money/2025/05/21/amazon-refunds-purchases/83776603007/

[2] *Id*.

The *In re Amazon Return Policy Lit.* litigation settled very early. Amazon moved for a "partial" dismissal, which the Court denied in April 2025. The parties conducted limited discovery and filed several motions to compel. There were no depositions, no expert reports exchanged, and the plaintiffs never moved for or obtained class certification. The parties reached a binding class term sheet in October 2025, executed the full Settlement agreement on January 23, 2026, and filed for preliminary approval that same day.

The Settlement suffers severe structural defects. The Settlement class covers anyone who purportedly did not receive a correct or timely refund from Amazon over the span of almost 9 years. The Settlement has two subclasses, identified as Subclass A and Subclass B. These Subclasses *are not defined*, either in the Settlement, the proposed Notice documents, in the Motion for Preliminary Approval, or even the Court's Order on Plaintiffs' Motion for Preliminary Approval, Dkt. 193. No class representative has been identified or appointed as representing Subclass B, even upon insistent questioning by Weiler's counsel in writing and by videoconference. A subclass that is undefined, and without a class representative, is uncertifiable. Indeed, the Court did not certify either Subclass A or Subclass B in its Order on Plaintiffs' Motion for Preliminary Approval, and did not appoint class representatives or class counsel to represent the subclasses. Dkt. 193.

The main benefit of the Settlement is a $309.5 non-reversionary cash Common Fund, of which Class Counsel seeks $100 million as attorneys' fees, plus $1 million in costs and expenses. The rest is distributed 92.7 percent in favor of Subclass A (which, again, is undefined), and the remining 7.3 percent in favor of Subclass B (also undefined). Accordingly, the Settlement sets aside $286.9 million (or $193.28 million after attorneys' fees and costs) for Subclass A, and $22.59 million (or $15.22 million after attorneys' fees and costs) for Subclass B. In their motion for preliminary approval, Class Counsel told the Court that every class member, *in both subclasses*, is set to receive a *full refund, plus interest*. That is false. Notably, other than the top-line $309.5 million Common Fund figure and the requested attorneys' fees and costs, none of these other figures discussed above, including the percentage splits between Subclasses

A and B, are mentioned anywhere in the motion for preliminary approval. Class Counsel also failed to explain how the apportionment was determined at the preliminary approval hearing.

The total dollar amount within Subclass A subject to refunds is valued at $81 million, meaning that Subclass A is set to receive 354% of their putative overall damages, or 238.6% of their putative overall damages after subtracting attorneys' fees and costs. Meanwhile, the total dollar amount within Subclass B subject to refunds is valued at *at least* $856.8 million, meaning that Subclass B is effectively releasing all claims in exchange for refunds of 2.6%, or 1.77% after attorneys' fees and costs. Because Subclass B members like Ms. Weiler are not even able to submit claims for the transactions at issue in *Weiler*, the true scope of Subclass B is likely far higher, almost certainly well over a billion dollars. Class Counsel's representation that everyone will get a full refund plus interest is incorrect. Rather, Class Counsel and Subclass A get a massive windfall, while the claims of Subclass B class members are sold off for pennies on the dollar and the claims of Ms. Weiler and class members within *Weiler* are sold off for *nothing in return*.

The problems continue. Within Subclass B, there are three "subcategories," titled "Ineligible Refunds," "Partial refunds – amount not refunded," and "Retrocharges." These are putative amounts owed by Amazon for vastly different claims, stemming from different contract terms, with different valuations and different theories of damages. Some, like "Ineligible Refunds," may very well be worthless. Others, like "Partial refunds," are just as strong as, if not stronger than, the claims within Subclass A. Lumping them together, without separate class representatives for Subclass B, infuses the Settlement with manifest conflicts. Adding insult to injury, everyone within Subclass B must submit a claim to receive any compensation, while Subclass A class members get benefits automatically. And, as discussed above, some class members cannot submit a claim for some of the transactions within Subclass B at all, like Ms. Weiler.

On February 2, 2026, Plaintiff Weiler filed *Weiler v. Amazon.com, Inc.*, Case No 2:26-cv-00378 (W.D. Wash.), a case concerning Amazon's breach of its Return Fee policies. Amazon

has a policy governing what happens when a customer returns an item late, damaged, or otherwise subject to a "restocking fee." The Return Fee policies delineate the conditions when Amazon may charge Return Shipping Fees, Late Fees, Damage Fees, and Restocking Fees, all of which are under the umbrella term "Return Fee." Plaintiff Weiler was assessed Restocking Fees. Weiler alleges that Amazon's charge of Restocking Fees violated its own Return Fee policies. Critically, Weiler was not provided an "instant" refund and was not then assessed a "retrocharge," like every plaintiff in *In re Amazon Return Policy Lit.* Weiler received full refunds when Amazon received her returned items at its warehouse but was then charged Restocking Fees in violation of Amazon's terms. Weiler seeks to represent classes of consumers that were charged Return/Restocking Fees in violation of Amazon's Return Fee terms.

Return Fees are not mentioned in, and were not the subject of, the litigation in *In re Amazon Return Policy Lit.* The plaintiffs never sought discovery concerning Return Fees. The Settlement never mentions Return Fees either. Nor do the Settlement Notice documents. The claim form does not permit Ms. Weiler to submit claims for the transactions at issue in *Weiler*. And yet, according to the parties here, the Settlement purportedly covers Ms. Weiler's claims. According to Amazon, Ms. Weiler's Return Fees are transactions subsumed within Subclass B – the subclass that was sidelined in the Settlement, its claims resolved for loose change or, in her case, for nothing.

As discussed in more detail below, the Settlement suffers a host of additional problems. Each issue is independently sufficient for the Court to deny approval of the Settlement, or, at a minimum, bar the Settlement from applying to Ms. Weiler's claims and those class members she seeks to represent. Collectively, they are fatal. This Settlement cannot be approved as written.

## II. THE *WEILER v AMAZON* COMPLAINT

Plaintiff Weiler filed *Weiler v. Amazon.com, Inc.*, Case No 2:26-cv-00378 on February 2, 2026 in the Western District of Washington. Ex. 1 (Weiler Complaint). Weiler asserts claims based on Amazon's Return Fee practices on behalf of two nationwide classes under Washington law pursuant to Amazon's terms and conditions that apply to all shoppers on its platform. The

gist of Weiler's complaint is that Amazon promises that most merchandise on its website can be returned for free, subject only to Return Fees that apply in specific, delineated situations as set out in its Returns Policy. *Id*. ¶¶ 1-4.

Amazon's Returns Policy has a discrete section titled "Return Fees," setting out the conditions precedent to and amounts of "Return Fees," an umbrella term that is then separated into Return Shipping Fees, Late Fees, Damage Fees, and Restocking Fees, each with their own conditions and fee amounts. *Id*. ¶ 5. For instance, Amazon's Late Fee policy states that Amazon will charge 20% of an item's price for the first 30 days after the "return by date," and 100% of the item price afterwards. *Id*. The Return Fees policy also states that Amazon may charge Restocking Fees of 100% of an item's price for very specific, delineated merchandise, but otherwise does not give Amazon the right to charge Restocking Fees for any other merchandise not specifically listed. *Id*. Amazon may also charge Damages Fees up to 50% of an item's price, or, in the case of luxury items, 100% of the item price. *Id*. The general conditions when Amazon charges such fees, Amazon's practices regarding Return Fees, and Amazon's public statements concerning Return Fees, are set out in detail. *Id*. ¶¶ 6-9.

Plaintiff Weiler alleges that she purchased four items on Amazon.com on December 27, 2025 that were subject to its "free returns" policy, and returned all four items to Amazon through Whole Foods (an Amazon business that accepts returns) on December 29, 2025 (the same day she received them), unused and unopened, brand new in original packaging. *Id*. ¶¶ 10-15. For each of the products, Amazon instructed her that she could return them for free until January 15, 2026, so there is no question that she returned the items on time. Amazon sent Weiler confirmation emails that each item was received by Amazon on December 29, 2026. *Id*. ¶ 16.

However, for purposes of determining whether to impose Return Fees, Amazon deceptively used the date its *warehouse* received the items, not the date the items were received by Amazon's returns center (Whole Foods). *Id*. ¶ 17. For instance, despite confirming that Weiler returned all four items on December 29, 2026, Amazon's system showed that its warehouse received the items on January 16, 2026 or January 18, 2026, after the January 15,

2026 returns window. *Id*. Because Amazon's system recorded that the items were returned outside the January 15, 2026 returns window, Amazon charged Weiler a "Restocking Fee" of $3.60 per item. *Id*. ¶¶ 17-18.

Critically, Amazon's receipts show that Weiler in fact received a *full* refund of her purchase price. *Id*. ¶¶ 18-21. As can be seen below, Amazon gave Weiler a *full* refund of her entire purchase price and taxes paid, but then charged her a Restocking Fee on top of the transaction. *Id*. ¶ 18.




Accordingly, the issue is not whether Weiler received a full refund under Amazon's promise to provide full refunds, because she clearly did. The only question in Weiler's case is whether Amazon's practice of charging Return Fees (in her case, called Restocking Fees) after issuing the full refund violates Amazon's terms concerning Return Fees. The allegations in the *Weiler* Complaint are not reasonably in dispute, as they are taken from screenshots of Weiler's Amazon account. Unlike in the *In re Amazon Return Policy Litigation* case, Weiler's refund was not an "instant" refund that was later retrocharged. Amazon only processed Weiler's refund after receiving the items at their warehouse on January 16 and 18, 2026. *Id*. ¶ 17.

Weiler seeks to represent two putative classes:

> All Amazon consumers in the United States for whom Amazon records show they requested a refund and returned the merchandise and were charged a Return Fee when the returned merchandise does not qualify for a Return Fee under Amazon's terms and conditions.
>
> All Amazon consumers in the United States for whom Amazon records show they requested a refund and returned the merchandise and were charged a Restocking/Late Fee when the returned merchandise was returned in an original condition within the applicable return window.

*Id*. ¶ 56. Weiler solely seeks to represent consumers like her who were charged Return Fees and/or Restocking/Late Fees in violation of Amazon's Return Fee policy. Weiler's claims rest on proving that Amazon breached its Return Fee policy. *Id*. ¶¶ 69-123.

## III. BACKGROUND OF *IN RE: AMAZON RETURN POLICY LITIGATION*

### A. The Complaints Have Nothing To Do With Return Fees

The *In re Amazon Return Policy Litigation* was filed originally as *Abbott et al. v. Amazon.com, Inc*., Case No. 2:23-cv-01372-JNW (W.D. Wash.) on September 5, 2023. Exhibit 2. The Complaint focused on Amazon's deceptive practice of promising free returns, accepting items for return and issuing "instant" refunds, only to then re-charge ("retrocharge") customers again for the returned item. Ex. 2, ¶ 4. Every plaintiff purchased a product from Amazon, returned the product to Amazon, was credited with an instant refund, and then was re-charged for the same product purportedly because Amazon had not received the item. *Id*. ¶¶ 61-84. Plaintiffs complained that Amazon would revert the "retrochages" if customers called to complain. The class was defined as anyone who was charged by Amazon for failing to return a product that was timely returned in its original condition. *Id*. ¶ 86. There is no mention of Return Fees, Late Fees, Restocking Fees, or Damage Fees, or even "partial" fees in the initial Complaint.

Substantively, the Consolidated Complaint changed little, other than adding more plaintiffs.[3] The focus of the Consolidated Complaint was still Amazon's failure to honor its free refund policy because Amazon either failed to issue refunds or would retrocharge customers who had returned items. Though the Consolidated Complaint now had 10 plaintiffs, all followed the same fact scenario: plaintiffs returned items on time, received an initial "instant" refund, and were then "retrocharged" because Amazon purportedly failed to receive the item. *Id*. ¶¶ 71-142. Some plaintiffs were refunded when they complained. One Plaintiff – Abbott – was ultimately refunded when she complained, but without any explanation, the refund was $9.22 instead of the $13.13 promised. *Id*. ¶ 79. The refunded amount – 70.22% of the total due – does not fit within any Return Fee, Late Fee, Restocking, Damage Fee schedules. Nor does Abbot allege that she was charged any such Return Fees. The class definition was narrowed from the initial Complaint, now focusing on customers who returned merchandise and were denied refunds "on the basis of non-receipt of the return" by Amazon. *Id*. ¶ 143. As with the original Complaint, the Consolidated Complaint contains no mention of Return Fees, Late Fees, Restocking Fees, Damage Fees, or "partial" fees.

Amazon filed a "partial" motion to dismiss on May 15, 2024. Ex. 4; Dkt. 62. The motion summarized that all plaintiffs participated in an "innovative" advanced refund program that gave them full refunds prior to Amazon receiving the product. *Id*. at 1. There is no mention of Return Fees. The motion was denied on April 29, 2025. Ex. 5; Dkt. 112. The Court summarized that "This case involves Amazon's 'advanced refund policy,' which is a portion of its overall return policy." *Id*., at 1.

