**EXHIBIT 16**

# Exhibit B

THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE: AMAZON RETURN POLICY LITIGATION | No. 2:23-CV-1372-JNW<br><br>**DECLARATION OF JOHN HOLTON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL** |

I, John Holton, hereby state as follows:

1. I certify that the statements set forth in this instrument are true and correct. I am over the age of eighteen, competent to testify in this matter, and make the following statements based on my personal knowledge.

**QUALIFICATIONS**

2. I am a founding principal of Symphony Consulting, Inc. ("Symphony Consulting"), which is a supply chain, manufacturing outsourcing, and IT consulting firm.

3. I have over thirty years of experience in the sourcing and procurement of components, subassemblies, and systems, as well as defining and architecting various supply chain models for companies. This includes the design, implementation, and monitoring performance of the reverse supply chain (e.g. product returns).

4. I have been a principal of Symphony Consulting since 2001. Providing consulting services to my clients in sourcing, procurement, fulfillment, and other supply chain management



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

topics, requires a thorough knowledge of the supply chain at every level including sourcing materials, managing the inbound supply of material, planning and execution of the manufacturing process, fulfillment of customer orders, and effectively managing the reverse supply chain.

5. I am often engaged in directly helping clients design their supply chain which involves developing robust processes with closed-loop metrics to ensure on-going performance. I have helped companies develop, implement, and operationalize, reverse supply chain programs. My work in this area includes a thorough understanding of various aspects of the returns process including: confirming customer issue, confirming entitlement for a return, organizing the returns process including packaging and shipping, confirming receipt of returned goods, evaluation of the returned goods, disposition of the inventory, and appropriate remedy for the customer which may involve a refund.

6. As part of my work to design supply reverse supply chains, I have had to analyze the long-term cost of returns and devise strategies for how to mitigate costs by determining the routing and handling of returns. This includes the location and method for the initial screening of units to determine the level of intervention required, the appropriate routing of the returns, tracking of information regarding the return and the repair costs, and where feasible the process for returning units to customers or inventory.

7. I have provided a variety of supply chain training to clients on topics such as advanced metrics, inventory exposure and management, lean supply chains, continuous improvement particularly with respect to supply chain design, contracts including service contracts with performance agreements, outsourcing contracts, and supplier selection and development. Our company's clients range from start-ups to Fortune 100 companies with revenues in the billions of dollars.

8. In 2010, my consulting firm, Symphony Consulting—with my direct involvement and participation—provided training to nearly 90 Cisco supply chain program managers on a variety of supply chain subjects, including inventory management, forecasting to suppliers (including CMs and component suppliers) and demand management, supply chain architecture, cost modeling, risk mitigation, price negotiations, and contract negotiations.



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

9. While working for Hewlett Packard (HP), I managed a group of Supply Chain Business Managers in the North American Distribution Operation that worked with various business units in HP's high-volume peripheral and PC business segment. My team's job was to provide advice to the business units and to manage high-profile projects that affected the distribution channel partners and retailers. This work involved a large volume of outbound sales but, as in the nature for the consumer facing businesses, also included significant work to address customer returns.

10. While working for Trimble Navigation, a growing company that was one of the leaders in the emerging GPS industry, I managed all of the supply chain functions for the company. This included strategic procurement, commodity engineering, receiving and warehouse, order fulfillment, and customer returns. One of the significant initiatives that I managed for Trimble was the outsourcing of internal manufacturing. This required a complete rewrite of most of our supply chain solutions including how we handled returns. To create an effective solution, we had to decide on key elements like the strategy for handling returns with this extended supply chain, the structure of the team, the quantity and skills of the personnel involved, the closed-loop process to create effective controls, and the metrics required to ensure on-going success.

11. Within my work at Symphony Consulting, I have been involved in numerous projects that include issues concerning product quality and returns. This includes a peripheral manufacturer that sold to high-volume printing and copier OEMs; a consumer electronics product that had the majority of its sales in North America but was manufactured in Asia; a private equity firm that wanted to evaluate a large computer company for potential investment, and wanted assessments on its capabilities including returns and quality controls, and a large automation company that wanted assessments of it outsourced manufacturing processes and business controls.

12. My education includes a Bachelor of Science in Business Administration with an emphasis on Operations Management (i.e. Supply Chain Management) from the University of Arizona and a Master of Business Administration from University of Arizona, located in Tucson, Arizona.

13. Exhibit A to this report contains a complete copy of my current curriculum vitae, which summarizes my qualifications and professional experience, and provides a listing of, to the best of my knowledge, the articles I have published over the past ten years.

14. Cale Wetzel is a Consultant at Symphony Consulting, Inc. Mr. Wetzel has a BS in Business Administration, Management and Operations from Western Governors University. Mr. Wetzel also has an AAS in Electronics Engineering Technology from Linn-Benton Community College in Albany, Oregon. Mr. Wetzel holds a certificate in Data Analysis from Google, and is working on a certificate in Data Science. He is also a lean six-sigma master black-belt.

15. Mr. Wetzel has worked in supply chain and reverse supply chain logistics and management since 2010. He has worked at Symphony since 2022. Prior to that, he served as Vice President of Operations at a mid-sized machining and fabrication company. He has also served as Director of Operations at a subsidiary of Danaher Corporation that specialized in oceanographic instrumentation.

16. Mr. Wetzel has extensive experience in data analysis beginning in 2004. He is proficient using MS Excel, Visual Basic, SQL, R and Python coding languages. Specific examples include instrument calibration routines, machining center scheduling system, supply chain financial analysis systems, and automated ordering quantity analysis.

17. In 2022 Mr. Wetzel joined Symphony Consulting. In his work with clients, he has created numerous analytical tools to provide insights on complex supply chains. These projects have included a structured approach to vendor risk analysis, purchasing process failures and remediation, analysis on multiple factors influencing part obsolescence risk, a new approach to assessing inbound supply chain risk focusing on purchased part misalignments, a tool to provide advanced insights on factory capacity and constraints, and detailed analytics on scale pricing and factors affecting purchase quantity decisions.

## BACKGROUND

### A. Amazon's Return Flow

18. This lawsuit concerns Amazon's return and refund practices. See generally First Amended Consolidated Complaint, Dkt. 116.



