**EXHIBIT 22**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| IN RE: AMAZON RETURN POLICY LITIGATION | C23-01372-JNW<br>SEATTLE, WASHINGTON<br>August 17, 2026 - 9:30 a.m.<br>MOTION HEARING |

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMAL N. WHITEHEAD
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:

Aaron M. Zigler
Zigler Law Group
308 S. Jefferson Street, Suite 333
Chicago, IL 60661

Nolan Anderson
Alicia Cobb
Quinn Emanuel Urquhart & Sullivan LLP
1109 First Avenue, Suite 210
Seattle, WA 98101

Adam Wolfson
Quinn Emanuel Urquhart & Sullivan LLP
865 S. Figueroa Street - 10th Floor
Los Angeles, CA 90017

Andrew Schapiro
Quinn Emanuel Urquhart & Sullivan LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606

Proceedings stenographically reported and transcript produced with computer-aided technology

| | |
|---|---|
| For the Defendant: | Moez M. Kaba<br>Hueston Hennigan LLP<br>523 W. Sixth Street, Suite 400<br>Los Angeles, CA 90014 |
| | Brandon Marsh<br>Hueston Hennigan LLP<br>620 Newport Center Drive<br>Suite 1300<br>Newport Beach, CA 92660 |
| | Jedediah Wakefield<br>Fenwick & West<br>One Front Street, 33rd Floor<br>San Francisco, CA 94111 |
| For the Objector Erin Weiler: | Yeremey O. Krivoshey<br>Smith Krivoshey PC<br>28 Geary Street, Suite 650 - 1507<br>San Francisco, CA 94108 |

Proceedings stenographically reported and transcript produced with computer-aided technology

THE COURT: Please be seated.

THE CLERK: This is the matter of In Re: Amazon Return Policy Litigation, Cause No. C23-1372, assigned to this Court.

Counsel, please rise and make their appearances for the record.

MR. ZIGLER: Good morning, Your Honor. Aaron Zigler on behalf of plaintiffs. And with me here today, I've got Nolan Anderson, Adam Wolfson, Andrew Schapiro, Ali Cobb, and Blair Zigler from my office.

THE COURT: Good morning, all.

MR. KABA: Good morning, Your Honor. Moez Kaba for defendant, and I'm joined by Brandon Marsh and Jed Wakefield.

THE COURT: Very good.

MR. KRIVOSHEY: Good morning, Your Honor. Yeremy Krivoshey. I'm here on behalf of Plaintiff Erin Weiler, a plaintiff in another case, but we are intervenors here today.

THE COURT: Very good.

All right. Good morning, all. We've got two motions. We've got plaintiffs' motion for preliminary approval of the class action settlement. There's also Ms. Weiler's motion to intervene and to deny preliminary approval.

Now, I understand that Ms. Weiler is a movant here, not a plaintiff in this case, but I think I would like to deal with the motion to intervene first. So I apologize if this is an ambush. I mean, I've got, I guess, really just two questions that I would

ask of you. But I would like to hear from Mr. Krivoshey on behalf of Ms. Weiler, and then I will turn to hear from Mr. Zigler, then I'll turn over to Amazon and hear from them. And, Mr. Krivoshey, to the extent that you would like to give any final words, I will give you that opportunity as well.

All right. So you let me know. I guess, what is it that you would like for me to know here on your motion to intervene? I have certainly reviewed the papers.

MR. KRIVOSHEY: So, Your Honor, I think the first point I would like to make on the motion to intervene is that it should really be decided second. And I want to respect that you wanted me to talk about that one first, but the reason I say that is because some of the decisions that we are citing in our motion to intervene, like the *Hilsley* case, the *CO Craft* and *Ross* cases, those courts all considered preliminary approval first, because it matters -- because it makes more sense to discuss intervention after knowing what's happening with the underlying settlement. Because, obviously, if the Court is inclined to grant preliminary approval, then I think, in that posture, we may be willing to stipulate that it makes more sense to pause intervention and proceed to final approval. However, you know, it's our position that preliminary approval and class certification are improper for mere -- reasons I don't want to -- if the Court just wants to hear about intervention, then, you know, I'll pause talking about those -- but I think it does get you to things, some of the

factors, that are at issue in intervention, such as prejudice to the parties. You know, whether it's going to upset the case schedule and timeliness all really boil down to the question of, you know, is the motion for preliminary approval going to proceed, is notice going to go out to the class and -- you know, because our main issue here is the settlement itself. So I don't want to take too much of the Court's time just talking about just the intervention part. I think it does make more sense to go to preliminary approval.

THE COURT: I guess that was the question. I mean, there is the motion to intervene, but, I mean, it really seems to me to be objections to the settlement here.

So I guess my question is, what does intervention get you that simply objecting or opting out -- what does intervention get you as opposed to taking the objection route or opting-out route?

MR. KRIVOSHEY: Sure, Your Honor.