Plaintiffs filed the now-operative First Amended Consolidated Complaint on May 23, 2025. Ex. 6; Dkt. 116. Little changed substantively from the prior iteration. As before, every

[3] After the initial Complaint was filed, several copy-cat cases were filed and the cases stalled while various plaintiffs and their attorneys vied for appointment of interim lead class counsel pursuant to Rule 23(g). The Court appointed the law firms Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") and Zigler Law Group, LLC ("ZLG") as interim lead counsel on February 22, 2024. Dkt. 56. Interim lead counsel filed a Consolidated Complaint on March 25, 2024. Ex. 3; Dkt. 58.

plaintiff was initially given a full "instant" refund but later was re-charged for the item. The only plaintiff that received a "partial" refund was, as before, Plaintiff Abbott. However, there is no explanation in the complaint about why the refund was partial. There is no allegation that Abbott was charged a Return Fee, Late Fee, Restocking Fee, or Damages Fee. Indeed, it is not clear that the referenced refund was even for the same product she purchased. *See id*. ¶ 92 (screenshot of refund does not identify item for which refund is provided). The operative Complaint still lists the putative classes as people who "were denied refunds by Amazon" when an item was returned. *Id*. ¶ 225. The class definition removed the requirement that the failure to issue was "on the basis of non-receipt of the return." *Id*. As before, Return Fees, Late Fees, Restocking Fees, Damage Fees are not discussed in the Complaint.

Any argument that Plaintiff Abbott's "partial" refund means that the Complaint somehow concerns all types of "partial" refunds, including any "partial" refunds due to Amazon's charging of Late Returns, Restocking Fees, Damage Fees, and Return Fees goes against key allegations in the Complaint's causes of action. For instance, most of the counts mention Amazon's re-charging "full sales price" of products that had been returned, without a single mention of "partial" or Return Fees. *Id*., ¶ 259 ("Amazon knew that it routinely denied refunds or re-charged its customers the *full sale price* and tax on items that were returned to Amazon or retained, in accordance with Amazon's instructions and in accordance with its policies") (emphasis added); *id*. ¶ 263 ("Despite Amazon's knowledge of its systemic failure to deliver on its promise of refunds for returned items and its practice of routinely denying refunds or re-charging its customers the *full sale price* and tax on items that were returned to it in accordance with its policies") (emphasis added); *id*. ¶ 271 ("Plaintiffs have suffered economic injury as a direct and proximate result of Amazon's conduct in that Plaintiffs were by its practices, wrongfully re-charged *the purchase price* and applicable taxes for returned items, damaging them in an amount equal to those charges and interest.") (emphasis added); *id*. ¶ 283 ("Amazon knew that it routinely charged its customers the *full sale price* and tax on items that were returned in accordance with Amazon's policies") (emphasis added); *id*. ¶ 301 ("Amazon knew that it

routinely charged its customers the *full sale price* and tax on items that were returned in accordance with Amazon's policies") (emphasis added); *id*. ¶ 316 ("Plaintiffs suffered contract damages *equal to the purchase price*, applicable taxes for the returned items and interest") (emphasis added); *id*. ¶ 327 ("Amazon knew that it routinely denied refunds or re-charged its customers the *full sale price* and tax on items that were returned in accordance with Amazon's instructions") (emphasis added).

The word "partial" does not appear once in the operative complaint. The only mention of putative "late" fees or "damage" fees is a stray reference in paragraph 1 of the complaint in the introduction: "Items returned late are entitled to an 80% refund of the purchase price. Damaged items can receive between 0 and 50% of the purchase price." *Id*. ¶ 1. "Restocking" or "Return" fees are not mentioned anywhere. The stray reference in paragraph 1 is accompanied by a footnote, which lists exceptions to the 30-day window for late returns. The footnote ends, "Although the policies have changed over time, and since the filing of the original complaint at Dkt. 1, Amazon's practice of recharging its customers for returns received continues." Nothing in the Complaint suggests that Amazon violates its Late Return, Damage, Restocking, Or Return Fee policies, as, again, those policies are not discussed anywhere. Instead, the Complaint focuses on Amazon's "practice of *recharging* its customers for returns received." *Id*. ¶ 1 n. 1 (emphasis added).

### B. The Parties Did Not Seek Discovery Concerning Return Fees

The parties filed a Joint Status report and Discovery Plan on July 16, 2024, and started discovery. Dkt. 70. The status report makes no mention of Return Fees despite itemized lists of topics for discovery. *Id*. Over the next calendar year, the parties filed multiple motions to compel discovery, which culminated in an order largely in favor of the plaintiffs on September 30, 2025. Ex. 7; Dkt. 156.

Plaintiffs served more than two hundred total discovery requests. None mention Return Fees. *See, e.g.*, Exs 8, 9 (RFPs 1-144).[4] Indeed, despite the extremely high number of requests

[4] Plaintiff Weiler has not been able to locate RFPs beyond 144 on the docket, though the filings suggest there were around 250 total RFPs served.

for production, the word "fee" is not mentioned even once. For instance, Plaintiffs' January 28, 2025, motion to compel production of documents frames the issues as, "Nine months ago, Plaintiffs served Amazon with 76 requests for production seeking documents and data concerning Amazon's practice of denying refunds by improperly re-charging consumers for returned products, the reasons for that practice, and the scope of the issue." Ex. 10; Dkt. 81, at 1. The focus of the litigation, as late as 2025, a few months prior to settlement, was on Amazon's practice of "re-charging consumers for returned products." *Id*.; *see also id*. at 5 ("The data sought is relevant to identifying instances in which Amazon's own records reflect that it received an item for which it improperly *re-charged* a consumer, assessing the scope of Amazon's conduct, and presenting a methodology for estimating classwide damages for purposes of class certification. This Court should therefore order Amazon to produce responsive data for all its customers that were *recharged* for an item for which they initiated a return.") (emphasis added). Given that Plaintiff Weiler was not "re-charged" for an item she returned, the data sought in discovery was not responsive to her claims.

Plaintiffs' February 20, 2025 Motion to Compel Interrogatory Responses does not mention the word "fees" once either. Ex. 11; Dkt. 96. The motion mentioned that one plaintiff – Abbott – received a "partial" refund, but Amazon "has yet to explain why." *Id*. at 11.

The parties filed a Joint Status Report on May 12, 2025. Dkt. 113. The report noted that, at the time, plaintiffs "have not yet noted or requested any depositions" of Amazon personnel, and anticipated that depositions would only occur after discovery was substantially complete. *Id*. at 6.

Plaintiffs filed another motion to compel on June 9, 2025. Ex. 12; Dkt. 123. The words "fees" or "partial" do not appear in the motion.

The Court issued its Order on Plaintiffs' Motions to Compel on September 30, 2025. Ex. 13; Dkt. 156. The Court summarized that "Plaintiffs seek transactional data to identify customers who experienced wrongful refund denials, including … [(1)] Amazon customers that have experienced wrongful denials of refunds on the basis of nonreceipt … [(2)] the monetary sum of

refunds wrongfully withheld on the basis for nonreceipt …[(3)] data sufficient to identify Amazon customers that received return-reminder and refund-recharge emails; and [(4)] [d]ata regarding transactions where Amazon denied refunds on the basis of nonreceipt." *Id*. at 8. None of this data is responsive to Plaintiff Weiler's claim. The Court ordered Amazon to produce a statistically significant sample of such data. *Id*. at 9. There is no mention of Return Fees or partial refunds.

Plaintiffs submitted the Declaration of Andrew H. Schapiro and Aaron Zigler in Support of Plaintiffs' Motion for Preliminary Approval. Ex. 14; Dkt. 171-1 ("Schapiro Declaration"). The Schapiro Declaration summarizes the case's history of litigation and discovery. Mr. Schapiro's declaration confirms that the pre-suit investigation solely focused on people that were given an advanced refund, and then recharged. *Id*. at 2-4. Mr. Schapiro confirmed that the parties did not conduct any depositions prior to settlement. *Id*. at 15. Mr. Schapiro also confirmed that, despite the Court ordering that Amazon produce a representative class data sample, the parties settled before such a production was made. *See id*. It appears that the parties executed a "binding term sheet" in October 2025, and formal discovery stopped – giving way to putative mediation disclosures. *See id.*

## IV. EXPLANATION OF *IN RE: AMAZON RETURN* SETTLEMENT

The parties executed the long-form Settlement Agreement on January 23, 2026. Ex. 15; Dkt. 171-5. As discussed above, the binding term sheet was executed in October 2025.

### A. Class Definitions

The "Settlement Class" is defined as "All persons who initiated a return to Amazon or requested a refund regarding a physical product purchased and (per Amazon's records) received in the U.S. after being sold through Amazon.com from September 5, 2017 to the time the Class Data is prepared, and who (1) incorrectly did not receive a refund from Amazon or received an untimely or incorrect refund from Amazon; and/or (2) did receive a refund but were later incorrectly charged by Amazon for the product(s) that was (were) the subject of the return." *Id*. § 1.3.

The term "Class Data" "includes, for each customer account that is part of the Class Data, and to the extent available, the name or identity of the account holder, postal and email address(es), phone number(s), and, for transactions at issue, the dollar values, order numbers, ASINs, and reason for retrocharge or refund denial." *Id*. § 1.9. According to § 5.5.1, Amazon was required to provide the Class Data to the Settlement Administrator no later than 21 calendar days after Plaintiffs filed their motion for preliminary approval. The Long Form notice sent to class members confirms that the class period spans September 5, 2017 through February 12, 2026. Exhibit 19.

The Settlement Class has two subclasses – Settlement Subclass A and Settlement Subclass B - which are entitled to different relief. However, the subclasses are effectively undefined and are hopelessly vague, defined using tautological terms.

Settlement Subclass A is defined as: "all persons whose transactions are included in Settlement Subclass A." *Id*. § 1.34.

Settlement Subclass B is defined as: "all persons who had transactions at issue in the Settlement Class other than the transactions included in 'Settlement Subclass A.'"

### B. Class Release

"Class Released Claims" means "all claims, rights, causes of action, suits, obligations, debts, demands, agreements, promises, liabilities, damages, losses, controversies, costs, expenses, and attorneys' fees of any nature whatsoever arising before the Effective Date, whether known or unknown, matured or unmatured, foreseen or unforeseen, suspected or unsuspected, accrued or unaccrued, which he or she ever had or now has under state or federal law, common law, or under any other principle of law or equity resulting from, arising out of, or related to any and all allegations in any complaint, including the First Amended Consolidated Complaint (ECF No. 116) in this action, including Defendant's actions, practices, or policies related to returns, refunds, and/or retrocharges." *Id*. § 1.10.

The Settlement provides a "specific release" of the Class Released Claims, not a general release. *Id*. § 8.3.4.

### C. Consideration

The main consideration offered by the Settlement is Amazon's creation of a $309.5 million non-reversionary common fund (although the preliminary approval brief suggests, incorrectly, that the consideration is $1 billion). *Id*. § 4.1.1. The fund is set aside to pay for Subclass A and Subclass B claims, as well as notice and administration fees, and attorneys' fees, costs, and expenses.

The Settlement also requires Amazon to continue processing certain Subclass A transactions that it started processing outside the settlement context:

> After this litigation was filed, Defendant identified certain customer refunds that were potentially unpaid and, in 2025, elected to implement a process to pay those refunds, including by paying some refunds for which Amazon could not confirm the money was owed. These refunds include <u>(1) refunds not completed due to a payment processing issue; and (2) refunds not completed where Amazon does not have sufficient confirmation that the correct item(s) were returned as required</u>. As of December 1, 2025, Defendant has issued approximately <u>$570</u> million in these refunds pursuant to this process, with approximately <u>$34</u> million of refunds remaining unpaid (the "Remaining Unpaid Refunds"). The refunds described in this subsection address some of the same categories of unpaid returns that are the subject of Plaintiffs' claims in this Action. As part of the consideration provided under this Settlement, Defendant has agreed to make reasonable efforts to complete payment of these Remaining Unpaid Refunds to Settlement Class Members outside of the Settlement Fund unless Amazon has a good faith belief that there is suspected fraud or abuse, or that such payment conflicts with Amazon's compliance or other legal obligations. Amazon will not claw back any amounts paid according to the process discussed in this paragraph, unless such claw back is requested by the account holder; or Amazon has a good faith belief that there is suspected fraud or abuse, or that such action is necessary for Amazon's compliance or other legal obligations.

*Id*. § 4.2.1 (underlining added). The Settlement states that there are $604 million such transactions, of which $570 have already been refunded outside the Settlement process, and another $34 which Amazon has already embarked to refund outside the Settlement. *Id*. *See also id*. § 2.2. The $604 million referenced herein *does not* count against the $309.5 million non-reversionary fund, as this was money Amazon already earmarked outside the settlement context.

The Settlement allows Class Counsel to seek up to $100 million as attorney's fees, plus an additional $1 million in costs and expenses, which count against the $309.5 million common

fund. Thus, assuming Class Counsel seeks $101 million in fees and costs, and the Court awards that amount, there would be $208.5 million remaining to pay class member claims. *Id*. § 7.2.

The Settlement sets out how any net amount remaining in the common fund ($309.5 million, or $208.5 after attorneys' fees and costs) should be split between Subclass A and Subclass B. Section 6.4.1 states that 92.7% of the Net Settlement Fund shall be divided among Subclass A members, with the remaining 7.3% to be divided among Subclass B members. That is, the Settlement sets aside $286.9 million (or $193.28 million after attorneys fees and costs) for Subclass A. The Settlement sets aside the remaining $22.59 million (or $15.22 million after attorneys fees and costs) for Subclass B.