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

19. Amazon successfully handles [redacted] of returns every year. The processes involved are varied and complex, and errors and mistakes can occur at various steps along the way. Given Amazon's scale, even small errors affecting only a small percentage of returns can add up. In the course of this litigation, discovery has revealed issues at various stages of the returns process. As part of this settlement, Amazon has agreed to (1) complete paying refunds of more than $600 million (from November 2017 to September 2025) for certain returns and refunds that were previously not processed, even where Amazon cannot confirm that a payment is owed; (2) fund $309.5M in additional compensation for customers related to refund issues; and (3) implement new practices that will bring about material improvements to its refund processes, providing meaningful and continued relief to Amazon customers. Returns are an important part of Amazon's business, as customers are more likely to buy online or return to Amazon if returns are easy, while customers are more likely to lose trust in Amazon if they experience issues. [AMZ_RETURN_00013386] [AMZ_RETURN_0031811].

20. To understand the practices that are the subject of this litigation, it is important to understand how Amazon processes returns and refunds. Amazon's return and refund stream generally proceeds as follows: To return an item to Amazon, a customer can request a refund on Amazon's website or application. The customer selects the item she wishes to return, enters an explanation for the return, and then chooses a pick-up or drop-off location. If the return is authorized by Amazon, it will generate a unique Return Merchandise Authorization ("RMA") code that is associated with the return and used by Amazon to catalogue and track the status of the return for some or all portions of the returns process.

21. If the customer chooses to have the item picked up, and that option is available for the customer's specific return, Amazon or its designated carrier will collect the return at the address the customer specifies.

22. If the customer chooses to drop-off the return at one of Amazon's thousands of designated drop off locations—e.g., physical Amazon stores, Whole Foods Markets, participating Kohl's and Staples locations, UPS Access Points, and The UPS Store—Amazon emails the customer a quick response ("QR") code that is associated with the RMA. At the drop-off location, items can be


QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

returned using self-service return kiosks or by handing the return to an associate of the drop-off location. The customer presents the QR code and item, and the associate or kiosk will scan the QR code and take custody of the return. At this point, a combination of Amazon's employees, agents, and/or third-party contractors will pack, ship, and process the return.

23. [redacted]

24. [redacted] Customers are provided with tracking codes or can otherwise access tracking data to follow the status of their return. [AMZ_RETURN_00037933]

25. After a trailer carrying shipping containers of returned items arrives at an Amazon return center's holding yard, the trailer is scanned by Amazon and/or its designated carrier. When a trailer is scanned at the return center, Amazon and/or the designated carrier's systems record that [redacted] has arrived at an Amazon return center. At this point, a customer tracking their return could see that their item was delivered back to Amazon. [AMZ_RETURN_00004212]

26. [redacted] After a container arrived at a fulfillment center, the next scan would be the grading



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

scan. [AMZ_RETURN_00405150] [redacted]. [AMZ_RETURN_00004212] [redacted].

27. When the shipping containers are unloaded from trailers in Amazon's holding yard into the return center's warehouses, an Amazon grading associate will scan [redacted] The grading associate will use these scans, in conjunction with Amazon's return systems and databases, to try and determine whether the package and item matches the associated RMA and underlying order. [AMZ_RETURN_00002771] The grading associate will then grade the item to determine its condition, whether the item is re-sellable, and whether the item is eligible for a full or partial refund, among other things. In some cases, items may be audited or checked a second time by grading associates that specialize in auditing returns. Until this process occurs, all Amazon knows is where a package associated with the customer's RMA has been scanned during its journey back to Amazon. [redacted].[1]

B. **Amazon's Refund Flow**

28. Amazon issues refunds in three different ways: (1) Refund upon Return: Amazon issues a refund after it has received, processed, and graded the item at one of its Return Centers to

[1] Returns fraud is a widespread concern for many retailers. Source: https://www.businessinsider.com/return-fraud-amazon-shipping-retail-theft-wardrobing-online-shopping-2025-7tpQu_sxNv4dCDPbpSGTrI9IbKHg_RZLA8P5pISL_XKysOBV48fbpigHRgeZFyzoip8_p_75ww3l6cI1lAeQ3ae9vlFhDjEi0VtJ6ySpvKepzKYOVZFkfEQLZdP3GWSrQ.



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

determine it received an item eligible for a refund consistent with its policies; (2) Instant or Advanced Refunds (also referred to internally as [redacted]: Amazon issues a refund before it physically receives the returned item at its Return Center to be processed and graded; and (3) Returnless Refund: Amazon directs the customer not to return the item but still promises to issue a refund because, [redacted] or in non-compliance of certain transportation/health and safety regulations.

29. In the case of a Refund upon Return, if Amazon concludes it has not received the item or that an item is otherwise not eligible for a refund, it will not issue a refund.

30. In the case of an Instant or Advanced refund, if Amazon concludes it has not received the correct item or that an item is otherwise not eligible for a refund, it will "retrocharge" (i.e., recharge) the customer for the item described in the RMA.

C. **<u>Defects In Amazon's Return And Refund Flows</u>**

31. [redacted] [AMZ_RETURN_00387580] These defects can result in erroneous denials of refunds or erroneous "retrocharges," which occur when a customer is initially given a refund but later recharged for the item. [redacted]

32. As discussed below, however, return processing errors at Amazon's return centers are just one category of root causes of wrongful denials of refunds or wrongful retrocharges. Wrongful denials of refunds or wrongful retrocharges can be triggered "due to" a "combination of defects" and other "processing errors." [AMZ_RETURN_00387580]



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

33. It is my opinion that some of Amazon's return errors are clear and easily traceable. [redacted].

34. In other circumstances, Amazon is unable to "diagnose the root causes" of wrongful refund denials or retrocharges because it is impossible to know whether, for example, a package that never arrived at the return center [redacted].[2] In these cases, Amazon must rely on "customer contact" to try to understand if, how, and why it may have wrongfully denied a refund. [Compare AMZ_RETURN_00211289 with AMZ_RETURN_00387580] Even when a customer does reach out, Amazon still may not be able to accurately diagnose the root cause because the error was the product of a combination of defects in the return and refund process – some of which may have occurred before the return even made its way back to Amazon. [AMZ_RETURN_00387580]

35. The following illustrative list of examples of mechanisms for wrongful denials of refunds or wrongful retrocharges offer insight into the various root causes of wrongful denials and why some are more difficult to identify than others. While the following examples are loosely categorized by root cause, they often overlap due to a combination of defects.