So I think the intervention motion presumes, again, that Your Honor is going to deny preliminary approval. And so once that happens, you know, the parties go back to the posture they were prior to the settlement, which in this case is, you know, Your Honor had relatively recently issued an order on a motion to dismiss and the parties were in discovery. You know, there's been no plaintiff depositions, expert reports exchanged, or anything like that. So I think, in that posture, we would seek to represent the interests of, you know, plaintiffs or consumers

like Ms. Weiler that have incurred return-fee charges and restocking-fee charges, because we believe that the current class counsel has been appointed and the plaintiffs there do not represent anybody in that same posture. And so we would be seeking to represent the consumers, you know, like Ms. Weiler going forward.

THE COURT: All right. Thank you. And, again, I apologize to the extent this was a pop quiz for you. But thank you.

MR. KRIVOSHEY: No worries.

THE COURT: All right. Let's turn to Mr. Zigler. So you can speak on intervention, but please also speak about the motion for preliminary approval.

MR. ZIGLER: Sure.

And thank you. I'm sorry. I'm having a little bit hard time hearing you. Thank you.

Judge, it's unusual that I agree with the movant in this posture. If the Court grants preliminary approval, there's no reason for intervention at all. And we're here today to give you all the reasons why you should grant preliminary approval, so I think that that should resolve the intervention motion as well.

But there is one point that I would disagree with counsel on, and that is, even if the Court is disinclined to grant preliminary approval today, even if you went the other way, there's still no reason to intervene. If you go the other way

and decide, no, go back to litigating, we've already had a fight on lead counsel here, Judge, and you have appointed us, we believe we have done a tremendous job so far, and if we have to go back to litigating and fighting, we're in the best position to continue to do that. And with all due respect to counsel, we don't need any assistance on that in that regard.

And I'll address this in the context of the preliminary approval motion directly, but the premise that there is no one like Ms. Weiler represented here is an incorrect one. We have named the plaintiffs in this case that are similarly situated to Ms. Weiler directly. Even though that's not the requirement under adequacy or typicality, we do have people that are in the same subgroup as Ms. Weiler and they're being represented here and they support the settlement.

So with that, I would like to turn to what I agree with counsel is really the issue here, which is whether or not this is a settlement deserving of issuing notice, so let's get there.

And, Your Honor, we've got a deck that might be helpful --

THE COURT: Sure.

MR. ZIGLER: -- if that's all right.

THE COURT: Please.

MR. ZIGLER: Grant. Thank you.

There we go. Great.

Okay. All right. Your Honor is familiar with the case, but I will give a brief overview. Amazon promised customers free

returns. We filed this lawsuit in 2023. It brought to light the fact that Amazon has been failing to deliver on that promise since at least 2017, failing to refund customers who had properly returned their merchandise. It also brought to light the fact that Amazon employees had been trying to escalate that matter since at least 2017.

How could this problem exist for so long? Well, the answer is contained in our allegations as well, which is that most people didn't even notice, and that's what Amazon knew, and Amazon wasn't going to fix a problem that nobody noticed, but when you complained, they would take care of it, which resulted in a large number of people for whom Amazon continued to owe unpaid refunds for almost a decade.

In March 2024, after this case had been pending for about six months, an Amazon manager was asked, "Have we taken care of these people?" And the answer was, "They have not been taken care of." This issue existed, it existed post this case, and it was one that this settlement here is designed to take care of. It took 13 months of hard-fought litigation, during which this Court denied Amazon's motion to dismiss, writing, among other things, that we'd "adequately alleged that Amazon stole money directly from the bank accounts and continues to possess it unlawfully." It took six months of mediation before a former federal judge, Judge Phillips. But we're here, and we're here on a settlement that we're very proud of, and so let me walk through the terms.

$604 million in overdue refunds go back to Amazon customers. Those overdue refunds have already started to go out. Roughly, $570 million of that has already gone out to class members. Amazon began paying those in 2005 {sic}, spring of 2005.

Amazon will pay another 309-and-a-half-million dollars into a non-reversionary fund to pay class members additional funds, also to take care of fees, costs, et cetera.

And the settlement requires six specific changes to the processes that caused these failures, changes that our expert values at $363 million, and concludes will fix the problems.

So, all told, we have got more than a billion dollars in value to the class.

So let me walk through the terms themselves. You can find this action, Judge, in the settlement agreement. This is Docket 175 {sic}, Exhibit 5.

Slow down. Skipping ahead too fast. There we go.

$604 million in refunds, most of which has already gone out. That's real value to the class that I don't think anybody can contest. But Amazon doesn't concede that it owed anybody any of this money, and there are three different spots on the settlement agreement where Amazon reserves its objection to paying anybody or that it owes anybody at all, and, yet, paid it. Section 4.2.1 says when and why.

After this litigation was filed, defendant identified certain customer records that were potentially unpaid, and, in 2025,

implemented a process to pay those refunds and it did so, including by paying some that Amazon could not confirm that it owed any money. A company that denies owing money and then pays out $500 million doesn't do so voluntarily; it does so because it's being forced to.