However, the Settlement stipulates that there are "[a]pproximately $81 million of transaction values in Settlement Subclass A that are eligible for full refunds to be paid out of the Settlement Fund, in addition to interest." *Id*. § 2.2 With $286.9 million (or $193.28 million after attorneys' fees) set aside for Subclass A, Subclass A class members are set to receive 354% of their putative overall damages, or 238.6% of their putative overall damages after subtracting attorneys' fees and costs. *See also* Settlement footnote 6, at page 15 ("[T]he Settling Parties understand that the total unpaid transaction amounts for Subclass A are less than the amount of the Subclass A common fund. Thus, all Settlement Class Members with transactions under Section 4.2.1 will receive automatic interest payments from the common fund for Settlement Subclass A.").

The Settlement then stipulates that "Defendant represents that its good faith estimate of the most likely potential claim pool for Settlement Subclass B is approximately $400 million." *Id*. § 2.3. Accordingly, Amazon estimates that Subclass B damages are nearly *five times* larger than Subclass A, but Subclass B set to receive only 7.3% of the overall common fund. Using the provided $400 million damages estimate, Subclass B is set to receive only 5.6% of its possible damages, or 3.8% when accounting for attorneys' fees and costs.

The discrepancy between benefits provided to Subclass A and B is actually far more drastic than it first appears. Settlement § 12.1 gave Class Counsel an option to terminate the

Settlement if they came to "believe that the 'most likely potential claim pool' for Subclass B exceeds 200% of approximately $400 million as Plaintiffs' estimate of the most likely Subclass B claim pool." In other words, Class Counsel was allowed to terminate the Settlement if they came to believe that the valuation of Subclass B was greater than $800 million, and not the $400 million estimated in the settlement. Notably, Class Counsel's right to terminate explicitly expired on January 12, 2026, 11 days *before* the full Settlement was signed on January 23, 2026, and over a month before they received the Class Data on February 13, 2026 that would have let them know how big Subclass B actually was. *Id*. § 12.1.2.

The parties filed an expert report from John Holton in support of preliminary approval. Ex. 16; Dkt. 174-2. Mr. Holton reiterates that Subclass A includes roughly $680 million of returns, $604 million of which Amazon had already earmarked to refund outside the Settlement, and $81 million for class members that would receive compensation out of the Common Fund. *Id*. ¶¶ 43; 87. Mr. Holton set out to ascertain the value of injunctive relief provided in the Settlement, which he valued at $122.9 million for Subclass A, and $155.2 for Subclass B, assuming the same rate of relief for the two subclasses based on the same assumed rate of errors leading to the wrongful charges by Amazon. *Id*. ¶¶ 70-71, 76-88. Because Mr. Holton uses the same error rates to arrive at a valuation of injunctive relief for Subclass B as for Subclass A, and injunctive relief is valued $155.2 million for Subclass B as compared to $122.9 million for Subclass A, it follows that the valuation of Subclass B is larger than Subclass A by the ratio of 155.2/122.9, or 1.26x. Given that Mr. Holton's valuation for Subclass A was $680 million, Subclass B is then valued at $680 million x 1.26, or $856.8 million, according to Mr. Holton's methodology.[5]

Using Mr. Holton's valuation of $856.8 million for Subclass B, two things become clear. First, Subclass B is valued at more than $800 million, above the threshold for which Class Counsel could (and should) have terminated the Settlement had it not agreed to limit its right to

[5] Notably, many of these figures are redacted in Mr. Holton's report, so Plaintiff Weiler bases her methodology on the publicly available figures. In conferrals amongst counsel for Weiler and Amazon, Amazon refused to provide Mr. Holton's unredacted report even subject to a protective order.

do so by January 12, 2026, prior to receiving the Class Data. Settlement § 12.1 (termination rights if Subclass B transactions worth more than $800 million). Second, and more critically, because Subclass B is eligible to receive only $22.59 million from the Common Fund, or $15.22 million after attorneys fees and costs, Subclass B is effectively releasing all claims in exchange for refunds of 2.6%, or 1.77% after attorneys' fees and costs.

**D. Transactions Within Subclasses A and B**

As discussed above, Subclasses A and B are not defined in the Settlement. However, Settlement § 4.2.1 notes that Subclass A includes "(1) refunds not completed due to a payment processing issue; and (2) refunds not completed where Amazon does not have sufficient confirmation that the correct item(s) were returned as required."

Mr. Holton's heavily redacted declaration provides the only substantive clues as to what transactions are within Subclasses A and B. Mr. Holton states that "Settlement Subclass A contains customers who experienced failed refunds or retrocharges due to computer and payment processing errors and those for products that did not complete the grading process for any number of reasons. For each of these transactions, it is not clear from Amazon's records what is the reason for the refund or retrocharge." Ex. 16, Holton Decl. ¶ 64. Effectively, Subclass A transactions are purportedly the result of true errors where Amazon has no idea why an error occurred, and liability is barely contested.

According to Mr. Holton, "Settlement Subclass B contains all other customers who had a refund denied or were retrocharged. For these customers, *Amazon's records show the reason for the refund denial or retrocharge (for example, incorrect item or quantity)*. If these customers believe the refund denial or retrocharge was improper, as part of the settlement they can submit evidence showing why it was improper to receive a payment from the settlement fund." *Id.* ¶ 65 (emphasis added).

Mr. Holton also includes an Exhibit to his declaration that sets out each of the myriad types of issues that resulted in incorrect or failed refunds for both Subclass A and B. Holton

Decl., Ex. B. Subclass A contains 12 different types of "Subcategories," while Subclass B contains 3 types of "Subcategories," as follows:

**Subclass A**

| | Subcategory |
|---|---|
| A1 | Retrocharges for packages that were delivered to a Designated Carrier, but Amazon does not have confirmation that arrived at a return center |
| A2 | Retrocharges for items that were returned but for which the retrocharge was not reversed. |
| A3 | Retrocharges for packages that arrived at a return center but Amazon could not identify the reason for the retrocharge. |
| A4 | Retrocharges where the customer attempted the return after the retrocharge |
| A5 | Unclassified retrocharges |
| A6 | Underpaid retrocharge refunds |
| A7 | Refunds that were determined ineligible for a refund, but Amazon was unable to determine why the refund was determined ineligible. |
| A8 | Charges that occurred during a short period of time when Amazon's system received a message that there was a decline, resulting in multiple charges. |
| A9 | Refunds that were only partially issued because the customer paid using two payment methods, the refund was successfully processed to one payment method but not the other, resulting in a partial refund. |
| A10 | Certain "returnless refunds" ([redacted]) that were retrocharged because of a process or technical error |
| A11 | Unpayable Refunds (subset of certain refunds include (1) refunds not completed due to a payment processing issue; and (2) refunds not completed where Amazon does not have sufficient confirmation that the correct item(s) were returned as required). |
| A12 | Transactional values for certain refunds that include (1) refunds not completed due to a payment processing issue; and (2) refunds not completed where Amazon does not have sufficient confirmation that the correct item(s) were returned as required |

**Subclass B**

| | Subcategory |
|---|---|
| B1 | Ineligible Refunds |
| B2 | Partial refunds - amount not refunded |
| B3 | Retrocharges |

*Id*. (highlighting added). As seen above, both Subclass A and Subclass B transactions purportedly include putative "partial" or "underpaid" refunds. Neither Subclass A nor Subclass B transactions explicitly mention Return Fees, Late Fees, Damage Fees, or Restocking Fees.

"The files provide[d] by Amazon for Subclass B are broken into 3 separate files as follows: B1 – Ineligible refunds; B2 – Partial refunds; B3 – Retrocharges. Each of these files covers a different category and provides detailed transactions from November 2017 to September of 2025 for files B1 and B2; and from January 2017 to September 2025 for file B3." Holton Decl. ¶ 81. As discussed above, for Subclass B, Amazon's records purportedly "show the reason for the refund denial or retrocharge." Mr. Holton then states that Subclass B "files are also different from Subclass A because the transactions showing in the Subclass A files are all transactions where there was either a payment processing issue or Amazon cannot determine the reason for the retrocharge or refund denial. The Subclass B files show total transactions. There is no delineation in these totals between transactions that were completed successfully and in accordance with Amazon's obligations to its customers, and those that were not completed successfully in accordance with its obligations." *Id*. ¶ 82.

According to Mr. Holton, then, Subclass B transactions are extremely disparate and not grouped according to types of fee, or in accordance with the merits of the claims. Purportedly, Amazon knows the precise reason for each charge within Subclass B, while Subclass A charges are due to processing errors or situations where Amazon cannot tell why there was a refund denial or retrocharge. Within Subclass B, some charges may have been processed correctly – in accordance with Amazon's policies – while others may not have been. Indeed, Subclass B includes cases where class members did not receive a refund because they fell within the "Ineligible Refunds" subcategory, while other class members like Ms. Weiler were indisputably charged Restocking/Late Fees in violation of Amazon's Return Fees policy. Both sets of class members are set to receive virtually nothing, 1.77% of the value of their claims, even though

class members like Plaintiff Weiler should be getting 100% of their Return Fees refunded, while class members in the Ineligible Refunds subcategory may very well be entitled to nothing.

**E. Claims Process**

Settlement Subclass A class members will receive all payments distributed from the Net Common Fund without the necessity of filing a Claim. Settlement § 6.1.1. Settlement Subclass A class members will only be asked to select a preferred payment method.

However, Subclass B class members will only receive benefits from the Net Common Fund *if they submit a Claim Form*. *Id*. § 6.1.2. The Claim Form requires that they establish "more likely than not [that] they are members of the Settlement Class, based on the evidence presented." *Id*. Given that Amazon knows the identity of every Settlement Class Member in both Subclasses A and B, and the precise dollar amount in dispute for every Settlement Class Member, there is no reason provided why Subclass B class members get nothing without submitting a Claim, while Settlement A class members get 3.5x their claim value without having to do anything.

Subclass B class members are required to provide their first and last name, street address, city, state, zip code, email address, phone number, and notice IDs, all of which Amazon already has. Ex. 15, Settlement Ex. 1 (Claim Form). Subclass B class members are then required to list an "Order #," "Date of Refund Requested," "Refund Amount Requested," "Refund Rejection Reason." *Id*. Then, "in order to verify your claim, [Subclass B class members] must provide the required information and/or documentation associated with each Refund Rejection Reason listed above," though it is not clear from the Claim Form what specific information or documentation is required or will be accepted. *Id*.

According to Mr. Holton, Amazon's records purportedly "show the reason for the refund denial or retrocharge" for Subclass B transactions, so it makes no sense to require Subclass B class members to not only self-identify every possible transaction that may quality, provide documentation for every transaction, but then also provide the reasons for every refund denial or retrocharge. Subclass B class members are then also put into the impossible position of figuring

out what transactions qualify for compensation under Subclass B *when Subclass B is never defined*, and the types of transactions that qualify for compensation under Subclass B are likewise *never identified*.

**F. Class Notice**

It appears that different Class Notices have been drafted for class members within Subclass A and Subclass B. *See* Ex. 15, Settlement Exs. 2-6. *See also* Ex. 20 (Weiler Notice). Settlement Subclass A class members are notified that they "will automatically receive a payment under the Settlement." *Id*., Ex. 2. Settlement Subclass B class members are told that they "are eligible to submit a Claim Form to potentially receive a payment from the Settlement." *Id*., Ex. 3. None of the notices provide definitions of Subclasses A or B.

The Long Form Notice, which purportedly has more information than any of the other "summary" or "reminder" notices is of no help. *Id*., Ex. 19 (Long Form Notice). The first page states that the case concerns "certain of Amazon's return policies and practices," while the "What is this lawsuit about?" section states that "Plaintiffs allege that certain of Amazon's return policies and practices violate Washington consumer protection and other laws." *Id*. There is no mention of Return Fees of any kind, or "partial" fees.

In a section called "How do I know if I am part of the Settlement?," the Long Form Notice specifies the global Settlement Class Member definition. *Id*. It then states that "[t]here are two Settlement Subclasses (A and B) as explained in the Settlement documentation. For further information, please visit the Settlement Website at www.ReturnSettlement.com or call toll-free 1-888-553-4246." Even the most inquisitive class member would of course have no way to decipher who or what types of transactions are part of Subclass B according to this Notice. Looking to the Settlement Agreement itself would not help.

In a section called "What does the Settlement provide?," class members are told that Subclass A class members are set to receive 92.7% of the Net Settlement Fund, while Subclass B class members are set to receive 7.3%, "divided among all Settlement Subclass B members who submit claims to the administrator showing more likely than not their membership in the

Settlement Subclass B and entitlement to a payment." *Id*. Again, there is no definition of either Subclass here.

The section called "What are the Released Claims?" does not mention Return Fees or partial refunds. *Id*.

The section "How do I make a claim to receive a payment in this Settlement?" does not define Subclasses A or B, or delineated what types of transactions are within each subclass.

### G. Preliminary Approval

#### 1. <u>Misleading Statements And Omissions</u>

Plaintiffs filed their Motion for Preliminary Approval on January 23, 2026. Ex. 17; Dkt. 171. The motion seeks preliminary approval of the Settlement, approval of the proposed notice plan, certification for settlement purposes under Rule 23(a) and Rule 23(b)(3), along with the appointment of Plaintiffs as class representatives and Interim Class Counsel as Class Counsel.