**1. <u>"Lost" Returns</u>**

36. [redacted]

---

[2] At certain drop off locations, customers can "scan" their own returns, meaning a customer can scan the RMA triggering a drop off scan, but could then never drop off the package.

[3] [AMZ-RETURN 00068139 ([redacted] are lost by the carrier."); AMZ-RETURN_00068137 ("[redacted] of the return packages got lost prior to processing.").



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

[redacted] [AMZ_RETURN_00387580] [redacted].

[AMZ_RETURN_00387580]

37. Defects can occur at the first step of the return process. In some cases, "[redacted][5] [redacted]

38. Defects can occur during drop-off process at the designated drop-off location or with the designated carrier. [redacted]

39. "[redacted] [AMZ_RETURN_00166811] This document

[redacted].

[5] When a customer initiates a return on Amazon.com, the customer can select "wrong item was sent" as the reason for the return.



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

discusses changes implemented in September 2023 to address this issue caused by human error. *Id.* AMZ_RETURN_00166811-12.

40. [redacted] [AMZ_RETURN_00002776]

41. [redacted] [AMZ_RETURN_00002786].

42. Any combination of these defects can lead to situations where Amazon's system has a record that an item was delivered in a trailer to Amazon, but Amazon has no record that the item was ever unloaded and scanned at a return center. In fact, according to one document I reviewed, [redacted]. [AMZ_RETURN_00002775] [redacted] *Id.* The documents I reviewed discuss measures taken to help improve the process of delivery to the returns centers. [AMZ_RETURN_00407512]

43. In the data provided by Amazon for Subclass A, which reflects returns or retrocharges for which Amazon could not identify the specific reason, we can see that at least 5 of the 10 categories that could be fully or partially affected by logistics challenges (A1, A3, A5, A6, and A7). That translates to approximately 45% of the Subclass A issues. Applying that number to the estimated value of returns shown in Subclass A from January 2017 to Sept 2025 ([redacted] a number which I have extrapolated from the data, which shows about $680M of returns, including those for which Amazon has already issued refunds), translates to an estimated [redacted] (using my extrapolated figure) of return issues attributable to problems in processes, systems, and polices in logistics.[6]

**2. <u>Missorting At Return Centers</u>**

[6] See Exhibit D



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

44. [redacted] [AMZ_RETURN_00002775] This category of errors can occur due to customer error before the return ever reaches Amazon or human error during the grading process at Amazon's return centers.

45. **Same product different variations.** In many instances, Amazon customers purchase multiple variations of the same product with the intent to keep their preferred item and return the rest. For example, a customer may buy two shirts but in different sizes with the intent to keep the shirt that fits best and return the other(s). [AMZ_Return_00004213; AMZ_RETURN_00387580] This is fully permitted under Amazon's return and refund policies. [redacted]

46. [redacted].[7]

47. **Multiple-For-One.** Similarly, sometimes customers purchase two of the exact same item and then decide to return both items. [AMZ_RETURN_00004213] [redacted]

[7] "[redacted]." AMZ_RETURN_00243144 (Mar. 4, 2024).



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

[redacted][8]

48. **A for B.** Sometimes Amazon determines the merchandise reflected on the RMA is not returned to Amazon because during its grading process it identifies the return as an item other than the item described in the RMA. If Amazon identifies the return as something other than the item described in the RMA, it will attempt to match the returned item to an item in the customer's order history and will issue a refund for the item it matches in the customer's history, even if the unmatched return item does not match any items in the currently authorized return. If Amazon had already issued a refund for the item described in the RMA, it retrocharges the refunded amount. However, grading is a manual process and human error could cause returns to be incorrectly categorized as A for B or 2 for 1.[9] [redacted].[10]

**3. <u>System And Policy Errors</u>**

49. In addition to the missorting and mishandling problems that could cause Amazon to incorrectly believe that item had not been returned, Amazon's return and refund process was also

---

[8] AMZ_RETURN_00179014 (May 31, 2024) [redacted]

[9] "[redacted]." AMZ_RETURN 00033124 (July 31, 2019).

[10] [redacted] AMZ_RETURN 00042656 (Jan. 28, 2022).



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

Case 2:23-cv-01372-JNW Document 174-2 Filed 01/29/25 Page 15 of 39

subject to system errors that prevented some customers from receiving refunds even when it was not lost or mishandled.[11]

50. [redacted][12] [redacted]

52. Additionally, a [redacted] technological issue caused refund payment failures. "[redacted]" AMZ_RETURN 00218226. Even though "[redacted]." [AMZ_RETURN 00218226]. That document reflects that "[redacted]," and Amazon worked to issue refunds to the impacted customers. *Id.*

**4. <u>Returnless Refunds</u>**

---

[11] AMZ_RETURN_00184223 (Sept. 25, 2019) ("My project is solely focusing on [redacted]

[12] Data derived from CS contacts takes the customer at their word and is inherently anecdotal and qualitative. A customer contact does not necessarily mean that Amazon made an error.



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

53. A returnless refund occurs where a customer is informed by Amazon that he or she will receive a refund but need not return the item. [AMZ_RETURN_00002111] Reasons for this kind of refund can occur [redacted] It is my understanding that under Amazon's policy, "returnless refunds" should not receive retrocharges. It is therefore my opinion that, by definition, denials of refunds and retrocharges in this circumstance would be erroneous if they are based on the customer's failure to return the item.

**D. Certain Issues Persisted Until After the Litigation**

54. Some of these issues, such as those caused by human error, are unavoidable parts of the returns process and therefore existed at Amazon for many years. AMZ_RETURN 00340642 (Apr. 9, 2019) ("[redacted]."); AMZ_RETURN 00033565 ("[redacted]).

55. Amazon identified some of these issues as early as 2020 and certain employees proposed recommendations, [AMZ_RETURN_00387583] but some issues were not addressed and persisted well past the filing of this lawsuit [AMZ_RETURN_00004212–15].