Section 4 makes it clear what Amazon is giving. The consideration provides that it "includes monetary and non-monetary benefits provided or implemented during the pendency of this action and preserved, completed, or enhanced through this Settlement."

And then Footnote 6, "...all transactions discussed in 4.2.1 are included in Settlement Subclass A," all 604 million dollars of them. Every one of those customers is a settlement class member, and they're going to get that. And not only that, but then interest on those funds, because those unpaid refunds go back as long as seven years.

So these are not customers standing outside the settlement who happen to get paid; they're class members.

THE COURT: Counsel, I mean, I've reviewed all of this. Let's talk about the subclasses, the allocation, the claims process for Subclass B. Can you walk me through some of those issues? I mean, I certainly have questions for you, but if we could skip to that part of your deck perhaps --

MR. ZIGLER: Understand, Judge.

THE COURT: -- that would be a good use of our time.

Here we go.

MR. ZIGLER: All right.

THE COURT: So this split, how was the split derived here?

MR. ZIGLER: It was negotiated. That's answer No. 1.

The subclasses were separately negotiated in front of Judge Phillips, with an understanding of what the claims possessed and their potential litigation risk for each, and we pressed to get as much for each class as we could individually get. That's the headline there, Judge.

THE COURT: You said that you pressed on behalf of Subclass A, Subclass B. Is there any sort of structural conflict there with you pressing for both subclasses and to achieve what you have represented here as a full refund, plus interest, for both classes?

MR. ZIGLER: Yes, Judge, it's covered. We've got ten subclass -- or ten class representatives. We have six of those class representatives that hold both A and B claims, and we have four that hold B claims alone. All ten support the settlement, all ten were informed about its process and what it provides. There is both typicality and adequacy across all.

THE COURT: Sure. But, I mean, adequacy of the named plaintiffs here, but in terms of your ability as counsel to represent both classes, is there any sort of conflict that exists there in your ability to zealously advocate on behalf of both

groups?

MR. ZIGLER: No, Judge, there isn't a conflict between that, and we made sure that there were structural assurances to prevent just that, and that includes separately negotiating the amount that would be paid to each and doing that adversarially, while supervised by Judge Phillips.

So because we had clients in each group and because we separately negotiated them to try to get the most possible, and it wasn't just simply counsel deciding here's where we're going to draw a line, this is the amount we're giving to one group, this is the amount we're giving to another group. There was no conflict of interest whatsoever and not one that the Court needs to be concerned about. Of course, the Court knows that only real and significant conflicts are required.

Here, the main issue has to do with an amount of information and the distribution. So let me go through why that's important and why the numbers look a little off but they're not quite. It just needs a little bit more explanation.

The difference between the two groups, Judge, is not their claims but the amount of information that Amazon possesses that would allow the proof of their claims through use of Amazon records alone. Okay? And let me walk through that a bit.

So there are some claims for which Amazon, in our view -- and in Amazon's view, Amazon thinks nobody is entitled to anything and none of these can be proven -- but in plaintiffs' view,

there's a group of claims, Subclass A, to which Amazon has all of the records necessary for us to come forward and try to prove their claims to you, and we think that we would be successful.

THE COURT: Hence, the automatic payment to Subclass A?

MR. ZIGLER: Yes.

And so as a result, we have got all the information, there's no need to be a claims process. Take that money, give it to them, it's theirs.

Subclass B, on the other hand, is a category in which, in looking at the data that Amazon has, at this point, we believe that there would have been necessarily an individual showing or some sort of statistical proxy to try to show which of those transactions were incorrect and who, among those, were entitled to recover. And let me just give Your Honor a couple of examples so that you understand.

One of the problems that happened in this case was that when somebody returns something to Amazon, Amazon tracks most of it all the way through the process, but what's not tracked is what's in the box. If you take a return to UPS -- and I'm going to use UPS as my example because that's what I use; there's Whole Foods and Kohl's and other ways to do it -- but you take a box to UPS, you bring it in, they scan it, and they take it. Nobody at UPS is looking in the box to see what's in the box, to see if the merchandise that you're returning is actually what you're supposed to be returning. Is it a brick? Is it an empty box?

Is it used? Is it ripped? Nobody is checking any of that. Okay? And there are in fact people out there who will return empty boxes or used beach towels or a brick in order to try to recover money that they otherwise wouldn't recover.

We undertook every instance to try to make sure that those aren't people in our class; that we're not trying to represent people who are trying to defraud Amazon or any other retailer. But those are people that we need to make sure to exclude from our class and not try to recover damages for. Your Honor knows that we can only pay people who have damages; we can only pay people who have standing. And so those are people that need to be eliminated both from a litigated class certification case and a settlement.