The preliminary motion is profoundly misleading about the nature and value of the Settlement. Pervasively throughout the motion, the parties extoll the Settlement as providing complete, 100% relief, plus interest. The first paragraph of the introduction states that "The monetary relief from the settlement will likely represent a full recovery for every class member-plus interest." *Id*. at 1.

There is very little discussion about the differences between Subclasses A and B. There is not a single mention of the fact that Subclass A is set to receive 92.7% of the Net Settlement Fund, while Subclass B class members are set to receive 7.3%, or any explanation of how Class Counsel arrived at the distribution, or why. Indeed, the parties double down on the "full recovery plus interest" statement by boldly claiming that "Members of *both* subclasses are expected to receive a *full refund plus interest*." *Id*. at 13-14 (emphasis added). This is quite a reckless claim given that Subclass B is set to receive less than 2% of their refunds due, and no interest.

The motion states, "The Settlement divides affected Amazon customers into two groups: Settlement Subclass A and Settlement Subclass B. Settlement Subclass A contains customers who experienced failed refunds or retrocharges due to computer and payment processing errors

and those where Amazon's records reflect that the return did not complete Amazon's review process, for example, because said return was potentially lost in transit. Settlement Subclass B contains all other customers who experienced failed refunds or retrocharges. These transactions include the mishandling and missorting situations where Amazon made errors in grading that resulted in a customer receiving less than they would have otherwise received *but the records available to Amazon do not establish that it is more likely than not Amazon incorrectly processed the return*." *Id*. at 12 (emphasis added).

This raises myriad questions. As discussed above, Amazon's records purportedly "show the reason for the refund denial or retrocharge" for Subclass B transactions. Holton Decl. ¶ 65. Further, Subclass B includes three "Subcategories," including "Ineligible Refunds," "Partial refunds – amount not refunded," and "Retrocharges." While it may make some sense that Amazon's records "do not establish that it is more likely than not Amazon incorrectly processed the return" for transactions labeled "Ineligible Refunds," there is, so far, no dispute that Ms. Weiler's Return Fee claim is valid, and Amazon has zero reason to not refund her. Class Counsel's claim that for Subclass B "Amazon's records alone do not establish an unpaid refund" only underscores that they never evaluated the merits of class members that were wrongly charged Return Fees, like Plaintiff Weiler. Ex. 17 (Preliminary Approval Motion); Dkt. 171 at 12. Class members that were wrongly charged Return Fees can certainly be identified as a matter of fact through Amazon's records alone, as Amazon knows (1) when the product was sold, (2) when the product was returned, (3) whether the product was damaged or returned late, and (4) the identity of the customer.

**2. <u>Class Counsel Identify No Subclass A or B Representatives</u>**

Class Counsel make no attempt to identify which Plaintiff - *if any* – seeks to represent Subclass A or B. Neither the "Typicality" or "Adequacy" sections of the motion mention the existence of two subclasses. Indeed, after repeated questioning of Amazon's counsel by Weiler's counsel, Amazon has either refused or been unable to identify a single putative class representative that is a member of Subclass B. Instead, Amazon simply states that Plaintiff

Abbott received only a "partial" refund, purportedly like Plaintiff Weiler. But "partial" refunds are also part of the twelve subcategories of Subclass A. And, all other facts suggest that Plaintiff Abbott is part of Subclass A. Like every other named Plaintiff, Abbott returned merchandise, received an "instant" credit, was then re-charged for the same item, and was only provided a refund after calling to complain. None of the Plaintiffs allege that they were charged a Return Fee, like Plaintiff Weiler.

In Plaintiffs' Opposition to Weiler's Motion to Intervene and to Deny Motion for Preliminary Approval, Plaintiffs stated that "Nine of the 10 Class Representatives alleged Subclass B transactions in the operative Complaint." Dkt. 187; Ex. 21 at 1. At the preliminary approval hearing, Class Counsel stated, "We have six of those class representatives that hold both A and B claims, and we have four that hold B claims alone." Ex. 22 (Preliminary Approval Hearing transcript) at 11:17-18. Again, Class Counsel did not identify which Plaintiffs, by name, represented Subclass A or B, or the transactions that qualified them as Subclass A or B members. *See id*. at 28:1-7 ("Today, we have been told that six hold both A and B claims while four hold B only. But that doesn't get us to the question of who are these people. So when the Court is writing its order on class certifications, it cannot appoint a class representative as adequate and typical without knowing who that person is and what exact transaction qualifies them to be in that class.").

**3. <u>The Preliminary Approval Hearing and Defective Preliminary Approval Order</u>**

The Court held a preliminary approval hearing on August 17, 2026.

The Court asked "how was the split derived here," referencing the 92.7/7.3 percent split of the Common Fund between Subclass A and B. Ex. 22 at 11:3-4. The Court also asked whether there was "any sort of structural conflict" with Class Counsel purportedly "pressing for both subclasses and to achieve what you have represented here as a full refund, plus interest, both classes?" *Id*. at 11:12-15. "[I]s there any sort of conflict that exists there in your ability to zealously advocate on behalf of both groups?" *Id*. at 11:24-12:1.

As to the split, Class Counsel responded that "[t]he subclasses were separately negotiated … with an understanding of what the claims possessed and their potential litigation risk for each, and we pressed to get as much for each class as we could individually get." *Id*. at 6-9. As to conflict, Class Counsel stated that "there isn't a conflict between that, and we made sure that there were structural assurances to prevent just that, and that includes separately negotiated the amount that would be paid to each and doing that adversarially." *Id*. at 12:2-5.

But the results speak louder than words. The fact remains that the Settlement creates only *one* Common Fund of $309.5 million. That *one* fund is then split on a percentage basis, with 92.7 percent to Subclass A, and 7.3 percent to Subclass B. Every fraction of a percent that is attributable to Subclass A takes away from, and is in direct conflict with, the interests of Subclass B. It is no possible for one counsel to negotiate one common fund, and then to seek as "much for each [sub]class" by dividing the whole into fractions, as necessarily counsel will need to abrogate the interests of one or the other class to reach a percentage split. A real "structural assurance" meant to avoid conflict would have had necessitated two independent counsel, representing the interests of each subclass, negotiating independently to arrive at two separate funds that would compensate each subclass. The "structure" used by Class Counsel guaranteed and necessarily infused conflict.

The Court also asked about class size and claims rates. Class Counsel indicated that there are *50 million* people within Subclass B, but only *500,000* class members likely have valid claims. Ex. 22 at 17:6-16. Class Counsel expected a claims rate of between 1.5 to 10 percent. *Id*. at 18:3-8. The Court asked, "is that what's baked into the assumptions for you to get to a place, again, where you can represent full refund to the class members?" *Id*. at 18:9-11. Class Counsel answered in the affirmative, stating, "Yes, Judge. … [A]ny redemption rate in that range gets its full refunds, plus interest, to those people in B." *Id*. at 12-17. As discussed above, however, the putative damages for Subclass B is at least $856.8 million. With only $15.22 million (after fees and costs) set aside for Subclass B, the claims rate for purported *valid claims* can be no larger than 1.78 percent for valid claimants to get full refunds, and even smaller if they were to receive

interest. And, of course, over 98 percent of Subclass B class members with valid claims would receive *nothing* in this scenario.

Further, given that the release covers 50 million Subclass B class members, the per class member recovery for Subclass B is $0.30: **thirty cents**. For Subclass A, on the other hand, *every* class member gets treble damages without even having to file a claim. With a population of 8.7 million for Subclass A, the per class member recovery (after fees and costs) is **$22.94**, which is provided automatically without claims submission. *See id*. at 17:4-5 (8.7 million people getting notice for Subclass A).

At the preliminary approval hearing, Class Counsel also admitted that even they "don't know" who is a Subclass B class member. *Id*. at 21:8-12. This is a problem of their own making, given that they failed to define Subclass B. It is a startling admission, one fatal to adequacy, class certification, and final approval. Class Counsel stated that "50 million people in Subclass B are getting notice," but that he anticipated that only 500,000 having valid claims. *Id*. at 17:5-16. Without Subclass B undefined, this means that Class Counsel anticipates that 50 million people will release claims, but only 500,000 are even eligible to submit claims, and of those, only 1.5 to 10 percent are anticipated to submit claims, for a total of 7,500 to 50,000 putative claimants for Subclass B out of a population of 50 million. **That is an effective valid claims rate of 0.015 to 0.1 percent**.

Counsel for Weiler also urged the Court that it could not grant preliminary or final approval without granting certification of each subclass, appointing a representative for each subclass, and class counsel for the subclasses. *Id*. at 26:23-29:11. To do so, each subclass must be defined, and each representative must be named. Likewise, the notice must provide the class definition. *Id*. Weiler's counsel also argued that there were inherent conflicts between Subclass A and B, making Class Counsel and the negotiating process inadequate. *Id*. at 29:12-30:15. Counsel also argued that Subclass B was effectively an improper fail-safe class, given that to be a class member you had to *prove* your claim by a preponderance of the evidence and not through identification of ascertainable criteria in the class definition. *Id*. at 30:16-31:18.

The Court issued its Order on Plaintiffs' Motion for Preliminary Approval on August 18, 2026. Dkt. 193;Ex. 23. The Court did not engage substantively with any of Plaintiff Weiler's arguments in opposing preliminary approval, or those made at the preliminary approval hearing. Critically, the Court did not certify Subclass A or B. The Court did not name a single class representative for Subclasses A or B, as they are not mentioned in the Preliminary Approval Order. And, the Court did not appoint class counsel for Subclass A or B. The notices and claim forms approved by the Court were defective for the reasons stated herein. Each error is independently sufficient to require the Court to deny final approval.

### H. The Claim Form Does Not Permit Recovery For Claims In *Weiler*

At the preliminary approval hearing, Court asked about the claims process, and what would be needed to "prove up" a claim for Subclass B. Class Counsel responded that for Subclass B, "any time anybody has had any return that has not been paid in full, gets prefilled on the electronic form to show them you had this return, this is how much it was, this is the number, this is the reject reason. Tell us why we got it wrong. Okay? It depends on the reason for the problem, for what somebody would have to do to correct it[.]" Ex. 22 at 15:13-18. Class Counsel also indicated that the claims process would be very simple and easy, stating "[W]e have done everything we can possibly think of to try to make that easy. We're going to send them an e-mail that says 'Click this button to file a claim.' It's going to prefill all the information they need to file a claim, so all they'll need to do is supply the one bit of information that we don't have, which is why is this wrong, click 'Submit,' their claim is in." *Id*. at 17:21-18:2.

As discussed above, both Amazon and Class Counsel have been adamant that Weiler's claims are covered by the Settlement. *See, e.g*., Ex. 21, Dkt. 187, at 3 ("Amazon and Plaintiffs' counsel told Weiler her claims are covered by the Settlement"); *id*. at 5 (stating Weiler's claims arise from the identical factual predicate, that "Amazon has confirmed her claims are covered," and that the "release reaches her claims"). Class Counsel also represented to the Court that the claim form "provides for disclosure of *each* transaction at issue, and Amazon's justification for its actions, by prepopulating the claim form with Amazon's data." *Id*. at 9 (emphasis added).

"And it provides the ability to disprove that justification by showing, more likely than not, that Amazon's non-refund, partial refund or retrocharge was incorrect." It appears that almost every one of these statements is false or misleading.

Plaintiff Weiler received the class notice on October 1, 2026. Ex. 20. The notice states that Settlement Subclass B members must fill out and submit an eligible Claim Form to qualify for a payment, providing a link to the claim form. *Id*. Clicking on the link for the link to submit the claim takes Ms. Weiler to a prepopulated Claim Form. *See* Exs. 24, 25. Section I prepopulates her first and last name and phone number, asking her to fill in her address and email address, both of which Amazon already has. *See id*. Section II lists the "Returns You May Contest," depicting the following screen:

## II. DETAILS ABOUT YOUR AMAZON RETURNS

### Returns You May Contest

The chart below includes details about your Amazon returns based on Amazon's records. This information cannot be edited. If you disagree with a rejected return shown below, check the "Claim" box and provide the required information displayed in the chart.

To receive a payment, you will need to provide, for each transaction, information allowing the Settlement Administrator to determine that it is more likely than not that Amazon incorrectly denied your refund, incorrectly issued only a partial refund, or incorrectly charged you.

Download CSV

| CLAIM | ORDER # | ITEM NAME | DATE REFUND REQUESTED | REFUND AMOUNT REQUESTED | REFUND REJECT REASON |
|---|---|---|---|---|---|
| ☐ | 113-0631813-3466636 | Dial Antibacterial Defense Liquid Hand Soap + Aloe, Spring Water Scent, 11 Fl Oz (Pack of 4), Dermatologist-Tested Hand Wash, Gentle Formula | 01/16/2025 | $10.27 | Retrocharge — missing item in a multi-quantity return |
| ☐ | 113-8567450-1481064 | HP Papers \| 8.5 x 11 Paper \| All In One 22 lb \| 1 Mega Ream - 750 Sheets \| 96 Bright \| Made in USA - FSC Certified \| 207750R | 08/08/2025 | $10.51 | Retrocharge — missing item in a multi-quantity return |
| ☐ | 114-9577593-6161829 | Ring Video Doorbell - 1080p HD video, improved motion detection, easy installation (2020 release) – Satin Nickel | 01/05/2023 | $109.49 | Not in order history |
| ☐ | 114-6063377-5623417 | Echo Show 5 (2nd Gen) Adjustable Stand \| Glacier White | 03/13/2023 | $15.32 | Not in order history |
| ☐ | 114-0349827-8025831 | BLACK+DECKER Portable Air Conditioner, 9,000 BTU, BPACT08WT, White | 08/01/2020 | $56.00 | Partial refund — restocking, damage, or late fee |

Section II specifies five transactions that Erin Weiler can purportedly seek compensation for as part of Subclass B, with the transactions dating from August 1, 2020 through January 16, 2025. The claim form says that "this information cannot be edited." Ms. Weiler, like other class

members, is then given an opportunity to contest each of these transactions by checked a box in the left column, and submit additional evidence, as applicable. *See* Ex. 25 (depiction of claim form upon checking the boxes in the left column).