56. Since the filing of this lawsuit, Amazon initiated numerous projects and "deep dives" to attempt to fix return errors. [redacted]



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

57. In my opinion, this litigation clearly spurred Amazon into action: [redacted]

58. The urgency of these corrective actions is found throughout the internal communications: [redacted] And in reply: "I'm sending out an update on the discussed action items from last week's discussion on [redacted] Multiple actions items are then listed with plans to follow up during weekly calls. AMZ_RETURN 00215448.

59. An Amazon Director asked about the size of the [redacted] problem and another employee gave her some statistics just for that year based on anecdotal CS data: "[redacted]." AMZ_RETURN 00260956.

60. The employee explains – presumably in response to a query about the litigation which ends with "can you get me the details": "[redacted]." AMZ_RETURN 00260956.

**E. The Proposed Settlement**

61. On October 20, 2026, the parties in this matter reached a settlement in principle of the claims, subject to negotiation of a long-form settlement agreement and Court approval.

62. The proposed settlement divides affected Amazon customers into two groups: Settlement Subclass A and Settlement Subclass B.



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

63. Settlement Subclass A includes:

- Unpaid refunds for refunds not completed due to a payment processing issue. Returns for "Returned but no refund requested"
- Refunds not completed where Amazon does not have sufficient confirmation that the correct item(s) were returned as required
- Retrocharges for packages that were delivered to a Designated Carrier, but Amazon does not have confirmation that arrived at a return center.
- Retrocharges for items that were returned but for which the retrocharge was not reversed.
- Retrocharges for packages that arrived at a return center but Amazon could not identify the reason for the retrocharge.
- Retrocharges where the customer attempted the return after the retrocharge;
- Unclassified retrocharges;
- Underpaid retrocharge refunds;
- Refunds that were determined ineligible for a refund, but Amazon was unable to determine why the refund was determined ineligible.
- Charges that occurred during a short period of time when Amazon's system received a message that there was a decline, resulting in multiple charges.
- Refunds that were only partially issued because the customer paid using two payment methods, the refund was successfully processed to one payment method but not the other, resulting in a partial refund.
- Certain "returnless refunds" [redacted] that were retrocharged because of a process or technical error

64. As a result, Settlement Subclass A contains customers who experienced failed refunds or retrocharges due to computer and payment processing errors and those for products that did not complete the grading process for any number of reasons. For each of these transactions, it is not clear from Amazon's records what is the reason for the refund or retrocharge.



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

65. Settlement Subclass B contains all other customers who had a refund denied or were retrocharged. For these customers, Amazon's records show the reason for the refund denial or retrocharge (for example, incorrect item or quantity). If these customers believe the refund denial or retrocharge was improper, as part of the settlement they can submit evidence showing why it was improper to receive a payment from the settlement fund.

66. Under the terms of the settlement, among other things, Amazon will (1) make reasonable efforts to complete payment of more than $600 million in certain refunds to Settlement Class A members; (2) pay an additional $309.5 million into an escrow fund for payment of additional previously unpaid refunds, attorneys fees and costs, to be divided 92.7% to Settlement Class A and 7.3% to Settlement Class B and (3) make certain process changes designed to improve its return and refund practices for all class members.

**F. Amazon's Practice Changes**

67. Specifically, the proposed settlement provides: In an effort to improve its return and refund practices, Amazon has implemented or will implement, by no later than the Effective Date, reasonable processes as follows:

1) Regular monitoring to ensure returns processed by Amazon are processed within the timelines contained in the Amazon Return Policy. Amazon will maintain such measures for eighteen months after the Effective Date.

2) In order to promote the completion of accurate and timely processing of refunds, review and troubleshoot technical issues that prevented refunds from processing or resulted in erroneous retrocharges (for returns processed by Amazon). Amazon will maintain such measures for eighteen months after the Effective Date.

3) For circumstances where customers initiate returns, but their approved refunds are still not completed after thirty days because of a payment processing issue, processes for automatic re-processing of the refunds. For circumstances where the automatic re- processing remains ineffective, processes for manual re-processing of the refunds. Amazon will maintain such measures for eighteen months after the Effective Date.



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

4) For customers who initiate returns that are processed by Amazon, notify customers by sending them a message when a refund is approved or denied. Amazon will maintain such measures for twenty-four months after the Effective Date.

5) For returns processed by Amazon, take reasonable steps to refund customers who initiate returns, but which return has not completed the grading process within 90 days, provided that Amazon has a reasonable belief that such returns are not fraudulent, abusive, or otherwise improper. Amazon will maintain such measures for twelve months after the Effective Date.

6) For returns processed by Amazon, send a message to customers in cases where customers initiate returns, but which return has not finished the grading process within 90 days. Such notification will inform customers, in sum or substance, that their returns have not been processed and that they should contact Amazon with any questions. Amazon will maintain such measures for twenty-four months after the Effective Date.

68. Symphony Consulting was retained by Plaintiffs in this matter to review the proposed process changes and use quantitative methods to calculate their value to the settlement class.

## FACTS CONSIDERED

69. To perform this work, we considered documents and other information from a variety of sources. This includes documents and information produced by Amazon and certain material produced by the parties and related to this matter. Here is a partial list:

a. The operative complaint;

b. Data files consisting of more than [redacted] Amazon records reflecting the transactions at issue in this matter (the organization and description of the files is captured in Exhibit B);

c. Amazon internal emails, chat communications, and analysis;

d. The parties' settlement agreement;

e. Confidential information produced by Amazon as part of the confirmatory discovery process.



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

## SUMMARY OF OPINIONS

70. **Opinion A:** In reviewing the Injunctive terms, Amazon has taken steps to improve processes and to monitor issues. Amazon's confirmatory discovery reveals that these changes will fix the issues affecting the Subclass A categories. Based on that, and the guaranteed timeframes listed in the Injunctive terms, I believe the Plaintiff class will receive an estimated benefit of $122,950,588.

71. **Opinion B:** The Subclass B covers other returns that are not covered in Subclass A. Amazon has provided broad transaction data separated into three categories but Amazon has not determined the specific problems nor provided a defect rate for these transactions. Using an error rate of 1.1% and the issues in Subclass A, I calculated the expected errors in Subclass B. Based on that, I expect the benefit to the Subclass B to be $155,166,078.