Then we have to track the return through Amazon's returns logistics system. So even if somebody put the right item in the box, then there are problems at Amazon that make it difficult to determine whether or not they successfully did that. And I will give you an example. Let's say somebody bought two different T-shirts, two different black T-shirts, one Hanes and one -- I don't know -- some other brand. Bought two. Returned one. It's frequently difficult for the person at the other end of that logistics chain to open up the box, and there's a black T-shirt in there that's been unwrapped, which one was returned, was it this brand or was it that brand, and there are mistakes that happen in that process. There's not data to show whether or not

the person at Amazon who tagged it as one shirt over another made the correct call.

THE COURT: So you have identified the problem; you have given me two examples as to how the problem might unfold. How are these claims being evaluated? If I'm a Subclass B member -- I believe I am -- and I submit my claim, how is it decided whether or not my claim is approved?

MR. ZIGLER: Okay. That gets us to the claims process, Judge.

So for the claims process -- Nolan, could you help me out?

For the claims process, we try to make it very easy. Like I said, for those A people, they're just going to get paid. For the B people, any time anybody has had any return that has not been paid in full, gets prefilled on the electronic form to show them you had this return, this is how much it was, this is the number, this is the reject reason. Tell us why we got it wrong. Okay? It depends on the reason for the problem, for what somebody would have to do to correct it, but we have given the latitude to the claims administrator to say: All you need to do is meet the lowest standard burden, tell me, by a preponderance, that you're entitled to this. And that could be a number of different things. If it is we never received that return -- I like to think about it this way. If that individual had a small claims case against Amazon, and Amazon came forward and said, Look, we never got that package, what would it take for that

individual class member to prove that to a preponderance? In that particular instance, it would likely take their testimony. They would have to come forth and say, Well, I dropped it off, here is my receipt from UPS, you know, here is some GPS tracking of me driving to the store, here is, you know, a picture that I took outside. It could be any number of things. And it might be just be their testimony: I dropped it off, I remember for a fact. That would be enough, I think, likely, for that person to meet the preponderance standard in a small claims court case. This is no different than that. We need that person to give whatever it takes to get us over that hump.

Now, if Amazon records show what we really got in that package was a brick, what we really got in that package was an empty box or a dirty beach towel, I think the standard would be a little higher for that person to try to justify that, oh, no, that's wrong. What that is in that particular instance, it's difficult for me to say. But depending on what the objection is or the stated reason for rejection of the return, we're going to leave that to the settlement administrator to decide, with input from both -- from plaintiffs' counsel.

THE COURT: So what's the expected -- do you have an anticipated claims rate or an anticipated grant rate for these Subclass B members submitting claims?

MR. ZIGLER: Sure, Judge, we have both of those things. So we have expert opinion that is in the record that talks about

error rates, and this is something to keep in mind. Let me talk about -- so for notice purposes -- and I think you will see this in Exhibit A to the Weisbrot declaration. It talks about notice population. The 8.7 million people getting notice for Subclass A. If they're in Subclass A, they get paid. The 50 million people in Subclass B are getting notice. Now, let's talk about what that is. 50 million people filed -- or returned something to Amazon and didn't get a full refund. Now, that doesn't mean that Amazon did it wrong. That just means they didn't get a refund because they didn't return it because they changed their mind, because they returned a brick, whatever that might be. Amazon's records show an error rate of about 1.1 percent. So if you take that 50 million and you knock that down to 1.1 percent, we're talking about -- you know, help me with math here -- 500,000 people. Okay. So we have got 500,000 effective potential claims against Subclass B. Claims rates have always been, I don't know, the real trouble in consumer cases, right? I would say you can lead a horse to water, but you can't make them drink. You can do everything you can to try to make it easy and sometimes you just can't get that person to do what's necessary to file the claim. Here, we have done everything we can possibly think of to try to make that easy. We're going to send them an e-mail that says "Click this button to file a claim." It's going to prefill all the information they need to file a claim, so all they'll need to do is supply the one bit of information that we

don't have, which is why is this wrong, click "Submit," their claim is in.

I would like to say that we're going to have a high claims rate, but when we look, historically, at what happens, you're looking at between 1 and a half percent and 10 percent on a good day. I'd like to say that it's going to be much higher than that, but I think if we're trying to do some projections, we should use between 1 and a half and 10 percent to project.

THE COURT: And is that what's baked into the assumptions for you to get to a place, again, where you can represent full refund to the class members?

MR. ZIGLER: Yes, Judge. Any redemption rate in that range gives us full refunds for everybody who -- in B. Remember, everybody in A is getting full refunds plus interest. So we're just talking about B, which is the tail, and any redemption rate in that range gets its full refunds, plus interest, to those people in B.

THE COURT: All right. Thank you.

MR. ZIGLER: Did Your Honor have any other questions or should I just --

THE COURT: No. That's what I had on that particular subject.

MR. ZIGLER: Okay. I wanted to -- you know what, Your Honor? You know more about this than I do, so if you are satisfied, I will sit down, but be ready for any more questions.

THE COURT: Give me a moment. Let me check my outline on the subject of the split between the subclasses.