Critically, the claim form does not provide class members the ability to add any transactions that are not already on the form, or otherwise edit the amounts of the refunds sought for the transactions specified**. The claim form does not list, identify, or otherwise allow Ms. Weiler to add any of the transactions at issue in *Weiler*, which all date December 27-29, 2025.** *See* Ex. 1 ¶¶ 10-20. There is no indication anywhere on the claim form, or in the notice, that if a class member believes that some covered transactions are not listed on the claim form that they have the ability to supplement the list of disputed transactions. Indeed, it would not be possible for Subclass B class members to supplement the claim form with added transactions in the first place as they were never told what type of transactions are at issue in Subclass B, and Subclass B is not defined.

Given that Class Counsel and Amazon knew about Weiler's objection and Complaint prior to sending out the class notice and prepopulating her claim form, it cannot possibly be an "error" that Ms. Weiler's claims that are at issue in *Weiler* are not within the Class Data and accordingly not listed on her claim form. And if it is an error, there is no way to know how many *other* class members it affects without doing actual discovery into Return Fees at issue in *Weiler*, which the parties never conducted. Thus, Class Counsel and Amazon seek a release of Weiler's claims without giving her the ability to file a claim concerning the Restocking Fees at issue in her Complaint. The absence of the *Weiler* transactions on the claim form demonstrates that the estimated $856.8 million valuation for Subclass B claims discussed above does not include any class member claims like Ms. Weiler's. For the same reason, the number of class members within Subclass B is likely significantly higher than the 50 million estimated by Class Counsel.

The claim form also demonstrates that its primary function is to choke the number claims, and not to seek out "valid" claims. For instance, checking the boxes each of Weiler's transactions asks Weiler for "proof of tender" to prove up her claim, consisting of "Carrier

tracking confirmation, drop-off receipt, Amazon drop-off confirmation email, or return-label scan showing the item was handed to a carrier or drop-off location." It also asks her to check a box stating under penalty of perjury that the claims is valid. The following screens are illustrative:

| CLAIM | ORDER # | ITEM NAME | DATE REFUND REQUESTED | REFUND AMOUNT REQUESTED | REFUND REJECT REASON |
|---|---|---|---|---|---|
| ☑ | 113-0631813-3466636 | Dial Antibacterial Defense Liquid Hand Soap + Aloe, Spring Water Scent, 11 Fl Oz (Pack of 4), Dermatologist-Tested Hand Wash, Gentle Formula | 01/16/2025 | $10.27 | Retrocharge — missing item in a multi-quantity return |

**Supporting this claim**

Documentation

Proof of tender.

Carrier tracking confirmation, drop-off receipt, Amazon drop-off confirmation email, or return-label scan showing the item was handed to a carrier or drop-off location.

Upload document

**and**

Attestation

Check each statement below that you attest to, under penalty of perjury:

☐ I returned all of the items for which I requested a refund in this order.

**and**

☐ I did not receive the refund.

**or**

☐ The refund I received was less than I was owed.

**or**

☐ I received a refund and was later charged again for the item(s).



| | | | | | |
|---|---|---|---|---|---|
| ☑ | 114-0349827-8025831 | BLACK+DECKER Portable Air Conditioner, 9,000 BTU, BPACT08WT, White | 08/01/2020 | $56.00 | Partial refund — restocking, damage, or late fee |

**Supporting this claim**

Documentation

Proof of tender.

Carrier tracking confirmation, drop-off receipt, Amazon drop-off confirmation email, or return-label scan showing the item was handed to a carrier or drop-off location.

Upload document

**and**

Attestation

Check each statement below that you attest to, under penalty of perjury:

☐ I returned the item(s) within the time allowed for the return, and in the same condition I received them.

As discussed in the Weiler Complaint, Amazon sends confirmation of returns emails *automatically* whenever someone drops off an item at any of Amazon's thousands of returns locations. *See* Ex. 1 ¶ 16. Providing that confirmation email, *which Amazon already has*, does nothing to prove or disprove a disputed transaction. Neither does checking a box that the customer "returned all of the items" or "returned the item(s) within the time allowed for the return, and in the same condition I received them." Amazon already knows when the item was returned, and what condition it was returned in. If a confirmation email and checking a box confirming the return are sufficient, then virtually every Subclass B transactions should automatically be approved as refundable, making the entire claims process unnecessary.

## V. THE *IN RE: AMAZON RETURN* SETTLEMENT SHOULD NOT BE APPROVED

### A. The Release Violates The Identical Factual Predicate Rule

"A settlement agreement may preclude a party from bringing a related claim in the future 'even though the claim was not presented and might not have been presentable in the class action,' but only where the released claim is 'based on the identical factual predicate as that underlying the claims in the settled class action.'" *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th

Cir. 2010) (quoting *Williams v. Boeing Co*., 517 F.3d 1120, 1133 (9th Cir. 2008)). "Thus, [the Ninth Circuit] [has] held that federal district courts properly released claims not alleged in the underlying complaint where those claims depended on the same set of facts as the claims that gave rise to the settlement." *Id*. However, "superficial similarity between … two class actions is insufficient to justify the release of the later claims by the settlement of the former." *Id*., 598 F.3d at 591. "Therefore, although the parties may have drafted the settlement agreement to include as broad a release as possible," a class release is "*enforceable* only as to subsequent claims depending upon the same set of facts." *In re Western States Wholesale Natural Gas Antitrust Lit*., 725 Fed. Appx. 560, 563 (9th Cir. 2018) ("*In re Western States*") (cleaned up, emphasis in original).

Further, the Ninth Circuit has noted that it is "unlikely that a plaintiff class's claims would ever be based on the identical factual predicate as the claims of a third party who did not adequately represent the class's interests." *Hesse*, 598 F.3d at 592. Accordingly, "courts also consider whether the named plaintiff in the prior action was an adequate representative for the claims asserted by the plaintiff in the subsequent action" when analyzing a release.

Whether a new matter shares an identical factual predicate with an action that has been settled is a "purely legal question," and does not require looking beyond the complaints in both actions to reach a determination. *In re Western States*, 725 Fed. Appx. at 564. However, whether parties conducted discovery into the facts concerning the subsequent action may be probative of whether the cases shared an identical factual predicate, and whether former counsel and plaintiffs adequately represented the interests of future claimants. *See, e.g., Johnson v. Winco Foods, LLC*, 2019 WL 6139161, at *8 (C.D. Cal. Sep. 18, 2019) (finding no identical factual predicate in part because the parties in the first action conducted no discovery concerning claims in subsequent action); *In re TikTok, Inc., Consumer Privacy Lit*., 713 F. Supp. 3d 470, 501 (N.D. Ill. Jan. 25, 2024) ("The in-app browser claims closely resemble the claims in the original MDL on their face, but they are not identical in either their underlying harms or their required elements of proof. Further, while the Original Plaintiffs' conduct does not raise any clear structural

adequacy-of-representation or notice concerns, the scope of their prior investigation into the App is murky at best. It is not clear that the Original Plaintiffs could reasonably have discovered the in-app browser's security risks and used them to assert additional claims on absent class members' behalf.").

The Ninth Circuit has taken a strict approach to the "identical factual predicate" rule. In *In re Western States Wholesale Natural Gas Antitrust Lit.*, the Ninth Circuit summarized that in the settled case, and the later-filed case, "both actions allege that Defendants inflated the price of natural gas by manipulative trading practices" and noted that "those elements of the factual predicates of each claim are identical." *In re Western States*, 725 Fed. Appx. at 563. Nonetheless, the Ninth Circuit reversed the district court's grant of summary judgment based on the release in the class settlement because the later-filed case depended on "proof of different facts to establish a different injury." *Id*. The Ninth Circuit even noted that the initial class settlement may serve as an offset to damages in the later-filed case, but that is a "separate inquiry" from whether the cases share an identical factual inquiry. *Id*., at 564 n. 5.

*Hesse*, the Ninth Circuit's seminal decision on the "identical factual predicate" rule is instructive. There, the district court granted summary judgment in a class action concerning Sprint's practice of passing on certain Washington state regulatory taxes and fees onto its customers because Sprint had earlier settled a class action with a broad release concerning Sprint's similar practice of passing on federal taxes and fees onto its customers. *Hesse*, 598 F.3d at 584-86. The Ninth Circuit reversed, holding both that the class representatives in the initial action were inadequate, and that in addition to due process concerns stemming from the class representatives' adequacy, the initial case did not satisfy the identical factual predicate rule. *Id*. at 588-592. The Ninth Circuit summarized:

> The claims underlying the *Benney* Settlement dealt exclusively with specific nationwide surcharges to recoup the costs of compliance with federal programs, whereas the claims at issue in the present case involve Sprint's statewide surcharge to recoup the cost of the Washington B & O Tax allegedly in violation of a Washington statute. The superficial similarity between the two class actions is insufficient to justify the release of the later claims by the settlement of the former. Both involve claims that Sprint improperly billed government taxes or

> fees to its customers, but they deal with different surcharges, imposed to recoup different costs, that were alleged to be improper for different reasons.

*Hess*, 598 F.3d at 591. The Ninth Circuit noted that while the practices in both cases were similar, they ultimately did not derive from the same "transaction or occurrence," and therefore the earlier settlement could not have released claims in the subsequent action. *Id*. at 592.

There are myriad decisions within the Ninth Circuit curbing the ability of settling class action parties to effectuate releases that go beyond the strict facts and theories of the underlying complaints. *See, e.g., Stonehocker v. Kindred Healthcare Operating, LLC*, 2019 WL 4542466, at 8 (N.D. Cal. Sep. 19, 2019) (identical factual predicate rule not satisfied where initial complaint concerned defendant's compensation of clinicians working in the home healthcare setting, whereas the second action concerned defendant's compensation of clinicians working in skilled nursing facilities); *Nagle v. Penske Logistics, LLC*, 2012 WL 12996852, at *2 (S.D. Cal. Oct. 30, 2012) (identical factual predicate not satisfied where initial complaint concerned a defendant's vacation pay policy, while second complaint concerned the defendant's overtime, meal break, and rest break claims); *Artega v. United Parcel Serv., Inc*., 2023 WL 2628711, at *4 (C.D. Cal. Jan. 17, 2023) ("Although Plaintiff suffered the same *type* of injury as those alleged in *Navarro*, *i.e*., lost wages, Plaintiff ultimately suffered a different injury, *i.e*., lost wages due to uncompensated hours worked rather than lost wages due to unpaid time spent going through security) (emphasis in original).

Here, as discussed in more detail below, the *In re Amazon Return Policy Litigation* fails the identical factual predicate test in part because neither counsel nor plaintiffs there were adequate or typical of the claims, class members, or facts at issue in *Weiler*. The Settlement also fails the identical factual predicate test because the two actions share different facts, require different proof, have different damages, and stem from a breach of different contractual terms. Finally, the Settlement fails the identical factual predicate because it does not allow Ms. Weiler to submit a claim for the transactions at issue in *Weiler*.

To start, the operative complaint in *In re Amazon Return Policy Lit*. does not mention the Return Fee policy outside of a stray reference in the introduction. The Return Fee policy is not contained anywhere in the body of the complaint. "Restocking Fees," the type of fee specifically charged to Weiler, are not mentioned anywhere in the operative Complaint. Rather, each Plaintiff in *In re Amazon Return Policy Lit*. follows the same fact scenario – they returned an item purchased from Amazon, received an "instant" refund, and were subsequently re-charged or "retrocharged" for the same transaction. Thus, the only policy challenged was Amazon's promise of "free returns," and not any Return Fee practices.

Weiler did not receive an "instant" refund. Nor was she "retrocharged." Nor were any of the class members she seeks to represent. Indeed, Weiler received a full refund, which was never clawed back. Instead, Amazon provided Weiler a full refund after her return was processed at its warehouse, and then charged her a Restocking Fee.

The parties in *In re Amazon Return Policy Lit*. clearly did not conduct any litigation concerning Amazon's Return Fee practices. Despite serving over two hundred requests for production, Plaintiffs did not serve a *single* document request seeking information or data concerning Return Fees.

Neither the Settlement itself, the notices that accompany the Settlement, nor the Release within the Settlement, make a single mention of Return Fees either. The Release covers any claims "arising out of, or related to any and all allegations in any complaint, including the First Amended Consolidated Complaint (ECF No. 116) in this action, including Defendant's actions, practices, or policies related to returns, refunds, and/or retrocharges." Settlement § 1.10. But Weiler's claim does not arise and is not related to any allegations within any of the complaints in *In re Amazon Return Policy Lit*., nor does it relate specifically to Amazon's policies related to returns, refunds, and/or retrocharges. She cannot even file a claim for the transactions at issue in her lawsuit.