72. **Opinion C:** I believe that Amazon customers will save ~1.3 million hours annually for a total value of $55,614,306 through the period of the Injunctive Terms.

73. Opinion D: Based on the average length of time it has taken Amazon to successfully resolve its issues involving returns and the average credit card rate published by the Federal Reserve in its G.19 report, we expect consumers to save $30,008,788 in potential interest expense.

74. In total, the process changes required by the proposed settlement are worth in excess of $363,739,761 to Amazon's consumers.

## OPINIONS AND THE BASIS THEREFORE

75. Based on the recognition of the problem, the financial impact, and the impact on customer experience captured in the internal Amazon communication, it would be normal industry practice for these process and policy changes to be permanent and not limited to the timeframe outlined by Amazon. After making a significant change to processes and policies, it is typical for a company in industry to monitor the results for a period of time to ensure the changes are having the intended impact. My interpretation of the Amazon timeframes listed in the injunctive terms are that these represent formal monitoring. I am only analyzing the impact based on the agreed to timeframes, but it is my opinion that Amazon customers will likely continue to enjoy the benefits of the improved processes and policies beyond the listed timeframes.



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

76. **Opinion A:** The files provided by Amazon are broken into 12 different files for Subclass A and are labelled subcategory A1-12. Each of these cover a different issue and provides detailed anonymized transactions from January 2017 to September of 2025 for most of the files. In three files, A7, A11, and A12, the data started from November of 2017 and went to September of 2025. I estimated the full year of 2017 (where appropriate) and 2025 by extrapolating linearly from the data provided.

77. Based on this historical data, I have calculated the average annual impact for each of the subcategories A1-12.

78. Within the Injunctive Terms, Amazon has committed to specific durations for the each of the terms and the associated remedial actions. Because each action may affect multiple subcategories within Subclass A, I have made a determination on how long I expect the class to receive benefits based on a mixed environment of Injunctive Terms.

79. Exhibit D contains a table with each of the categories within Subclass A and the following information: (a) the calculated average annual impact;(b) the Injunctive Terms that are likely to have an impact; (3) the range of durations with each of the terms; (4) the expected duration of benefit for each of the categories; (5) the total expected benefit for each category and for the Subclass A as a total. The total expected benefit of the future practice changes for Subclass A is $122,950,588.

80. **Opinion B:** The Subclass B covers other returns that are not covered in Subclass A. Amazon has provided broad transaction data separated into three categories but Amazon has not determined the specific problems nor provided a defect rate for these transactions. Applying my derived error rate of 1.1% for these issues and I have used this, along with the issues in Subclass A, to calculate the expected errors in Subclass B. Based on that, I expect the benefit to the Subclass B to be $155,166,078.

81. The files provide by Amazon for Subclass B are broken into 3 separate files as follows: B1 – Ineligible refunds; B2 – Partial refunds; B3 – Retrocharges. Each of these files covers a different category and provides detailed transactions from November 2017 to September of 2025 for files B1 and B2; and from January 2017 to September 2025 for file B3. I estimated the full year of 2017 (where appropriate ) and 2025 by extrapolating linearly from the data provided.



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

82. It is my understanding that these files show total transactions that are wholly separate from the transactions showing in Subclass A. These files are also different from Subclass A because the transactions showing in the Subclass A files are all transactions where there was either a payment processing issue or Amazon cannot determine the reason for the retrocharge or refund denial. The Subclass B files show total transactions. There is no delineation in these totals between transactions that were completed successfully and in accordance with Amazon's obligations to its customers, and those that were not completed successfully in accordance with its obligations.

83. [redacted]

84. I have used 1.1% of returns as the overall return error rate which is approximately midway between [redacted]

85. As part of the confirmatory discovery in this matter, Amazon has represented that there were about [redacted] potential total refunds processed by Amazon from November 2017 through September 2025.

86. In Exhibit E, I have used this information as the basis for a calculation to estimate the amount of return errors that have affected the total population of Subclass A and Subclass B. Applying the 1.1% error rate, I have estimated that the total returns with errors that affected Subclass A and Subclasss B from 2017-2025 equals [redacted]

87. Since about $680M of returns were already included in Subclass A, that leaves a total of [redacted] for Subclass B. I used these two numbers to calculate that the ratio of Subclass B to Subclass A is [redacted].

88. If Subclass A had a total average annual impact of [redacted], then by applying this ratio of [redacted], I have estimated that Subclass B had a total annual impact of [redacted] Exhibit E (page 2), shows the translation to Expected Benefit by applying the expected duration of the Injunctive Terms to this annual impact and distributes it proportionally amongst categories B1, B2, and B3. The total expected benefit for Subclass B is $155,166,078.



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

89. **Opinion C:** I believe that Amazon customers will save 1,279,272 hours annually for a total value of $55,614,306 through the period of the Injunctive Terms.

90. As a result of the return errors captured in Subclass A and B, some Amazon customers were forced to contact Customer Support (CS) to attempt to rectify the errors. There are numerous references in the files produced by Amazon that talk about the impact on customer experience and the interactions with CS.

91. [redacted]

92. Exhibit F contains the details of transactions in each of the A1-A12 categories separated by year. This includes an estimate for 2017 and 2025 based on partial year data. In looking at the total transaction for Subclass A, there is an average of annual transactions of [redacted]. Applying the same ratio of [redacted] (see exhibit E) to extrapolate from Subclass A to Subclass B, translates to a total [redacted] transactions for Subclass B. The total between the Subclass A and Subclass B of [redacted] that would require customer intervention to resolve.

93. Several of the internal documents provided by Amazon demonstrate that some customers have to make multiple calls to resolve issues. [redacted] For the analysis in Exhibit G, I have assumed two CS contacts per defective return.

94. It is my understanding that Amazon has not provided information on the amount of time the customer spends on each call to CS to resolve these return issues. In the original complaint there are two detailed transactions that include time stamps with the interaction between the customer and CS. These two transactions took 10 and 11 minutes respectively to resolve. Based on my experience, this is within the expected range for this type of interaction. Within the analysis in Exhibit G, I have assumed the lower number of 10 minutes per transaction to resolve with CS.