Let me see if there's anything else I would like to ask you about.

Walk me through the notice campaign.

MR. ZIGLER: Notice campaign.

Can you bring up the notice for me, Nolan?

Again, here, Judge, when -- I have done a lot of these settlements. When we design these settlements, we do everything we can to make sure that they're both easy for the class member -- you know, those are our clients -- and we also want to make sure that we check every box. You know, we research this to the end.

E-mail notice goes out to everybody. So I gave you the numbers from the Weisbrot declaration. We're sending e-mail notices to all of those people. That's the e-mail we have on file with Amazon. So this is what they're using to log into Amazon to buy merchandise. It's how Amazon has been communicating with them for a long time. We think that that's going to be good records. But we're also going to do a reverse lookup for all of those e-mail addresses to make sure that we've got good ones. That e-mail goes out three times to everybody. And we're doing e-mail, Judge, because, you know, we've got a duty to this class to make sure that we get them the money. At 50 million people getting notice for Subclass B, that's a lot of

postal expense if we just send them all a letter, which would eat up the fund unnecessarily. So we're going to send them three e-mails. And for those where we can't, it's undelivered -- where after three e-mails is undeliverable, the fallback is a postcard. Okay? So we're going to make sure that it gets out to them. We've got an Internet campaign and an Internet site as well, but we're not doing publication in papers. Okay?

The big point here, which raises an issue that was raised before, is that there are different notices depending on which group you're in. If you're a Subclass A member, you get a Subclass A notice. If you're a Subclass B member, you get a Subclass B notice. If you're in both -- and there are some that are in both -- you get a notice that covers both.

So this will tell you right up front you are in Subclass A, you're going to get paid. You can follow this link and pick the way that you are going to get paid or you can do nothing and you will still get paid. If you are a Subclass B member, you need to click on this link and you need to file a claim.

So everybody is informed about what the rights are, how to act, depending upon which class they're in, and there's no confusion about that. It comes from Amazon's records, which have already been provided to Angeion.

Can you bring up the notice itself?

So we've got the notice we filed, Exhibit 2 to the settlement agreement, Judge. This is 171-5, Exhibit 2. The notice contains

everything that the FTC recommends. It's in a clear, easy-to-recommend {sic} format, designed by Angeion, which has been doing this for a long time, and they cover everything. We have got it in multilanguage, as clear as can be.

Go ahead. Take me to the next slide, please.

Let's see. The very first clause tells you what you need to do. This is for A. You know, you automatically get a payment.

This is B. It says you're potentially a class member. Because we don't know. We don't know if Amazon screwed up your return or not. So you are going to have to file a claim to tell us. You have been identified as a potential settlement class member. You may be eligible.

The first page has the rights grid. It gives all the information that's required for due process. Subclass A, automatic. Subclass B, you need to file a form. Claims deadline.

Can you take me to the claims form?

The claims form, Judge, is in there. It is Exhibit 1 to the settlement agreement. It has a form in it. Obviously, it's difficult to show the judge a web page, but this will be an interactive web page that will fill in all the information necessary for somebody to fill out the form.

I wanted to note, we're sending this by e-mail. Some people can request it by mail. It would have a link in the e-mail. Click the link, fill it out. But it also has a QR code, so if

somebody prints it out or they get it by mail, they can scan it with their phone and fill it out that way.

Did that cover what you were looking for, Judge?

THE COURT: It does. Thank you.

MR. ZIGLER: Okay.

The one thing that I did want to raise before I sit down, we have been asked: Why not just take all of this money, put it together, throw it in a fund, and let anybody collect from it? Why didn't we do it? And there's a really important reason for that, Judge, and it's because that makes the you-can-lead-a-horse-to-water-but-not-make-them-drink exponentially worse. If we take all the money and put it in a fund and then assume a 50 percent claim rate of that, then we're talking about millions of people who would otherwise get paid are not getting paid. In all the time that I have been doing this, every time we have the opportunity just to send people money and not make them do anything, that's the course we want to take, and that's why we did it here, Judge. And we did it with as many people as we possibly could, and we limited it to only those people where we could, in good faith, send it out.

The other thing is, Judge, we have this fiduciary duty to make sure that only class members get paid and not other people, not random people, not anybody off the street. And for Subclass B, we can't just open it up to everybody. That invites fraud. It invites the fund to be diminished by people who shouldn't get

paid. And those people are my clients. My people, my clients, are the people who were wronged by this process, and I need to make sure the money gets into their hands.

THE COURT: All right. Thank you, Mr. Zigler.

MR. ZIGLER: Thank you.

THE COURT: Who will speak for Amazon? Is that you, Mr. Kaba?

MR. KABA: Yes, Your Honor. Thank you, Your Honor.

I actually don't have very much to say. Unsurprisingly, I will note we vehemently disagree with much of Mr. Zigler's characterization of the --

THE COURT: I figured you might say something like that.