The elements of Weiler's claims, and the damages she seeks, are also different. To prove her claims, Weiler must prove that Amazon breached its Return Fee policy, and damages are

determined by the amount of Return Fees. The Plaintiffs in *In re Amazon Return Policy Lit*. did not have to prove any of these facts to prevail, nor did they seek recovery of Return Fees as damages. To the extent that the parties in *In re Amazon Return Policy Lit*., believe that the Settlement bars Weiler's claims, or the claims of class members she seeks to represent, the Settlement fails the identical factual predicate test under *Hess* and its progeny.

### B. Under *Briseño*, Consideration For The Release Is Illusory

In *Briseño v. Henderson*, 998 F.3d 1014, 1019 (9th Cir. 2021), the Ninth Circuit reversed settlement approval for many reasons that apply to the settlement here, including fees that eclipsed the relief made available to class members and an "an injunction touted by an expert as worth tens of millions of dollars [that] appear[ed] worthless." But one point made in *Briseño* stands out as particularly relevant: the court held that settlement consideration is illusory—and approval is an abuse of discretion—when the relief "does not obligate [the bound party] to do anything it was not already doing voluntarily for its own business reasons," and "not because of any court - or settlement-imposed obligation." *Id.* at 1028 (cleaned up); *see also Koby v. ARS Nat'l. Servs., Inc.*, 846 F.3d 1071, 1080 (9th Cir. 2017) (reversing settlement where the relief "did not obligate [defendant] to do anything it was not already doing"). Amazon already publicly committed to returning $1.1 billion dollars in refunds before the settlement, so there is no legal basis to say that the "excess in $1 billion" in settlement benefits is valid consideration.

Further, as to Weiler specifically and the class members she seeks to represent, the Settlement provides *zero* consideration. Despite requiring her to release her claims, the Settlement does not allow Weiler to submit a claim for the transactions at issue in *Weiler*.

### C. The Subclasses Were Not Certified, And No Class Representatives Or Class Counsel Were Appointed

"A class definition should be precise, objective and presently ascertainable." *Wolph v. Acer Am. Corp*., 272 F.R.D. 477, 482 (N.D. Cal. 2011) (quotation omitted). "[T]he class definition must be sufficiently definite so that the members of the class can be ascertained by reference to objective criteria." *Daniel F. v. Blue Shield of Ca*., 305 F.R.D. 115, 122 (N.D. Cal. 2014).

"In the settlement context, a court must pay undiluted, even heightened, attention to class certification requirements." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods Liab. Lit*., 895 F.3d 597, 606 (9th Cir. 2018) (quotations omitted). Where, as here, a settlement is negotiated before class certification, "it must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *Roes, 1–2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048-49 (9th Cir. 2019). "This more exacting review is warranted to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Id.* at 1049.

Whether viewed as an issue of adequacy, due process, the identical factual predicate rule, or satisfying the requirements of Rule 23, it is axiomatic that any class or subclass shall have an adequate class representative and adequate class counsel. "Without adequate representation, a court order approving a claim-preclusive class action settlement cannot satisfy due process as to all members of the class." *Hess*, 598 F.3d at 588. "Class representation is inadequate if the named plaintiff fails to prosecute the action vigorously on behalf of the entire class or has an insurmountable conflict of interest with other class members." *Id*. at 589.

Here, the Court never certified Subclass A or B. It only certified a universal class consisting of everyone that has Subclass A and B claims. In turn, it did not appoint a class representative for either Subclass A or B, and did not appoint class counsel for these classes, as they were never certified. Ex. 23. There is no question whether there are conflicting interests between Subclass A and B such that certification of subclasses in the first place is appropriate. The *Settlement* itself identifies two subclasses, each with wildly different forms of relief and valuations, and each with antagonistic interests through being forced to split a single common fund. Because the Settlement requires two subclasses, it is error to approve the Settlement without certification of each subclass. *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S., 591,

627 (1997) ("[W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups."); *In re Literary Works in Electronic Databases Copyright Lit*., 654 F.3d 242, 252 (2d Cir. 2011) ("Without subclasses, named plaintiffs with only Category C claims were obligated to advance the collective interests of the class, rather than those of the subset of class members whose claims mirrored their own. Only the creation of subclasses, and the advocacy of an attorney representing each subclass, can ensure that the interests of that particular subgroup are in fact adequately represented."); *In re Clearview AI, Inc. Consumer Privacy Lit*., 181 F.4th 785, 800 (7th Cir. 2026) ("Appointment of separately counseled class representatives for identifiable, significantly different groups of claimants with fundamentally conflicting interests is Rule 23's primary mechanism for such protection. Only then can the district court properly fulfill its role in scrutinizing the settlement."); *In re Gen. Motors Corp. Pick-Up Fuel Tank Prods. Liab. Lit*., 55 F.3d 768, 795 (3d Cir. 1995) ("[T]he inquiry into the settlement's fairness cannot conceptually replace the inquiry into the propriety of class certification … the process of negotiation does not reveal anything about commonality and typicality.").

Amazon and Class Counsel contend that Weiler is a member of Subclass B. See, e.g., Ex. 18 (email thread between Weiler and Amazon counsel), at 4 (Amazon's counsel Ms. Feit: "The transactions identified in the complaint for which Erin Weiler received a partial refund fall under Subclass B."). As discussed above, Subclass B is not defined in the Settlement, so it is not possible to tell what kind of transactions are within Subclass B. And, neither the Settlement nor the Motion for Preliminary Approval identify which, if any, putative class representative is a member of Subclass B or seeks to represent Subclass B. Weiler's counsel asked Amazon's counsel repeatedly, both over email and over video conference calls, to identify which of the plaintiffs in *In re Amazon Return Policy Lit*. represents Subclass B. *Id*., at 5 (Weiler's counsel: "If Abbott is not Subclass B, let us know which of the other plaintiffs is"); *id*. at 6 ("You also

have not identified which of the putative class representatives actually represents her interests. There's apparently three types of transactions in subclass b, but it's not clear if any of the class reps are members of class b, or any of its subcategories."). Amazon's counsel refused to provide an answer to this most basic question. Class Counsel and Amazon also refused to provide a basic response to this question in their briefing on Weiler's motion to deny preliminary approval and at the preliminary approval hearing.

Without any appointed class representative for Subclass B, the Settlement cannot possibly satisfy the identical factual predicate rule, due process, adequacy, or Rule 23 as a matter of law. Accordingly, the Settlement cannot bar Weiler's claims or those of any members of Subclass B.

### D. There Are Material Conflicts Between Class Members

"Courts generally are wary of settlement agreements where some class members are treated differently than others." *True v. Am. Honda Motor Co*., 749 F. Supp. 2d 1052, 1067 (C.D. Cal. Feb. 26, 2010). Issues regarding disparate treatment of subgroups of class members affect a settlement's overall fairness, as well as adequacy and conflict for the class representatives and class counsel. *See id*.

"The initial inquiry in assessing adequacy of representation is whether the named plaintiffs and their counsel have any conflicts of interest with other class members." *Kim v. Allison*, 87 F.4th 994, 100 (9th Cir. 2023) (internal quotations omitted). "That general standard must be broken down for specific application; conflicts within classes come in many guises." *In re Volkswagen*, 895 F.3d at 607. "For example, two subgroups may have differing, even adversarial, interests in the allocation of limited settlement funds." *Id*. (citing *Amchem Prods., Inc.*, 521 U.S., at 626. "Class members with higher-value claims may have interests in protecting those claims from class members with much weaker ones, or from being compromised by a class representative with lesser injuries who may settle more valuable claims cheaply. *Id*. (internal citations omitted). "Aside from such evident structural conflicts, some proposed agreements are so unfair in their terms to one subset of class members that they cannot but be the product of

inadequate representation of that subset." *Id*. "Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (quoting 1 William B. Rubenstein et al., *Newberg on Class Actions* § 3:58 (5th ed. 2011)).

### 1. Material Conflicts Between Subclass A and Subclass B Members

The conflicts between Subclass A and Subclass B members are paramount here. Class Counsel bargained off Subclass B claims for *pennies* on the dollar, while Subclass A class members received *more than treble damages*. This Settlement checks off every conceivable conflict issue identified by the Ninth Circuit in *In re Volkswagen*.

The Settlement creates one limited pot, the $309.5 million Common Fund. Any money set aside for Subclass A is directly taken away from Subclass B. This is not a situation where all class members can submit claims, and all are paid pro rata if the fund is exhausted. Instead, the Common Fund has been explicitly split 92.7% in favor of Subclass A, leaving only 7.3% for Subclass B. There is not enough money in the Common Fund to provide full refunds to members of both Subclasses A and B. Indeed, the Common Fund is not even large enough to fully refund Subclass B alone.

As discussed in more detail above, given that Subclass A only had roughly $81 million worth of transactions, Subclass A is set to receive between 238.6% and 354% of their damages, depending on the amount of attorneys' fees and costs the Court awards to Class Counsel. Meanwhile, Subclass B's damages are estimated at $856.8 million, with only $15.22 - $22.59 million reserved for Subclass B from the Common Fund, depending on the amount of attorney's fees and costs the Court awards. Accordingly, the Settlement provides Subclass B with a recovery of between 1.77% to 2.6% of their putative damages. The discrepancy in recovery between the subclasses is "so unfair" that the Settlement "cannot but be the product of inadequate representation of [Subclass B]." *In re Volkswagen*, 895 F.3d at 607. The parties' representation to the Court that all class members, including members of *both* subclasses, are set to receive *full refunds plus interest* is unsupported and incorrect.

This appears to be a clear situation where "[c]lass members with higher-value claims may have interests in protecting those claims from class members with much weaker ones." *Id*. *See also Hesse*, 598 F.3d at 589 ("In this case, the *Benney* Class Plaintiff's interest in settling his federal Regulatory Fee claims, even at the cost of a broad release of other claims he did not possess, was in conflict with the Washington Plaintiffs' unrepresented interest in prosecuting their B & O Tax Surcharge claims."). As discussed above, Amazon has effectively admitted liability for all Subclass A claims. It started processing refunds outside the Settlement and had agreed to refund over $600 million of Subclass A claims before the Settlement was even reached. For Subclass B, however, Amazon and Class Counsel claim that those class members may not be entitled to refunds *at all*. Indeed, one of the subcategories within Subclass B is titled "Ineligible Refunds." It is evident that neither Amazon nor Class Counsel placed any real value on Subclass B claims as a whole, selling them off for less than 2% of their worth. There was no discovery or litigation concerning Return Fees. *See, e.g., Hesse*, 598 F.3d at 589 ("It is evident that [Class Counsel] did not vigorously prosecute the claims relevant to this case."). Without a Subclass B representative, or a representative that was subject to Return Fees, there was no class representative incentivized to object to the 92.7/7.3% split, or object on the basis that certain categories of Subclass B transactions are worth just as much, if not more than, Subclass A transaction, like Ms. Weiler's. *See True*, 749 F. Supp. 2d at 1066-67 ("[T]he proposed settlement's award of a cash payment—'Option C'—to only a select sub-group of the class creates the most significant obstacle to approval of this settlement … Of note, both of the representative plaintiffs are members of the subclass.").

**2. <u>Material Conflicts Between Subclass B Subgroups</u>**

Even if one or several of the named class representatives are members of Subclass B, they still would not be adequate. As discussed above, Subclass B contains three subcategories: Ineligible Refunds, Partial refunds – amount not refunded, and Retrocharges. According to Amazon's counsel, Plaintiff Weiler falls into the "Partial refunds – amount not refunded" subcategory of Subclass B.

To the extent that Return Fees are in fact part of the "Partial refunds – amount not refunded" subcategory, that suggests that some claims within Subclass B (those relating to Return Fees) are extremely strong. Plaintiff Weiler has Amazon dead to rights on her Return Fees claims. The facts are not reasonably in dispute, the Return Fees clearly violate the Return Fees, and she is owed a full refund of the Return Fees charged. Not so for the members of the subcategory "Ineligible Refunds." For those class members, it appears that Amazon's position is that they are not eligible for refunds *at all*, forcing such class members to prove up their claims through the claims process and establish why they are entitled to a refund in the first place.

Given that the facts, claims, theories of relief, damages, and strengths and weaknesses of the claims of class members within the "Ineligible Refunds" category are vastly different from those that were charged Return Fees in the "Partial refunds" subcategory, each subcategory should have been represented by its own class representative, and have received different compensation under the Settlement. It is inherently unfair, and illustrates a gross conflict, for Subclass B claims that are worth effectively nothing to receive the same relief as claims that are so strong that Amazon has no defense. *See, e.g., Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999) ("The settlement decides that the claims of the immediately injured deserve no provisions more favorable than the more speculative claims of those projected to have future injuries, and that liability subject to indemnification is no different from liability with no indemnification. *The very decision to treat them all the same is itself an allocation decision* with results almost certainly different from the results that those with immediate injuries or claims of indemnified liability would have chosen.") (emphasis added).

### 3. <u>Material Conflicts Within The Unified Class Without Structural Assurances To Assuage Conflict</u>

The Court would have been in a better position to evaluate the reasonableness and fairness of the Settlement if Class Counsel had structured the Settlement, and the settlement negotiations, in a way that was meant to maximize the interests of both Subclass A and B and avoid conflicts. Instead, one set of counsel negotiated the claims of the unitary class that was certified, as well as each of the subclasses, despite obvious conflicts between the subclasses and

within the unitary class. Without necessary structural protections, the Court is not in a position to evaluate the reasonableness of the Settlement. Further, Class Counsel and the class representatives are not adequate under Rule 23(a)(4).