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

95. To determine the value of a customer's time, I have used data from the US Bureau of Labor and Statistics. Based on that data, the median wage in the US at the end of 2024 (the last full year) was $1,159 per week or $28.98 based on a 40 hour work week.

96. As mentioned previously, Subclass A and Subclass B have different Injunctive terms that affect different subcategories within the classes. I have used the minimum duration of 18 months or 1.5 years as shown in Exhibit C for this analysis.

97. Exhibit G uses all of the information and assumptions stated above and, as a result, I would expect the consumers in Subclass A and Subclass B to see a total benefit of $55,614,306 as a result of the Injunctive Terms avoiding the historical returns errors and the requisite calls to CS.

98. **Opinion D:** Based on the average length of time it has taken Amazon to successfully resolve its issues involving returns and the average credit card rate published by the Federal Reserve in its G.19 report, I expect consumers to save $30,008,788 in potential interest expense.

99. It is my understanding that Amazon was not able to provide an average length of time that customers have had to wait for their corrective refunds. The records for all of Subclass A and Subclass B, go back as early as 2017.

101. In order to calculate future benefit, I have used a more conservative time frame for calculating the time that issues are unresolved.

102. To calculate the cost to consumers for payments being delayed and potentially incurring interest costs, I have used rate from the Federal Reserve G 19 report for Credit Card Plans – All Accounts. Based on the most recent report, that rate is 21.58% annually.

103. The calculations in Exhibit H uses the average annual returns for Subclass A and Subclass B shown in Exhibit D and E respectively and the other information above. Based on that, I estimate that consumers will see a benefit of $30,008,788 in avoided interest payments.

104. Summary: Based on the injunctive terms, I estimate that the total benefit that will flow to Subclass A and Subclass B for the duration of the Injunctive terms, totals $363,739,761. That is made up of the following components:

a. Avoided return errors for Subclass A, meaning that customer get their refunds within Amazon's stated policies, totaling $122,950,588.



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

b. Avoided return errors for Subclass B, meaning that customer get their refunds within Amazon's stated policies $155,166,078.

c. Avoided consumer time spent to resolve return errors with customer support totaling $55,614,306.

d. Avoided interest on purchases that would have been left unresolved for a period of time totaling $30,008,788.

Executed this 20th day of January, 2026, at Los Altos, California.

John Holton



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

Exhibit A Curriculum Vitae John Holton


# John Holton

Symphony Consulting, Inc
440 N. Wolfe Road
Sunnyvale, CA 94085
Cell: (408) 218-0207
john@symphonyconsult.com


## Core Areas of Expertise

- Extensive experience in designing a complete supply chain including forecasting, planning, sourcing, warehouse and logistics, order fulfillment, and customer returns.
- Contracting and dispute resolution. Deep understanding of contracts and how to craft them for clarity to avoid future conflicts. Broad experience in resolving difficult contractual situations.
- Designing harmonized supply chains that provide needed flexibility while minimizing inventory exposure and driving down long-term costs.
- Designing sourcing organizations to meet company objectives while developing key processes, metrics, and controls to ensure on-going successes
- Understanding the key drivers of inventory and developing organizational solutions that address the issues and reduce inventory
- Developing advanced supply chain metrics for the extended supply chain
- Understanding the cost drivers in the electronics supply chain and the contract manufacturing - using leverage points to drive down costs
- Managing complex sourcing and negotiations projects involving multiple suppliers and complex terms affecting value
- Drafting and negotiating supply/procurement agreements
- Creating robust procurement strategies to address long-term cost, quality, and contractual risks

## Experience

### Symphony Consulting, Sunnyvale CA

Co-Founder (2/01 to Present)
Company focuses on outsourcing, inventory, supply chain management, supply chain design, and strategic procurement. My role is to advise clients and create solutions for their needs in these areas. Most of my work has been in the areas of outsourcing, contracts, and inventory solutions. We have developed advance mechanisms for effectively managing outsourced relationships. In contracting, I have extensive experience in issues such as product pricing and cost models, inventory liability, order fulfillment, customer returns and quality systems, manufacturing process control, and design services. When it comes to inventory, I have detailed knowledge on the key drivers for inventory including forecast processes, ordering policies, purchasing systems, demand-pull systems, product strategies, and supply chain flexibility and the use of buffers.

## Trimble Navigation, Sunnyvale, CA (1995-2001)

Director of Strategic Suppliers

Managed a group of Procurement Engineers and Commodity Managers who controlled key commodities and negotiated critical contracts for Trimble. Their mission was to secure a competitive advantage for Trimble in terms of cost, supply chain flexibility, long-term reliability, and support. My role was to manage key projects and negotiations and help teach and develop the individuals in the group. Also played a central role in on-going management of the CEM partner. Helped diagnose and solve processes problems between companies that hampered performance.

Management Lead for project to outsource all of Trimble's manufacturing. Led the efforts on developing RFP/RFQ, managing supplier responses, final supplier selection, negotiations, and transition management. Worked with the team to re-create key processes and system tools that were fundamentally changed as a result of outsourcing. The final deal affected one quarter of Trimble's workforce and the contract was equivalent to almost 40% of Trimble's revenue. This initiative was one of the most important in Trimble's history.

Director of Materials

Managed a group of approximately 100 people; functional areas included Commodity Management, Procurement Engineering, Planning, Purchasing, Order fulfillment, Shipping and Logistics. Introduced new concepts in the management of key commodities. Built the Commodity Management and Procurement Engineering groups for the purpose of influencing R&D and the component selection process. Significantly reduced the cost structure of Trimble's most important products. Revamped the order fulfillment systems and processes - adding new capabilities and new discipline. Developed and implemented new approaches to effectively use inventory in the supply chain – decreasing total inventory and improving responsiveness.

## Hewlett-Packard Company, Palo Alto, CA (1985-1995)

Worldwide Procurement Manager

Led HP's strategic efforts on the Interconnect commodity. Annual purchases totaled over $120 million. The team had the responsibility for setting the direction for new connector solutions from both a technical and a business prospective; for negotiating contract pricing and terms; for developing suppliers and managing supplier relationships. Results during my tenure include cost reduction far outstripping the market changes, creation and execution of a new strategic direction, measurable improvement in supplier performance, and a successful transition to a direct funding model.