MR. KABA: -- of the what happened. There is a record. I want to make that very clear. Obviously, a resolution is not an adjudication of the merits or a concession of any form of liability, which we have reserved expressly in the agreement.

That said, the negotiations, how hard fought this was, how, despite our disagreements, with the assistance of Judge Phillips and his team, we were able to put aside much of that and try to arrive at a compromise. And Mr. Zigler's representations as to how there were these distinct negotiations to arrive at the amounts for each of the subclasses are all, of course, accurate. And if the Court has questions for us, I'm happy to answer them. Otherwise, the papers are quite extensive here.

THE COURT: Yeah.

And the amount that Amazon has endeavored to pay, something like 600 million or so, and 34 million remaining to be paid, that was the representation as of the date of the filings that I received, which obviously were some months ago. Is the figure still at about 34 million?

MR. KABA: No, Your Honor. Both of the numbers have actually changed a little bit. So due to some data refreshing, the 600 is a little bit under 600 now, based on the best data we have, and I believe it's 19 million at this point that remain outstanding. But as Your Honor knows, under the terms of the agreement, we are going to continue to endeavor to pay even that amount out, and that is not a part of the 300-plus million that's going into the payments for the remaining A and B.

THE COURT: And this settlement, just big picture, I mean, what does this settlement obligate Amazon to do that it wasn't already doing?

MR. KABA: Sure.

A number of things, Your Honor. And this is laid out in the settlement agreement at Section 4.3. There are at least six practice changes. I'll describe them broadly. Of course, Your Honor, I would be remiss if I didn't say that Amazon is always continuously trying to improve its processes and ensure that it's getting it right for its customers. As the Court is well aware, there is a lot of volume on Amazon.com, there is a lot of transactions generally, and so it's an ongoing process.

As part of this settlement, there are a number of changes and a number of commitments, I would say, that are being made that are laid out, as I said, in more detail in the settlement agreement. But to describe them broadly, there is additional monitoring of returns processes, there is automatic and manual reprocessing, which is a pretty significant obligation, of delayed refunds, there is more customer notification.

Mr. Zigler made a reference to, well, if the customer doesn't know, maybe it won't happen. There's additional steps being taken to notify customers if a return is being, for example, delayed or if a refund is being denied. And then there is additional proactive refunding, Your Honor, if a customer's returned product is not graded within a certain amount of time. So just a brief word on that, so the Court appreciates the significance of that, and plaintiffs' experts have valued this nonmonetary relief.

So when somebody returns something, it will undergo a grading process for many reasons, including is it damaged, is it the same -- you know, is it being returned in the original quality or resalable quality, et cetera. So as part of this resolution, if, for some reason, the grading process is not completed within 90 days, then we will take reasonable steps to proactively refund the customer, even if the grading would have resulted in a poor grade for that product. So, obviously, there's carve-outs for fraud and other abuses, but that's a high-level description, Your

Honor, of some of the nonmonetary but very valuable forms of relief that we have also agreed to as part of this resolution.

THE COURT: All right.

And just in looking at the record, I mean, the motion for preliminary approval is presented by interim class counsel. I mean, I have certainly read the settlement agreement which Amazon has signed. But just to, you know, make the record clear, I mean, are you affirming that the settlement here is fair, reasonable, adequate, as it relates to the class?

MR. KABA: I would say it's overly fair and incredibly -- well, reasonable from the perspective of the class certainly, Your Honor. But, yeah, we stand in support of the plaintiffs' preliminary approval papers and, of course, ultimate approval as well.

THE COURT: Very good. All right. Thank you, Mr. Kaba.

MR. KABA: Thank you.

THE COURT: Mr. Krivoshey, is there anything you would like to add? I mean, the motion was styled as a motion to intervene and to deny the preliminary approval. So is there anything else that you would like to tell me?

MR. KRIVOSHEY: I would like to speak briefly.

THE COURT: All right. Briefly.

MR. KRIVOSHEY: Okay, Your Honor. So you're being asked to do two things with the motion for preliminary approval. As you know, you first have to grant class certification, and then,

at that point, and only at that point, move to determine whether the settlement was fair and reasonable. One thing that no one has discussed today so far is the motion to grant class certification itself. And I don't think that Your Honor can move on to Step B because class certification is not possible under the rules.

One of the most fundamental blocks of a motion for class certification is telling the Court what the class is. The class has to be ascertainable by reference to -- it must be objective, it must be clear, and it must be written in simple terms that any person on the street reading it can understand it.

Subclass A, Subclass B -- class counsel seek for the Court to certify those subclasses -- those subclasses are not defined. The Court cannot certify a class that is undefined.

Now, that leads us to the second issue. The Court must determine whether the class representatives that have been put forth to represent those subclasses are adequate and typical under Rule 23(a)(3) and (4), and it is not possible to determine whether they're typical or adequate when class counsel has not disclosed to Your Honor even the names of those class representatives.