This Settlement is similar to the class settlement in *In re Literary Works*. There, the Settlement was divided into three categories: A, B, and C. *In re Literary Works*, 654 F.3d at 246. The Settlement created a damages formula for each category, with a total cap on compensation of $18 million, with Subclass A and B claims generally treated more favorably than Subclass C claims. *Id*. The Second Circuit noted that the ingredients for conflict identified in *Amchem* and *Ortiz* were present because the settlement "'confine[s] compensation and … limit[s] defendants' liability' by setting an $18 million recovery and cost ceiling, and distributes that recovery by making 'essential allocation decisions' among categories of claims." *Id*., 654 F.3d at 251 (quoting *Amchem*, 521 U.S. at 627). "Although named plaintiffs collectively hold all three categories of claim, 'each served generally as representative for the whole, not for a separate constituency.'" *Id*. "In addition, individual Category A and B claims are 'more valuable' than Category C claims, producing 'disparate interests' within the class." *Id*. (quoting *Ortiz*, 527 U.S. at 857).

"That named plaintiffs hold claims in all categories does not … eliminate the risk of fundamental conflict among subgroups." *Id*., 654. F3d at 253. Plaintiffs with more valuable A and B claims would have incentives to maximize those claims over their C claims. *Id*. Indeed, [e]ven if some named plaintiffs have only Category C claims, that is not enough to protect the Category C-only plaintiffs, because each named plaintiff represented the entire class." *Id*. "Without subclasses, named plaintiffs with only Category C claims were obligated to advance the collective interests of the class, rather than those of the subset of class members whose claims mirrored their own." *Id*. "**Only the creation of subclasses, and the advocacy of an attorney representing each subclass, can ensure that the interests of that particular subgroup are in fact adequately represented**." *Id*. (bolding added). The Second Circuit overturned settlement approval even though the settlement "was the product of an intense,

protracted, adversarial mediation, involving multiple parties and complex issues," and the "mediators were highly respected and capable, and their participation provided some assurance that the proceedings were free of collusion and undue pressure." *Id*. (internal quotations omitted). The Second Circuit also noted that it did not matter that Category C claims were indisputably worth less than Category A and B claims, as the "problem, of course, is that we have no basis for assessing whether the discount applied to Category C's recovery appropriately reflects that weakness … in the absence of independent representation." *Id*. at 253.

"The rationale is simple: how can the value of any subgroup of claims be properly assessed without independent counsel pressing its most compelling case?" *Id*. "It is for this reason that the participation of impartial mediators and institutional plaintiffs does not compensate for the absence of independent representation." *Id*. "Although the mediators safeguarded the negotiation process, and the institutional plaintiffs watched out for the interests of the class as a whole, no one advanced the strongest arguments in favor of Category C's recovery." *Id*. That is precisely what happened here. One set of counsel, and one set of plaintiffs representing a single, certified unitary class, represented the interests of Subclass A and B. As in *In re Literary Works*, the ultimate common fund required apportionment decisions, which directly put the interests of Subclass A and B against each other. The same counsel represented Subclass A and B in those negotiations. And, the same putative class representatives represented both subclasses, as all appointed class representatives sought to represent the unitary class as a whole.

*In re Literary Works* is no outlier. Virtually every federal circuit has held similarly in analogous circumstances. *See, e.g., Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 345 (1st Cir. 2022) ("In the class settlement context, conflicts sometimes arise because there is a common fund -- i.e., an aggregate proposed settlement amount covering all claims -- that must be allocated among class members. In these zero-sum circumstances, a benefit to one group of class members (in the form of a larger portion of the common fund) comes at the detriment of the other class members (who receive a smaller portion as a result). This presents a concern that the

class representatives or class counsel may 'have sold out some of the class members' by allocating some of their fair share to other class members.") (quoting 4 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 13:56 (6th ed., June 2022 update); *Central States Southeast and Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 246 (2d Cir. 2007) ("Because the antagonistic interests apparent in the class should be adequately and independently represented, we remand to the District Court for certification of a subclass encompassing the self-funded plans in order to better protect their claims in this litigation."); *In re Joint Eastern and Southern Dist. Asbestos Lit*., 982 F.2d 721, 739-740 (2d Cir. 1992) ("The Trial Courts maintained that the health claimants and the co-defendant manufacturers shared a common interest in maximizing the resources of the Trust and assuring an equitable distribution of its funds. That is so. That commonality of interest might well permit a single class to obtain relief *as to which adversity was not present*.") (emphasis added, internal citation omitted); *Georgine v. Amchem Prods. Inc*., 83 F.3d 610, 631 (3d Cir. 1996) ("Absent structural protections to assure that differently situated plaintiffs negotiate for their own unique interests, the fact that plaintiffs of different types were among the named plaintiffs does not rectify the conflict."); *In re Community Bank of N. Va*., 418 F.3d 277 (3d Cir. 2005) ("At the very least, consideration should have been given to the feasibility of dividing the class into sub-classes so that a court examining the proposed settlement could have judged the fairness of the settlement as it applied to similarly situated class members."); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods Liab. Lit*., 55 F.3d 768, 797 (3d Cir. 1995) ("To state that class members were united in the interest of maximizing over-all recovery begs the question."); *Broussard v. Meineke Discount Muffler Shops, Inc*., 155 F.3d 331, 338 (4th Cir. 1998) ("in making the class certification decision the district court might reasonably have been concerned that plaintiffs' residual, forward-looking interest, as current franchisees, in Meineke's continued viability would have tempered their zeal for damages and prejudiced the backward-looking interests of former franchisees."); *In re Clearview AI, Inc*., 181 F.4th at 799-800 ("Judge Andersen's affidavit did not say how the allocation was determined … [I]t is difficult to accept

any particular set of ratios as fair when those who would get the short end of the stick – members of only the Nationwide Class – were not represented separately in the negotiations and did not themselves agree to that short end … Assuming the class representatives and their attorneys negotiated the ratios among themselves, we are not saying that the result was unreasonable or unfair. Rather, the problem is that the settlement lacks adequate structural protections for us to tell either way. Appointment of separately counseled class representatives for identifiable, significantly different groups of claimants with fundamentally conflicting interests is Rule 23's primary mechanism for such protection. Only then can the district court properly fulfill its role in scrutinizing the settlement.”).

**E. Subclass B Is An Impermissible Failsafe Class**

“[A] class definition is impermissible where it is a ‘fail-safe’ class, a class that cannot be defined until the case is resolved on its merits.” *Sauter v. CVS Pharmacy, Inc.,* 2014 WL 1814076, at *4 (S.D. Ohio May 7, 2014) (quoting *Young v. Nationwide Mut. Ins. Co.,* 693 F.3d 532, 538 (6th Cir.2012)). A “failsafe” class is “when the class itself is defined in a way that precludes membership unless the liability of the defendant is established.” *Olney v. Job.com, Inc*., 2013 WL 5476813, at *11 (E.D. Cal. Sep. 30, 2013) (quoting *Kamar v. RadioShack Corp*., 375 F. App’x 734, 736 (9th Cir. 2010)). “Such a class ‘includes *only* those who are *entitled* to relief.” *Taylor v. Universal Auto Grp. I, Inc*., 2013 WL 6654270, at *21 (W.D. Wash. Nov. 24, 2014) (quoting *Sauter*, 2014 WL 1814076, at *4) (emphasis in original). It “is prohibited because it would allow putative class members to seek a remedy but not be bound by an adverse judgment—either those ‘class members win or, by virtue of losing, they are not in the class’ and are not bound.” *Id*. A “‘failsafe’ class is not only palpably unfair to the defendant for these reasons, but it is also unmanageable because it is unclear in such cases to whom class notice should be sent.” *Id*., 2013 WL 6654270, at *22. (internal quotations omitted). “The existence of a ‘failsafe’ class constitutes an independent ground for denying class certification.” *Id*. (cleaned up).

Several cases are illustrative of the concept. In *Taylor*, Judge Karen L. Strombom of the Western District of Washington found that the proposed class definition in a TCPA action was an impermissible "failsafe" because to be a class member the person must have received a call "without the recipient's prior consent," a disputed issue at the heart of liability in the case. *See id.*, 2013 WL 6654270, at *22. Accordingly, if a person could not prove that the call was without prior consent, they would not be part of the class, while those that prevailed on the consent issue would be. In *Brazil v. Dell Inc.*, 585 F. Supp. 2d 1158, 1167 (N.D. Cal. July 7, 2008), Judge Ronald M. Whyte found the proposed class definition an impermissible "failsafe" where it included customers that purchased a Dell computer that was "falsely advertised as discounted." Again, if customers proved that their particular Dell computer was "falsely advertised," the central liability question in dispute, they would be class members. Otherwise, they would not.

Here, the issue of class membership within Subclass B is tricky, as it has no definition. At the preliminary approval hearing, however, Class Counsel left no doubt that Subclass B is a "failsafe" class. Subclass B members get a prefilled claim form that lists transactions that *might* qualify for membership within Subclass B. Ex. 22 at 13:9-18:17; Ex. 21, Dkt. 187, at 9 ("The settlement provides for notice to every potential Subclass B member."). Every claims is automatically presumed to be rejected, with Amazon providing "the reject reason." *Id*. at 15:12-16. Then, if a person proves by a preponderance of the evidence that the reject reason is not correct – *i.e.*, that they are entitled to a refund or relief – only then are they considered part of the class. *See id*. at 15:16-16:20; Ex. 21, at 9 ("The claim and proof requirement are indispensable to preventing settlement funds from being misdirected to uninjured, **non-class members**.") (bolding added). Class Counsel went on to say that there are a *potential* 50 million Subclass B members, people who returned something to Amazon and did not get a full refund. *Id*. at 17:5-9. Of that, roughly 500,000 are *likely* to be Subclass B class members, assuming an error rate of 1.1 percent for these overall transactions. *Id*. at 17:12-16. And yet, Class Counsel was adamant that Subclass B will all receive a full refund plus interest, which, as they explained, is only possible if the only persons that are adjudged to be Subclass B class members are those that not only receive

notice and submit a claim, but are adjudicated by the Settlement Administrator under the preponderance of the evidence standard as having proven their claims. *See id*. at 18:3-17. If they fail to "prove" their claims, they will be considered "non-class members." Ex. 21, at 9. Here, Ms. Weiler's claim form does not even include the transactions at issue in *Weiler*, and, because she has no opportunity to "prove" those claims by a preponderance of the evidence, those claims are, according to Class Counsel, not part of the class.

None of the 50 million people receiving notice for Subclass B, or even the estimated 500,000 people with likely valid claims, are strictly entitled to *anything*. In a typical class action with a claims process, class members are entitled to specific relief if they affirmatively prove class *membership* – *i.e*., they prove their identity, prove that they were charged a fee within the scope of the class, or prove that they purchased a covered product. Here, the Settlement requires that Subclass B prove not only class membership, but also prove "more likely than not" that they are entitled to damages through evidentiary submissions. Ex. 21, Dkt. 187, at 8, 9. Subclass B must "*disprove* [Amazon's] justification [for failing to refund] by showing, more likely than not, that Amazon's non-refund, partial refund or retrocharge was incorrect." *Id*. at 9 (emphasis added). Amazon is effectively afforded a presumption that its determination is correct. Class members must then prove "more likely than not" that they are entitled to damages, the same standard used *at trial* in civil litigation. *In re Crain Walnut Shelling, LP*, 175 F.4th 1069, 1076 (9th Cir. 2026); *United States v. Montano*, 250 F.3d 709, 713 (9th Cir. 2001). Should Subclass B members fail to "prove" damages by a preponderance of the evidence, *they get nothing and are considered non-class mebers*, even if they otherwise establish a transaction within the scope of the class.

Further, because the standard to "prove" entitlement in the Settlement is the same as in civil litigation, Subclass B members are drastically worse off *because of* the Settlement. Outside the Settlement, Subclass B's claims are worth more than $856.8 million, can be prosecuted as a class action, can be appealed, can be prosecuted with the aid of merits experts and experienced class counsel, and can be won or lost under the same "more likely than not" standard. In the case

of a judgment in favor of Subclass B, class members would merely need to prove that they are *bona fide* class members to receive a share of any judgment. The Settlement, however, caps damages at $15.22 to $22.59 million, provides Amazon with a release, sets a quick claims deadline, removes the right to a trial or to appeal, forces claims to be "proven" individually without the aid of class counsel or merits experts (Settlement § 6.2.5), and forces class members to "prove" their claims *without discovery from Amazon*.[6] All claims are subject to a final determination by the Settlement Administrator "in its sole discretion." Settlement § 6.2.1. So, the Settlement keeps the standard of proof the same as in civil litigation, but drastically decreases putative damages and the ability of class members to prove or appeal their claims.

As in *Taylor* and *Brazil*, Subclass B is a blatant "failsafe" class. That is an "independent ground for denying class certification." *Taylor*, 2013 WL 6654270, at *22.