Senior Manager – Supplier Partners

Managed a group of Business Managers who acted as liaisons to key divisions in the Printer and Peripheral Groups. The Business Managers helped the divisions develop and execute supply chain strategies for the Reseller Channel. Added key infrastructure to support this multi-billion dollar business as it was transforming to a postponement manufacturing strategy.

Production Manager – Printed Circuits

Managed a group of over 100 people that created PC assemblies for use in high-precision electronic instruments. Directed various efforts to improve quality and reduce cycle times, including the introduction of Kanban. Results: 40% reduction in defect rates and customer returns; 50% reduction in cycle times. Division leader for a consolidation of several PCA shops internal to HP. Demonstrated strong project management skills and an ability to create innovative process solutions.

Purchasing Manager



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

Managed a group of ten buyers with annual purchases of over $40 million. Led several department-wide process improvement projects and undertook several initiatives to upgrade the buyers' skills

Senior Buyer
Managed various high-value commodities, initiated contracts, led system introductions and other process improvements

## Education

### *University of Arizona, Tucson, AZ (1985) - Masters of Business Administration*

Concentration was on advanced operations management topics including courses from the Department of Industrial Engineering. Graduated with Honors.

University of Arizona, Tucson, AZ (1983) – BS Business Administration – Major: Operations Management
Course work included classes in inventory management, JIT, MRP, capacity planning, factory flow and cycle times, statistical quality control, management practices, and business law. Graduated with Honors.

Foothill College, Los Altos, CA
Took various classes in engineering and electronics to improve technical skills.

### *Professional Development Classes*

Advanced Negotiations Program (Stanford University, Graduate School of Business); Hewlett-Packard Management Training; Hewlett-Packard Strategic Procurement; Building a Market Focused Organization (Lanning, Philips & Associates); Situational Negotiations (Bay Group); Leadership and Teamwork (PAR group); Zero Based Pricing (Anklesaria Group); Interact (HP internal); Teams in Action (Trimble internal)



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

# List of Publications – 10 years

1. Optimizing Volume Price Breaks for Cost and Efficiency

https://www.symphonyconsult.com/wp-content/uploads/2024/11/Symphony-Optimizing-Volume-Price-Breaks-for-Cost-and-Efficiency.pdf

2. Lean in the Electronics Supply Chain: Five Common Mistakes to Avoid

https://www.symphonyconsult.com/wp-content/uploads/2024/01/Symphony-Lean-Five-Common-Mistakes.pdf

3. Leverage: The Great Equalizer in Negotiations (8/15/2014)

https://www.symphonyconsult.com/leverage-the-great-equalizer-in-negotiations/

4. Managing Supplier Power (2/13/2015)

https://www.symphonyconsult.com/managing-supplier-power/

5. Over-Negotiating with Suppliers (12/2/2015)

https://www.symphonyconsult.com/over-negotiating-with-suppliers/

6. Selecting the Right Contract Manufacturer (2/16/2016)

https://www.symphonyconsult.com/selecting-the-right-contract-manufacturer/

7. Can Your Suppliers Scale? (2/4/2018)

https://www.symphonyconsult.com/can-your-suppliers-scale/

8. Are Supply Risks Impacting Your Revenue? (10/22/2018)

https://www.symphonyconsult.com/are-supply-risks-impacting-your-revenue/

9. Can Your Suppliers Survive a Downturn? (1/8/2019)

https://www.symphonyconsult.com/can-your-suppliers-survive-a-downturn/

10. Selecting and Implementing an ERP Solution: Five Key Steps to Getting it Right (3/4/2019)

https://www.symphonyconsult.com/selecting-and-implementing-an-erp-solution-five-key-steps-to-getting-it-right/

11. When Your Non-Critical Suppliers Become Critical (4/21/2020)

https://www.symphonyconsult.com/when-your-non-critical-suppliers-become-critical/

12. Selecting and Implementing an ERP System: Seven Common Mistakes (1/24/2021)

https://www.symphonyconsult.com/wp-content/uploads/2021/05/ERP-Paper.pdf

13. Seven Common Mistakes in IT Procurement (5/12/2021)

https://www.symphonyconsult.com/wp-content/uploads/2021/05/Seven-Common-Mistakes-in-IT-and-Procurement.pdf

14. Volume Price Breaks: Are You on the Wrong End of the Scale? (2/14/2023)

https://www.symphonyconsult.com/volume-price-breaks/



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

## Exhibit B Key Data Files Provided by Amazon

Organization of files submitted by Amazon that gives details on transactions that fall into each of these subcategories.

**Subclass A**

| | Subcategory |
|---|---|
| A1 | Retrocharges for packages that were delivered to a Designated Carrier, but Amazon does not have confirmation that arrived at a return center |
| A2 | Retrocharges for items that were returned but for which the retrocharge was not reversed. |
| A3 | Retrocharges for packages that arrived at a return center but Amazon could not identify the reason for the retrocharge. |
| A4 | Retrocharges where the customer attempted the return after the retrocharge |
| A5 | Unclassified retrocharges |
| A6 | Underpaid retrocharge refunds |
| A7 | Refunds that were determined ineligible for a refund, but Amazon was unable to determine why the refund was determined ineligible. |
| A8 | Charges that occurred during a short period of time when Amazon's system received a message that there was a decline, resulting in multiple charges. |
| A9 | Refunds that were only partially issued because the customer paid using two payment methods, the refund was successfully processed to one payment method but not the other, resulting in a partial refund. |
| A10 | Certain "returnless refunds" ([redacted]) that were retrocharged because of a process or technical error |
| A11 | Unpayable Refunds (subset of certain refunds include (1) refunds not completed due to a payment processing issue; and (2) refunds not completed where Amazon does not have sufficient confirmation that the correct item(s) were returned as required). |
| A12 | Transactional values for certain refunds that include (1) refunds not completed due to a payment processing issue; and (2) refunds not completed where Amazon does not have sufficient confirmation that the correct item(s) were returned as required |

**Subclass B**

| | Subcategory |
|---|---|
| B1 | Ineligible Refunds |
| B2 | Partial refunds - amount not refunded |
| B3 | Retrocharges |