So there's been a couple of different representations that have been made. In their opposition to our motion, they said that nine out of the ten representatives are members of Subclass B and that one is a representative of Subclass A. Today, it's a

slightly different representation. Today, we have been told that six hold both A and B claims while four hold B only. But that doesn't get us to the question of who are these people. So when the Court is writing its order on class certification, it cannot appoint a class representative as adequate and typical without knowing who that person is and what exact transaction qualifies them to be in that class. Now, without knowing what the definition of Subclass A is, it can't do either part, because it can't say it is adequate of the people within that subclass without knowing exactly what that subclass is and then not knowing their names.

Because, you know, as objectors, it's very difficult for us to, you know, evaluate the merits of adequacy and typicality, and I think it should be for Your Honor as well, because we haven't been told. And, you know, all we have right now -- there's no plaintiff declaration submitted in support of preliminary approval. All we have is the complaint, and the complaint alleges that every single one of these people, effectively, had one fact scenario: They all returned items, they requested a refund, and they received an instant refund under a then-novel program, and then every single one of them was then retro charged back. One plaintiff, Abbott, purportedly, the retro charge was not for the full amount, so they describe her as a partial refund. So that's Step 1.

But that also gets to -- that overlaps with issues with

notice. Because 23(c) requires that class notice define the class so that people are notified that they're part of it and can determine whether they want to participate, whether they want to opt out, whether they want to object.

None of the notices tell people what the definitions of these classes are, because they're not defined in the class itself. So it's not possible for somebody to be notified of, you know, this settlement, in a proper way, without being told what the class is. It's not fair to ask class members to determine whether they believe that this class settlement is fair and adequate or they want to opt out or object if they're not told what the class is.

Now, there's a couple of other issues on the merits of the settlement itself. So Your Honor was asking class counsel about the issue of adequacy or conflict as representing both people in Subclass A and B, and there was this kind of very vague and generalized description of how those negotiations went. And, obviously, I was not there at the mediation, but I can see the end result. The end result is one common fund of 309 million and so in change. It is one fund, and it is divided based on a percentage. It's not even based on some sort of number of, you know, it's 50 million for you and 250 for the other. It's based on a percentage. And when you are dealing with one fund with two separate subclasses, that, by definition, just makes it a -- you know, it makes it a zero-sum game. Every single dollar taken away from Subclass A is given to Subclass B. That is an inherent

conflict. And so when the same counsel represents class members from which it takes, it benefits the other to the jeopardy of the other.

And I don't think that there's been any suggestion that there were teams, you know, that had some sort of, you know, wall placed behind them so they didn't know what the other one was negotiating. Maybe if the process involved, you know, we're going to have one mediation to get the final number for Subclass A, write that down, make that binding, and have a second mediation with a completely separate fund to determine what's in Subclass B, you know, that would be a more plausible structural issue that perhaps could have addressed this. But that's not what happened. They had a couple of mediations; the end result of which was one fund that is split, and, you know, every dollar going to one subclass takes away from the other.

The next issue that I want to talk about is, again, who is in this class. Because Your Honor was asking about the claims process and whether people submitting claims -- if enough people -- if there's going to be enough of them to get full refunds, you know, plus interest, what does that look like. And Mr. Zigler made the representation that he only represents people with a valid claim. Right? He only represents people that can prove, under a preponderance-of-the-evidence standard, that they're entitled to these benefits. So, effectively, what that means, they've made an opt-in procedure but given an opt-out

release. Right? The release for the settlement is structured that so long as -- if you do nothing, you are bound. But the claims process requires you to prove your claim. According to Mr. Zigler's statements, if you can't prove your claim, he doesn't represent you. So he only represents the winners, right? And so if somebody is out there with a borderline claim and the claims administrator denies that claim, by definition, it appears that class counsel does not represent them. So now we're put in the situation of, you know, I represent Ms. Weiler and class members like her that were charged return fees and restocking fees, and class counsel can't tell me whether they represent her because they wouldn't know if they represent her until there's been a determination that her claim survives under the preponderance of the evidence. I think this is what's called a fail-safe class, you know, in the literature, because the class only exists if it wins. That's just not how opt-out classes work. That is an opt-in procedure, like they have sometimes like under the FLSA and other statutes.

The other part is the claims procedure. The analogy that's been used by Mr. Zigler is, he said, this is effectively like -- we have tried to give them the same process and the same burden that they would see in a small claims court, and that is an interesting statement to make because, in small claims court, right, you're significantly better off as a class member than you would be under this settlement. Because in the small claims

court, you have no cap to your potential damages. So if every one of these people wanted to submit a claim, they would not have an automatic ceiling of about $15 million total that could ever be paid out to them under the settlement, because the total fund, you know, the total amount of transactions at issue, for Subclass B, is well over $800 million. So if these people were all to submit claims, in small claims court, the max they could get is the 850. Now, would all of them get it? Probably not. But they would still have the benefits and protections of, you know, a judge evaluating their claims, they potentially may be entitled to discovery, they may have appeal rights, they can be represented by counsel, depending on which smalls claims court it is, not all small claims courts do that.