### F. The Claims Made Process Is Unnecessary For Subclass B

The Settlement provides that Subclass A class members will be paid automatically, while Subclass B class members will not only have to submit a claim, but effectively prove their entitlement to a refund through the claims process. This is yet more evidence of the disparate and unfair treatment of Subclass B class members due to the conflicts between Subclass A and B, and within Subclass B subcategories. Amazon knows every putative class member's address, and the dates, identities, and dollar amounts of all transactions within the Settlement. The Class Data produced as part of the settlement process contains the exact amount that each class member is due.

Class Counsel and Amazon argue that Amazon may not agree that a refund is due to some members within Subclass B at all, or that Amazon does not know why such class members are owed refunds. However, that means class members are entitled to *nothing* if they cannot "prove" they have a valid claim, despite their transactions being covered within the Class Data and the Release covering all claims they may have concerning refunds against Amazon. And, it means, as discussed above, that Subclass B is a failsafe class. While it may be true that Amazon

[6] The Settlement Administrator can seek further inquiry and investigation *from the Settlement Class Member*, but cannot seek discovery from Amazon. Settlement § 6.2.4.

believes it does not owe refunds for class members within the Ineligible Refunds subcategory, that is not the case for class members like Ms. Weiler that were charged Return Fees. Amazon knows the date Ms. Weiler and other class members returned an item, knows whether the item was returned on time or late, and knows whether it should have charged a Late Fee or Restocking Fee under its Return Fee policy.

The Federal Judicial Center's Judge's Class Action Notice and Claims Process Checklist and Plain Language Guide[7] asks whether a "claims process" is "actually necessary?" "In too many cases, the parties may negotiate a claims process which serves as a choke on the total amount paid to class members. When the defendant already holds information that would allow at least some claims to be paid automatically, those claims should be paid directly without requiring claim forms."[8] Here, as least for class members that were subject to improper Return Fees, there is no reason to require a claims process. Instead, such class members should receive payments automatically, like Subclass A class members.

### G. The Notice Is Defective

The District Court cannot approve the Settlement because the proposed Notice is defective. Rule 23(c)(2)(B)(i)-(iii) requires that the notice "must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; [and] (iii) the class claims, issues, or defenses."

Here, there is not a single mention of Return Fees in the Settlement agreement or the Notice documents themselves. The Long Form Notice describes that the action is about "certain of Amazon's return policies and practices," while the "What is this lawsuit about?" section states that "Plaintiffs allege that certain of Amazon's return policies and practices violate Washington consumer protection and other laws." Nothing about this language would alert class members that Return Fees might be at issue.

---

[7] https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf

[8] *Id*.

Further, neither the Settlement nor the Notice identifies who is a member of either Subclass A or B. The subclasses are undefined. Class members cannot self-identify, but instead, must rely on Amazon to decide who is in which class, based on information that it will not publicly disclose.

These are not minor issues. Without identification of *who* is in the subclasses, a judgement would have no binding effect as it would violate due process and Rule 23.

### H. The Attorneys' Fees Are Out Of Proportion To The True Amount Of Relief

One of the clearest signs of collusion is "when counsel receive a disproportionate distribution of the settlement." *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 947 (9th Cir. 2011). Here, while Class Counsel says that the Settlement is valued at over a *billion* dollars, it is worth a small fraction. *See* Ex. 17, Motion for Preliminary Approval, at 11. The more than $1 billion dollar valuation is based on over $600 million that Amazon agreed to refund class members (and has virtually *completed* refunding) *outside the Settlement process*. The Settlement itself says that Amazon has already repaid $570 million through this process "outside of the Settlement Fund," which started in 2025. Settlement § 4.2.1.

Amazon's agreement in the Settlement to not "claw back any amounts paid according to th[is] process" is worth nothing, as there is no indication it was ever going to claw this money back. Indeed, the reason for the refunds in the first place was Amazon effectively conceding that "retrocharges" – clawbacks – of these fees were unlawful. Amounts that Amazon has already paid outside the Settlement are not worth the *full value* of the amounts so paid, as Class Counsel argues. The Settlement's valuation of injunctive relief – again, a process Amazon started outside the Settlement process[9] – is far too speculative and is not a benefit to the settlement class, but rather to *future* customers. *Roes, 1-2*, 944 F.3d at 1055 ("Our caselaw, however, demands that, because of the danger that parties will overestimate the value of injunctive relief in order to inflate fees, courts must be particularly careful when ascribing value to injunctive relief for

[9] As discussed in the Introduction, Amazon stated to the press that it already fixed all issues and processes that lead to the incorrect refund retrochages in early 2025, outside the Settlement.

purposes of determining attorneys' fees, and avoid doing so altogether if the value of the injunctive relief is not easily measurable.").

That leaves only the $309.5 Common Fund. Given that Amazon had voluntarily already agreed to provide over $600 million in refunds to Subclass A class members, and appeared committed to pay out all Subclass A refunds, it is highly likely that Amazon was going to refund all of these claims anyways.[10] However, by packaging these refunds through a Common Fund, Class Counsel seeks $100 million in attorneys' fees, plus $1 million in costs and expenses, likely *decreasing* the amount Amazon would have paid out to the settlement class. The only "new" money that Amazon has really committed to is the $15.22-$22.59 million payments to Subclass B. But, as discussed above, the effect of the Settlement is to release more than $856.8 million in putative damages from Subclass B for almost nothing, for claims that have tremendous value (at least for the Return Fees component), but were never litigated by Class Counsel.

The requested $100 million in fees is also an outrageous amount given the posture of the case, and infuses the overall settlement with a specter of collusion. The case was at a very early stage, settling months after a ruling on Amazon's "partial" motion to dismiss. Amazon settled before producing a sample of representative class data ordered by the Court. The parties did not take a single deposition. Expert reports were not exchanged. Plaintiffs never moved for or obtained class certification. And, as discussed above, the parties conducted zero discovery concerning Return Fees, and thereby ascribed no value to such claims.

There is no justification to limit Subclass B relief to $15.22 - $22.59 million dollars for claims worth more than $856.8 million, while Class Counsel gets $100 million in fees.

### I. The Court Does Not Have Sufficient Information To Evaluate Valuation of Subclass B Because The Classes Were Not Adequately Represented

"The amount offered in settlement is generally considered to be the most important consideration of any class settlement." *Carlin v. DairyAmerica, Inc.*, 380 F. Supp. 3d 998, 1011

[10] Note that Amazon had set aside $1.1 billion to address these refund issues in early 2025, outside the Settlement, as discussed in the Introduction.

(E.D. Cal. 2019); *see also Bayat v. Bank of the West*, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015) ("[T]he critical component of any settlement is the amount of relief obtained by the class."). "To determine whether the amount offered in settlement is fair, district courts in the Ninth Circuit must compare the settlement amount to what the parties estimate would be the maximum recovery in a successful litigation." *Grady v. RCM Techs, Inc*., 671 F. Supp. 3d 1065, 1075 (C.D. Cal. May 2, 2023).

The issues described above show that plaintiffs here failed to sufficiently evaluate the claims they were settling, take necessary discovery, and be sufficiently informed of the strengths and weakness of the case at the time of resolution. *See, e,g., Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992) (evaluation of settlement fairness includes factors like "the extent of discovery completed, and the stage of the proceedings"); *Hesse*, 598 F.3d at 589 (finding that "[i]t is evident that the *Benney* Class Plaintiff did not vigorously prosecute the claims relevant to this case" where the types of surcharges at issue differed between the two cases).

The lack of necessary discovery is evident in the record, if the Court is told where to look for it. First, as discussed above, plaintiffs here took zero discovery concerning Return Fees. Second, they did not take sufficient discovery to be reasonably informed of the putative damages of the Subclass B claims at the time of Settlement. The "class period" here covers all Settlement Class members that did not receive an appropriate refund "from September 5, 2017 to the time the Class Data is prepared." Settlement § 1.30. Notably, the term sheet in this case was signed in October 2025, and the full Settlement agreement was executed January 23, 2026. Class Counsel did not have the Class Data at either of those times. Pursuant to Settlement § 5.5.1, Class Data was due February 13, 2026.

In the abstract, these issues on their own may be benign, but the Settlement contains evidence that plaintiffs vastly underestimated the damages exposure for Subclass B when the Settlement was executed. The Settlement states: "Defendant represents that its good faith estimate of the most likely potential claim pool for Settlement Subclass B is approximately $400

million." Settlement § 2.3. Class Counsel, however, had little faith in that estimate. The estimate of $400 million in damages for Subclass B is only represented by *Defendant*, and not as a joint representation of the settling parties.

Class Counsel's lack of faith in the $400 million estimate is demonstrated by Settlement § 12.1, which grants Plaintiffs the right to terminate the Settlement under discrete conditions. Pursuant to § 12.1.1.1, Plaintiffs could terminate the Settlement if they "believe that Amazon has not provided sufficient data, or the data proves materially inaccurate, incomplete, or misleading." It appears that this provision was necessary because, as discussed above, at the time Plaintiffs executed the Settlement, they did not have the Class Data. In addition, pursuant to § 12.1.1.2, Plaintiffs could terminate if they "in good faith believe that the 'most likely potential claim pool' for Subclass B exceeds 200% of approximately $400 million as Plaintiffs' estimate of the most likely Subclass B claim pool, or the total amount of transactions at issue in Subclass A exceeds 120% of the approximately $81 million of transactions described in Section 2.2 above." It appears that "most likely potential claim pool" quote directly cites Amazon's estimate of $400 million damages in § 2.3.

Several issues are apparent. <u>First</u>, this is yet another example of the inferior treatment of Subclass B. Plaintiffs negotiated a right to terminate the entire Settlement if Amazon's estimate of damages ($81 million) for Subclass A was off just 20.1%. So, if the Class Data showed that Subclass A damages were $97.281 million, Class Counsel could terminate, even though under that scenario Subclass A would still get more than double putative damages out of the Common Fund. On the other hand, Class Counsel could not terminate the Settlement unless the estimated damages for Subclass B were more than *double* Amazon's estimate, thereby more than halving Subclass B's recovery.

<u>Second</u>, the fact that plaintiffs here stipulated that putative Subclass B damages may be more than double Amazon's estimate is a massive red flag in and of itself. Plaintiffs should have done their due diligence *first*, ensuring that Amazon produced Class Data sufficient to disclose

the true size of Subclass B damages *before* resolving those claims, especially when they had clear suspicions that Amazon's estimates may be off by more than 200%.

Third, Plaintiffs' right to terminate the Settlement was illusory, because it abrogated the right to do so *before* getting possession of the Class Data. Pursuant to Settlement § 12.1.2, "Plaintiffs' right of termination is waived unless Plaintiffs exercise this termination right by notice in writing to Defendant served by January 12, 2026." But the Settlement was signed on January 23, 2026, meaning that the right to terminate is illusory, as it was explicitly waived before execution of the Settlement, and before Class Counsel's receipt of the Class Data. Thus, even though it is now apparent that Subclass B's damages are worth more than $856.8 million, well above the putative termination limit, Plaintiffs here are powerless to terminate the Settlement.

Fourth, Class Counsel did not provide the Court with an estimate of exposure for Subclass B. At the preliminary approval hearing, Class Counsel noted that to arrive at a putative damages figure and identify class members within Subclass B, there needed to have been "some sort of statistical proxy to try to show which of those transactions were incorrect and who, among those, were entitled to recover." Ex. 22 at 13:12-15. But Class Counsel never ran such a statistical proxy, or provided putative damages estimates for the Court to evaluate whether the 15.22 million (after fees and costs) made available to Subclass B is reasonable and fair compensation when compared to the "estimate [of] the maximum recovery in a successful litigation." *Grady*, 671 F. Supp. 3d at 1075. Even Class Counsel's benefits/damages expert, Mr. Holton, never came up with a putative damages calculation for Subclass B, instead limiting his analysis to the anticipated value of the injunctive relief.

## VI. CONCLUSION

The Settlement is rife with problems, and cannot stand as written, without adequate representatives, class counsel, consideration, notice, or claims process. Further, Plaintiff Weiler believes that discovery is necessary to adequately evaluate the merits and valuation of the Settlement, and the disparate treatment of putative subclass members. Without discovery, the

Court does not have enough information to approve the Settlement and cannot satisfy its obligations under Rule 23 or due process.

Dated: October 29, 2026

Respectfully submitted,

**SMITH KRIVOSHEY, PC**

By: */s/* ______________________
Yeremey O. Krivoshey

Yeremey O. Krivoshey
28 Geary Street
Suite 650 # 1507
San Francisco, CA 94108
Telephone: 415-839-7077
Facsimile: (888) 410-0415
Email: yeremey@skclassactions.com

Joel D. Smith
867 Boylston Street
5th Floor #1520
Boston, MA 02116
Telephone: 415-202-6109
Facsimile: (888) 410-0415
Email: joel@skclassactions.com

Todd Wyatt
**WYATT GRONSKI PLLC**
Todd Wyatt (Bar No. 31608)
540 Newport Way NW, Suite 200
Issaquah, WA 98027
Phone: 425-395-7784
E-Mail: todd@wdlawgroup.com

Plaintiff Erin Weiler
618 S Sweetzer Ave
Los Angeles, CA 90048
Emails: erinweiler@hotmail.com, erinsellsluxury@gmail.com
Ms. Weiler's attorneys may seek fees and costs upon a duly notice motion for fees.
Ms. Weiler intends to appear at the final approval hearing through counsel (disclosed above).

Plaintiff Weiler's Signature: ______________________