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

# Exhibit C Injunctive Terms and Impact on Subclass Categories

**Injunctive Terms** Term (months)

| | 18 | 18 | 18 | 24 | 24 | 24 |
|---|---|---|---|---|---|---|
| | (i) Regular Monitoring 30 day window | (ii) Review and troubleshoot technical issue | (iii) issues with payment on refunds | (iv) email confirm or deny return | (v) reasonable steps to refund with 90 days | (vi) email of grading returns > 90 days |
| **Subclass A** | | | | | | |
| A1 | X | X | | X | X | X |
| A2 | X | X | | X | X | X |
| A3 | X | X | | X | X | X |
| A4 | X | X | | X | X | X |
| A5 | X | X | | X | X | X |
| A6 | X | X | | X | X | X |
| A7 | X | X | | X | X | X |
| A8 | X | X | X | X | | |
| A9 | | X | X | X | | |
| A10 | X | X | X | X | | |
| A11 | | X | X | X | | |
| A12 | X | X | X | X | X | X |
| **Subclass B - not included in subclass A** | | | | | | |
| B1 | X | X | | X | X | X |
| B2 | X | X | X | X | X | X |
| B3 | X | X | X | X | X | X |



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

# Exhibit D Subclass A Benefit Calculation

| Year \ Sub-Category | A_1 | A_2 | A_3 | A_4 | A_5 | A_6 | A_7 | A_8 | A_9 | A_10 | A_11 | A12 (incl A11) | Total for year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2017 (est) | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2018 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2019 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2020 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2021 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2022 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2023 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2024 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2025 (est) | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Total | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Average Annual | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Injunctive Term that is likely to have an impact | i, ii, iv, v, vi | i, ii, iv, v, vi | i, ii, iv, v, vi | i, ii, iv, v, vi | i, ii, iv, v, vi | i, ii, iv, v, vi | i, ii, iv, v, vi | i, ii, iii, iv, v, vi | ii, iii, iv | I, ii, iii, vi | ii, iii, vi | i, ii, iii, iv, v, vi | |
| Injunctive Term (range) | 1.5-2 | 1.5-2 | 1.5-2 | 1.5-2 | 1.5-2 | 1.5-2 | 1.5-2 | 1.5-2 | 1.5-2 | 1.5-2 | 1.5-2 | 1.5-2 | |
| Minimum Expected Duration (Years) | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | |
| **Expected Benefit** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | **$ 122,950,588** |



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

## Exhibit E Subclass B Benefit Calculation (page 1)

**Subclass B Estimate of Returns**

| | |
|---|---|
| **Total Returns 2017 to Sept 2025** | [redacted] |
| **Return Error Rate** | **1.10%** |
| **Total Value of Returns with Errors** | [redacted] |
| **Errors Already Covered by Subclass A (2017 to 2025)** | [redacted] |
| **Remaining Errors Covered by Subclass B (2017 to 2025)** | [redacted] |
| **Ratio of Subclass B to Subclass A** | [redacted] |
| **Average Annual Impact Subclass A** | [redacted] |
| **Expected Average Annual Impact Subclass B (estimated based on ratio)** | [redacted] |



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

# Exhibit E Subclass B Benefit Calculation (page 2)

**Subclass B Estimate of Benefit**

| | Categories | | | |
|---|---|---|---|---|
| | Ineligible refunds | Partial refunds, amount not refunded | Retrocharges | |
| Year | B_1 | B_2 | B_3 | |
| 2017 (est) | [redacted] | [redacted] | [redacted] | |
| 2018 | [redacted] | [redacted] | [redacted] | |
| 2019 | [redacted] | [redacted] | [redacted] | |
| 2020 | [redacted] | [redacted] | [redacted] | |
| 2021 | [redacted] | [redacted] | [redacted] | |
| 2022 | [redacted] | [redacted] | [redacted] | |
| 2023 | [redacted] | [redacted] | [redacted] | |
| 2024 | [redacted] | [redacted] | [redacted] | |
| 2025 (est) | [redacted] | [redacted] | [redacted] | |
| Total | [redacted] | [redacted] | [redacted] | |
| Average Annual | [redacted] | [redacted] | [redacted] | |
| Portion of Total Subclass B | [redacted] | [redacted] | [redacted] | |
| Allocation of Expected Annual Impact | [redacted] | [redacted] | [redacted] | |
| Injunctive Term that is likely to have an impact | i, ii, iv, v, vi | i, ii, iii, iv, v, vi | i, ii, iii, iv, v, vi | |
| Minimum Expected Duration (Years) | 1.5 | 1.5 | 1.5 | |
| **Expected Benefit** | [redacted] | [redacted] | [redacted] | **$ 155,166,078** |



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

**Exhibit F Return Error Transactions Subclass A**






QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

# Exhibit G Consumer Time to Resolve Issues

Consumer Time to Resolve Issues

| | Average Number of Problems Transactions per Year | Number of Contacts to Resolve | Average Time Per Contact (minutes) | Average Time Per Contact (hours) | Total Annual Hours | Value of Time ($/hour) based on average wage | Annualized Impact |
|---|---|---|---|---|---|---|---|
| Subclass A | [redacted] | 2 | 10 | 0.17 | [redacted] | [redacted] | [redacted] |
| Subclass B | [redacted] | 2 | 10 | 0.17 | [redacted] | [redacted] | [redacted] |
| Total | [redacted] | | | | [redacted] | | [redacted] |

| | |
|---|---|
| Duration of Injunctive Terms | 1.5 years |
| Total Expected Benefit from Saved Consumer Time | **$ 55,614,306** |



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

**Exhibit H Interest Expense for Delayed Refunds**

Cost of Money Due to Processing Delays

| | Annual Returns Issues | Monthly Avg Returns Issues | Time to Resolve (in months) | Total Consumer Debt | Average Consumer Credit Card Rate | Expected Impact to Consumer after 30-day |
|---|---|---|---|---|---|---|
| Subclass A | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Subclass B | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Total Annual | | | | | | [redacted] |
| Duration of Injunctive Terms | 1.5 | | | | | |
| Total Expected Benefit Interest Expense Savings | **$ 30,008,788.33** | | | | | |



QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000