THE COURT: Mr. Krivoshey, I mean, these sound like objections that you can make. I will give you two more minutes here to wrap things up.

MR. KRIVOSHEY: No, Your Honor. That's all I have.

THE COURT: Okay.

MR. KRIVOSHEY: Thank you.

THE COURT: Mr. Zigler, I will give you three minutes or less to respond here. Do you have anything that you would like to add in response to what Mr. Krivoshey has just given?

MR. ZIGLER: Sure, Judge.

Can you bring those up?

So counsel is right, he wasn't at the mediation. Mediation

privilege applies. So I would love to tell the Court everything that happened, because these were potential objections that we were keyed in on to make sure that we covered, but what the judge has is a declaration from Judge Phillips that lays all of this out. He was in the room, he swore to what happened, and I can't go beyond what Judge Phillips says because I'm prevented from doing so. But this is here. It is Document 173-3 {sic}.

And, Nolan, if you could take us to the next couple of slides?

We can just walk through them: Sophisticated and capable counsel, bona fide and contentious negotiation, each side advocating its own risks.

Get me to the next one.

So no sense of collusion.

The next one, please.

It did not settle right away. This wasn't predetermined. It took many months.

Keep on going, please.

Mr. Phillips -- or, I'm sorry, former Judge Phillips and two other mediators. Not a deal we fell into.

Please go -- keep on.

Mr. Phillips thinks that this wouldn't have even settled had we not taken it to him and if it hadn't been for his hard work.

There should be one more, I believe. No?

He, in his declaration, talks about how each side has its own

view of damages and how disparate it was and how we negotiated each part of it, including the damages number. So all of this was separately negotiated. We've got evidence in the record from Judge Phillips. If we need a supplemental declaration at final approval, we will give it to Your Honor, but it's certainly not a requirement here for preliminary approval.

THE COURT: All right.

MR. ZIGLER: As for the typicality and adequacy of the class members, as the judge knows, for adequacy, we only need one; for typicality, this is not a balkanization of every possible factual permutation that might be there. But we have got ten plaintiffs overall, over both subclasses, distributed throughout, and all it takes is looking at the complaint to see what's there.

In the complaint, we allege nine with Subclass B claims and two with Subclass A claims. That's what we alleged in the complaint, because we didn't know all of their claims. But when you look in the class data, it's even more broad than that, as we would expect. Okay?

Just on this typicality point, there's a case that couldn't be more on point, Judge. It's called *Just Film v. Buono*, 847 F.3d 1109, Ninth Circuit, 2017. The same issue here. You had some people got a refund, some people didn't get a refund, some people just had time. The Ninth Circuit looked at that and said you don't need somebody from every category. The facts are

eerily similar and get us right there.

If the Court has any other questions, I'm happy to address them. This is a settlement that I am proud of, I am certain that we're going to get final approval of it, and it far and away exceeds the likely-to-approve standard for preliminary approval.

Thank you, Judge.

Oh, I'm sorry. Let me make one more point before I sit down, because I promised myself I would.

Although the classes received a great number of benefits already out of the nearly $700 million in refunds, there's a lot that's waiting on this Court to give notice and to give final approval, and, specifically, those are the practice changes. And I get calls from people who say this is happening to me, and I'd like to tell them it's -- I tell them that it's going to get fixed. It can't get fixed until we get to the effective day, Judge.

THE COURT: All right.

MR. ZIGLER: Thank you, Your Honor.

THE COURT: Thank you, Mr. Zigler.

All right. Thank you, all, for the thoroughness of the papers that you have put before the Court. I thank you for your arguments here today.

The question, as Mr. Zigler pointed out, for me here at this preliminary approval stage is whether I'm likely to be able to approve this settlement under Rule 23 and to certify a class for

purposes of judgment. I find that I am, and I will sign the proposed order, which I believe is Exhibit 7 to the settlement agreement that's in the record, and I will make the findings that are recited in that proposed order.

So I will preliminarily certify the settlement class as defined in the settlement agreement. I will appoint Mr. Zigler and Quinn Emanuel as class counsel. I will preliminarily approve the settlement itself as fair, reasonable, and adequate. I approve the notice plan -- and the form of the notice is attached -- as well as Angeion Group as the settlement administrator.

As for the motion to intervene or to deny preliminary approval, it's obviously denied. The arguments that were made today can be made in the form of objections. There's no waiver there. Certainly Ms. Weiler can opt out. But the motion is denied.

Is there anything else to address while we're all convened?

MR. KABA: Nothing from us, Your Honor.

THE COURT: All right. Thank you, all. Have a good day.

(Adjourned.)

C E R T I F I C A T E

I, Nickoline M. Drury, RMR, CRR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do certify that the foregoing is a correct transcript, to the best of my ability, from the record of proceedings in the above-entitled matter.

/s/ Nickoline Drury

Nickoline Drury