THE HONORABLE JUDGE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE: AMAZON RETURN POLICY LITIGATION

Case No.: 2:23-cv-01372-JNW

**DECLARATION OF ANDREW H. SCHAPIRO AND AARON ZIGLER IN SUPPORT OF PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS**

I, Andrew H. Schapiro, and I, Aaron M. Zigler, hereby jointly state as follows:

1. Mr. Schapiro is a partner at the law firm Quinn Emanuel Urquhart & Sullivan, LLP. Mr. Zigler is the founding member of the law firm Zigler Law Group, LLC. Quinn Emanuel and ZLG were appointed interim class counsel in this action, (Dkt. 56), and Class Counsel for the Settlement Class, (Dkt. 193). We have each been involved in this case from its inception. We make this declaration on personal knowledge, our review of the record, and our firms' time and expense records, and, if called as witnesses, we could and would testify competently to these facts. Where a fact is within the knowledge of only one of us, we say so.

2. We submit this declaration in support of Plaintiffs' Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Service Awards. It describes the work Class Counsel performed, including before this case was filed; how that work produced the relief in the Settlement; Class Counsel's lodestar and expenses; and the Class Representatives' contributions. Exhibit A summarizes Quinn Emanuel's time, Exhibit B summarizes ZLG's time, and Exhibit C is the official transcript of the August 17, 2026 preliminary approval hearing.



QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WA 98101
TEL: (206) 905-7000

**Class Counsel Identified and Investigated These Claims Before Suit**

3. This case began with the experience of Blair M. Zigler, ZLG's co-founder and Chief Executive Officer. B. Zigler Decl. (Dkt. 46) ¶¶ 2-3. Ms. Zigler is now ZLG's Managing Partner after being admitted to the Illinois bar in November 2026. All of her time in ZLG's lodestar is billed at non-attorney rates. In late 2022, Amazon charged Ms. Zigler for an item she had timely returned, and the same thing happened several more times in early 2023. *Id.* ¶¶ 7-8. She began to wonder how often Amazon was doing this to other customers, and how many of them, unlike her, never noticed the charge. *Id.* ¶ 9. Some of her 2023 experiences are the allegations relating to "Customer 1." Schapiro & A. Zigler Decl. (Dkt. 171-1) at 2-3; First Amend. Consol. Compl. (Dkt. 116) ¶¶ 47-74.

4. On May 8, 2023, Ms. Zigler began investigating, under ZLG's supervision, with a view toward potential litigation. Dkt. 46 ¶ 10. During that pre-suit investigation, she interviewed 71 Amazon customers about their returns and about any instance in which they had been charged for an item they had timely returned. *Id.* She also reviewed online message boards and news articles and identified dozens of other Amazon customers who had encountered the same problem. *Id.* ¶ 11.

5. Once it appeared that Amazon's practice of charging customers for returned items was systemic and nationwide, ZLG's lawyers began identifying potential legal claims. *Id.* ¶ 12. Mr. Zigler directed ZLG staff to determine whether anyone had already sued Amazon on similar claims, and in mid-June 2023 ZLG lawyers began drafting a complaint under his supervision. A. Zigler Decl. (Dkt. 45) ¶¶ 22, 25. Mr. Zigler researched the elements of the potential claims and likely affirmative defenses, including deception, reliance, and unfairness under the Washington Consumer Protection Act, and consulted Washington's model jury instructions. *Id.* ¶¶ 26, 31.

6. In mid-June 2023, Mr. Zigler contacted Mr. Schapiro about a potential partnership to investigate and, if warranted, prosecute the claims. *Id.* ¶ 24. We had worked together as co-counsel in an earlier consumer case against Amazon. *Id.*; *see* Schapiro Decl. (Dkt. 47) ¶ 6. Mr. Zigler also knew that this District's local rules would require local counsel, and that Quinn Emanuel had a Seattle office whose lawyers had litigated consumer cases against Amazon here. Dkt. 45 ¶¶ 23-24. From late June 2023 on, ZLG and Quinn Emanuel held weekly calls to coordinate the investigation and the complaint. *Id.* ¶¶ 27, 31.

7. While the complaint was being drafted, ZLG continued interviewing customers, in part to understand what might be causing the errors in Amazon's return process. *Id.* ¶ 28. The original four plaintiffs retained ZLG between June 16 and June 25, 2023, and ZLG ran background checks to confirm that each would be an adequate class representative. *Id.* ¶¶ 21, 29. The proposed complaint was shared with the plaintiffs for review on August 26, 2023, and filed on September 5, 2023. *Id.* ¶¶ 34, 36; Dkt. 1.

8. Class Counsel's time records reflect 188.3 hours of work before the complaint was filed: 152.3 hours by ZLG, beginning June 13, 2023, and 36.0 hours by Quinn Emanuel, beginning August 2, 2023 (although Quinn Emanuel lawyers did begin work before that date, they do not include them in the lodestar calculations here because those hours were not consistently tracked under a firm matter number). ZLG's investigative work before June 13, 2023, is not reflected in ZLG's time records, which begin on June 13, 2023, and is not included in the lodestar. ZLG's 152.3-pre-filing hours are fewer than the 164.9 pre-suit hours reported by ZLG in Dkt. 46 ¶ 15 for two reasons. First, that figure came from a time report run on September 7, 2023, and inadvertently included 9.2 hours recorded on September 5-7, after the complaint was filed. Those 9.2 hours remain in ZLG's lodestar as post-filing time. ZLG's contemporaneous records show 155.7 hours before filing, consistent with the monthly figures in Dkt. 45 ¶¶ 30, 32, and 35. Second, the audit described *infra* ¶ 28 removed 4.0 hours of duplicate pre-suit entries, and later corrections to individual entries added a net 0.6 hours, for a final figure of 152.3 hours.

9. The investigation continued after filing. ZLG received regular inquiries from affected customers, vetted their claims, and were retained by several. Dkt. 46 ¶ 14. By November 2023, Class Counsel had interviewed 197 customers. *Id.* That work later allowed Class Counsel to add five class representatives in the consolidated complaint and two more in the First Amended Consolidated Complaint. Dkt. 58; Dkt. 116; Dkt. 171-1 at 5, 14.

**B. Appointment as Interim Class Counsel**

10. Two other firms filed shorter complaints asserting the same causes of action, on October 5 and November 7, 2023. Dkt. 171-1 at 4. The Court consolidated the cases and ordered

competing applications for leadership. Dkt. 32. Our applications described the investigation summarized above. Dkts. 44-47, 53, 55.

11. The Court appointed Quinn Emanuel and ZLG. It found that we had "spent substantially more time and resources advancing the interests of the class" and that we had filed first, and it credited the view that we had "done an exceedingly thorough job working up the case, raising a presumption that [we] are the most knowledgeable about the policies and practices at issue and best prepared to advance the litigation." Dkt. 56 at 5. The Court also directed interim lead counsel to maintain adequate time and disbursement records and to monitor co-counsel to avoid unnecessary expenditures of time and funds. *Id.* at 7-8. We did both, as described in Part H below.

**C. Pleadings and Amazon's Motion to Dismiss**

12. Class Counsel filed a consolidated complaint on March 25, 2024. Dkt. 58. Amazon moved to dismiss Plaintiffs' claims for money had and received, unjust enrichment, promissory estoppel, and conversion. Dkt. 62. Notably, neither of Amazon's motions to dismiss challenged Plaintiffs' breach-of-contract or Consumer Protection Act claims. Dkt. 171-1 at 6. On April 29, 2025, the Court denied Amazon's motion in full, holding that Plaintiffs had plausibly alleged each of their claims. Dkt. 112. Plaintiffs filed the operative First Amended Consolidated Complaint on May 23, 2025. Dkt. 116.

**D. Discovery**

13. Discovery was contested from the outset. Amazon sought to modify the District's model protective order to restrict Plaintiffs' ability to share confidential materials with their experts, and the Court rejected that request. Dkt. 171-1 at 8-9; Dkt. 75.

14. Class Counsel served four sets of requests for production, containing more than 250 requests, and four sets of interrogatories. Dkt. 171-1 at 8. On behalf of each Plaintiff, we prepared and served responses to more than 300 requests for production and roughly 100 interrogatories, and later supplemental responses. *Id.* at 8, 13-14. We reviewed hundreds of thousands of pages of documents produced by Amazon. *Id.* at 8-9.

15. Discovery produced six contested motions to compel. Dkt. 171-1 at 9. On September 30, 2025, the Court granted in substantial part Plaintiffs' first two motions to compel, on document


QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WA 98101
TEL: (206) 905-7000

production and interrogatory responses, finding Amazon's interrogatory responses "evasive" and at least one of its objections "borderline frivolous." Dkts. 81, 93, 156; Dkt. 171-1 at 7, 11. When the parties reached a settlement in principle, Plaintiffs' motions to compel on custodians and on additional document requests and Amazon's two motions to compel remained pending, and depositions of Amazon employees were fast approaching. Dkts. 98, 122, 123, 146; Dkt. 171-1 at 13-15.

**E. The Data Demands, the Mediation Pause, and Amazon's Refunds**

16. From the outset, Class Counsel's central objective in discovery was Amazon's transaction data, which would show how often customers had been denied refunds or charged after returning merchandise. On September 27, 2024, Class Counsel sent Amazon a 23-page letter narrowing Plaintiffs' requests and proposing a statistically significant sample of the data. Dkt. 82-4; Dkt. 171-1 at 10. Amazon maintained its objections, Dkt. 82-6, and Plaintiffs moved to compel on January 28, 2025, Dkt. 81.

17. Beginning February 16, 2025, the parties discussed mediation and agreed to an informal pause in the litigation so that Amazon could collect the data necessary for mediation. Dkt. 171-1 at 14-15; Dkt. 171 at 3. On May 9, 2025, Amazon informed Plaintiffs that it intended to begin issuing more than $500 million in refunds for certain unpaid returns. Dkt. 171-1 at 15. The first mediation session took place on May 27, 2025. *Id.* As of December 1, 2025, the Settlement Agreement reports that Amazon had issued approximately $570 million in refunds, with approximately $34 million unpaid, on approximately $604 million of transaction values. Settlement Agreement ("SA"), Dkt. 182, §§ 2.2, 4.2.1. At the August 17, 2026 hearing, Amazon's counsel reported that after a data refresh the total was "a little bit under 600" million, with about $19 million still outstanding. Ex. C (Aug. 17, 2026 Hr'g Tr.) 24:6-10.

18. Plaintiffs' expert reviewed Amazon's internal documents, which Class Counsel obtained in discovery. He concluded that problems Amazon had identified "as early as 2020" were "not addressed and persisted well past the filing of this lawsuit"; that "[s]ince the filing of this lawsuit, Amazon initiated numerous projects and 'deep dives' to attempt to fix return errors"; and that "this litigation clearly spurred Amazon into action." Holton Decl., Dkt. 181, ¶¶ 55-57. The

Settlement Agreement acknowledges that Amazon identified the unpaid refunds "[a]fter this litigation was filed" and that those refunds "address some of the same categories of unpaid returns that are the subject of Plaintiffs' claims." SA § 4.2.1.

19. Class Counsel then negotiated terms for the Settlement Agreement that made those refunds a binding obligation, and provided for interest payments on top. The Settlement divides the class into Subclass A (customers whose failed refunds or retrocharges Amazon's records attribute to payment-processing or other system errors, or to Amazon's lack of sufficient confirmation that the correct item was returned, or for which the records give no reason), and Subclass B (customers who had a refund denied or reduced, or were charged again, for a reason Amazon's records state, such as a finding that the item or quantity was incorrect). SA §§ 1.34-1.35; Holton Decl. ¶¶ 63-65, 81-82. Under the Settlement Agreement, Amazon must make reasonable efforts to complete the remaining unpaid refunds and may not claw back refunds already paid, except in narrow circumstances (an account holder's request, suspected fraud or abuse, or legal compliance); the Settlement Administrator will make reasonable efforts to complete from the Subclass A fund any refund Amazon cannot; and every class member with a § 4.2.1 transaction will receive an automatic interest payment from that fund. SA §§ 2.2, 4.2.1-4.2.2, 6.4.1 & n.6.

## F. Mediation and Settlement

20. The parties mediated before the Honorable Layn R. Phillips (Ret.) from May through October 2025, through multiple Zoom sessions and numerous one-on-one conversations with Judge Phillips and his team. Dkt. 171-3 ¶¶ 15-16; Dkt. 171-1 at 15. While mediation continued, Class Counsel kept litigating: we served new discovery requests based on our review of Amazon's documents and briefed contested discovery motions. Dkt. 171-1 at 15. The subclasses' shares of the fund were negotiated separately and adversarially before Judge Phillips. *See infra* ¶ 22.

21. The parties signed a binding term sheet on October 20, 2025, Dkt. 157, and executed the long-form Settlement Agreement on January 23, 2026, after several more rounds of negotiation over the agreement, the notices, and Amazon's data. Dkt. 171-1 at 15. Class Counsel negotiated with Amazon's transaction data in hand, and the binding term sheet protected the class if that data proved inadequate.


QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WA 98101
TEL: (206) 905-7000

- *First*, when settlement discussions began on February 16, 2025, Plaintiffs identified the data they needed to mediate, and on March 3, 2025, the parties paused the litigation so that Amazon could collect it. Dkt. 171 at 3; Dkt. 171-1 at 14-15. Amazon then collected and provided data for use in the mediation, which Class Counsel analyzed before the first mediation session on May 27, 2025.
- *Second*, Class Counsel took confirmatory discovery, SA at 2 (recitals), and Symphony used it together with Amazon's anonymized transaction files to value the Settlement's practice changes. Those files cover each of the twelve Subclass A categories and the Subclass B categories, from roughly January 2017 through September 2025. Holton Decl. ¶¶ 69-70, 76, 81, 85.
- *Third*, the Settlement Agreement conditioned Plaintiffs' willingness to proceed on the sufficiency and accuracy of that data. Plaintiffs could terminate if they believed Amazon had not provided sufficient data or the data proved materially inaccurate, incomplete, or misleading, or if the Subclass B claim pool exceeded 200% of the approximately $400 million estimate in SA § 2.3 or the Subclass A transactions exceeded 120% of approximately $81 million. SA §§ 12.1.1.1-12.1.1.2.

The "Class Data" that SA § 5.5.1 required Amazon to deliver to the Settlement Administrator within 21 days after the preliminary approval motion is a different set of data. It identifies each customer account, with contact information, order numbers, dollar values, and the reason for any refund denial or retrocharge, so that the Administrator can send notice, determine class membership, and verify claims. SA §§ 1.9, 5.5.1-5.5.2, 6.2.3.

22. Attached as **Exhibit C** is a true and correct copy of the official transcript of the August 17, 2026 hearing on Plaintiffs' motion for preliminary approval, which the court reporter filed as Dkt. 197 ("Tr."). Both of us attended the hearing, and Mr. Zigler argued for Plaintiffs. At the hearing, Mr. Zigler explained that the subclasses' shares of the fund were negotiated separately and adversarially under Judge Phillips's supervision. Tr. 11:5-12:12. Amazon's counsel described the negotiations as "hard fought," confirmed that our account of the separate negotiation of each subclass's share was "all, of course, accurate," described the practice changes as "commitments"

made "[a]s part of this settlement" and as "very valuable forms of relief." Tr. 23:17-22, 25:1-2, 26:1-2. The Court granted preliminary approval. Dkt. 193.

## G. Notice, Administration, and Remaining Work

23. We understand from Angeion, the Settlement Administrator, that Class Notice was distributed beginning September 23, 2026. As of November 13, 2026, 52,085,087 potential class members have been sent notice, 499,392 Subclass B claims have been filed, 685 individuals have opted out, and 5 have objected. Notice and claims administration are ongoing, and Class Counsel will update the Court in their reply.

24. Class Counsel's work is not finished. We will prepare the reply on this motion and the motion for final approval, respond to objections, prepare for the March 16, 2027 Final Approval Hearing, oversee the Subclass B claims process and distribution, monitor Amazon's completion of the remaining refunds, and answer class members' questions. We estimate that this will require approximately 150 additional hours. That time is not included in the lodestar below, and Class Counsel will not seek additional fees for it.

## H. Class Counsel's Lodestar

25. **Exhibit A** summarizes Quinn Emanuel's time, and **Exhibit B** summarizes ZLG's time, from the inception of each firm's work through August 18, 2026. Each exhibit shows, for each timekeeper and year, the hours worked and the resulting lodestar, at historical rates and at current rates. Historical rates are the rates in effect when the work was performed. Current rates are each timekeeper's rate as of the date of this declaration.

26. *Quinn Emanuel's rates.* Quinn Emanuel's historical and current rates are the firm's standard national hourly rates, which it lists for clients who pay by the hour, regardless of outcome; the vast majority of the firm's work is for such clients rather than on contingency. Those national rates are appropriate here: this is a nationwide class action against a national company, litigated by Quinn Emanuel lawyers in several of its offices. Quinn Emanuel does not publish its standard rate schedules and treats the timekeeper-level rates in Exhibit A as confidential, because competitors could use them to price against the firm and clients could use them in fee negotiations on unrelated matters. For an associate who has left the firm, the current rate is the rate the firm currently lists for


QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WA 98101
TEL: (206) 905-7000

associates of the same seniority, which is set by law school graduation year. For a partner or counsel who has left the firm, the current rate is the firm's current rate for the band in which that timekeeper was billed before departing.

27. *ZLG's rates.* ZLG represents clients only on a contingent basis and does not invoice them. It nonetheless records its professionals' time and maintains billing rates, because courts may require lodestar support for a fee request and because ZLG's co-counsel agreements call for the firms to exchange time records and to use relative lodestar as a factor in dividing any fee. ZLG sets its rates by reference to rates published in legal-market surveys, rates courts have awarded in common-fund cases generally and to ZLG's professionals specifically, and rates its professionals charged at prior firms. Those rates are then tested in negotiations with co-counsel. ZLG discloses them to its clients at retention, and the clients consent to their use in any fee petition. Courts have accepted Mr. Zigler's rates in common-fund fee awards: $900 in *Senne v. Kansas City Royals Baseball Corp.*, No. 14-cv-00608-JCS, 2023 WL 2699972 (N.D. Cal. Mar. 29, 2023), and *Wong v. Arlo Technologies, Inc.*, No. 5:19-cv-00372-BLF, 2021 WL 1531171 (N.D. Cal. Apr. 19, 2021); $850 in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-7789 (LGS), 2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018); and $475 in *City of Greenville v. Syngenta Crop Protection, Inc.*, 904 F. Supp. 2d 902 (S.D. Ill. 2012). Mr. Zigler understands that in 2022, Mr. Ashe's time was billed to clients of Boies Schiller Flexner LLP at $960 per hour. In assembling ZLG's lodestar, where ZLG's log reflected two different 2024 rates for the same timekeeper, ZLG applied the higher 2024 rate to that year's historical calculation. That adjustment increased ZLG's historical lodestar by $10,902.50 and does not affect the current-rate lodestar.

28. *Billing judgment.* Each firm reviewed its records before preparing its exhibit. ZLG removed 925 entries totaling 282.2 hours ($148,472.50 at historical rates). ZLG also added 30.5 hours for Mr. Zigler that its log inadvertently omitted. Of those, 3.9 hours are for seven calls and meetings that appear in Quinn Emanuel's contemporaneous time records but had no matching ZLG entry, and 26.6 hours are for January 8-16, 2026, when Mr. Zigler was drafting the preliminary approval papers and finalizing the associated papers and settlement documents. ZLG reconstructed

that time from Mr. Zigler's sent emails, document save times, and calendar, net of time already logged and of time on other matters. Those entries are identified as added in Exhibit B.

29. The lodestar totals are as follows:

| Firm | Hours | Lodestar (historical rates) | Lodestar (current rates) |
|---|---|---|---|
| Quinn Emanuel | 3,923.2 | $6,520,712.00 | $7,594,654.50 |
| Zigler Law Group | 6,688.7 | $5,213,342.50 | $5,267,747.50 |
| Total | 10,611.9 | $11,734,054.50 | $12,862,402.00 |

30. The requested $100 million fee represents a multiplier of 7.77 on the current-rate lodestar and 8.52 on the historical-rate lodestar.

31. *Timing of the work.* Measured at current rates, Class Counsel had incurred 53.6% of their lodestar before the Court denied Amazon's motion to dismiss on April 29, 2025; 55.8% before Amazon informed Plaintiffs on May 9, 2025 that it would issue certain refunds; and 88.4% before the parties signed the term sheet on October 20, 2025. For most of this case, Class Counsel worked without any assurance that the class would recover anything.

## I. The Work of Class Counsel's Teams

32. *Quinn Emanuel.* A number of different Class Counsel attorneys worked on this litigation over the years.

- The highest biller on the case was Nolan Anderson. Mr. Anderson joined the firm shortly after the complaint was filed and has worked on the case ever since. He was a constant team member whose records show he worked on nearly every aspect of the case. His duties ranged from drafting substantive motions, preparing amended complaints, drafting and responding to discovery requests, participating in numerous meet and confers, preparing documents for production, and more. Although Mr. Anderson joined the firm after a clerkship and with no litigation or class action experience, he quickly became an integral part of the team under the guidance and training of more senior, experienced attorneys on the team. Another significant biller in the case, Briaunna Buckner, joined in the middle of discovery, assisting Mr.

Anderson with reviewing and preparing Plaintiffs' documents prior to production, reviewing Amazon's extensive document production, drafting discovery requests, and researching issues related to discovery disputes. Ms. Buckner left the firm in 2025.

- The next highest biller in the case was Andrew H. Schapiro. I have extensive experience with high-stakes litigation, including large class actions. I am the lead partner on this case for our firm, and have been involved since its inception. In the nascent stages of the case, I helped develop the original theories of the case and helped prepare the original complaint. I played an active role in creating and developing the case strategy throughout the entire litigation. I also provided substantive feedback and revisions for the amended complaints, court filings, discovery requests, correspondence, and other written work. I was also instrumental in negotiating the settlement, preparing the short form and final agreements, and preparing the motion for preliminary approval.
- The third highest biller was Alyssa G. Olson. Ms. Olson joined the case at the beginning of discovery and helped kick it into high gear. She was instrumental in pressing Amazon to meet its discovery obligations, reviewing Amazon's discovery responses and document productions, and developing a theory of the case based on Amazon's discovery. She was also instrumental in preparing Plaintiffs' multiple motions to compel. As a senior attorney for our firm, she oversaw the day-to-day operations of the associate group, providing expert guidance to keep the case moving forward smoothly and efficiently.
- After Ms. Buckner, Alicia Cobb was the next highest biller. Like Mr. Schapiro, Ms. Cobb was involved in developing the original theories of the case and drafting the initial complaint, and she has worked on this case since that time. She brought her expertise in class actions, Ninth Circuit caselaw, and local practice to this case. In conjunction with Ms. Olson, Ms. Cobb also helped oversee the day-to-day operations of the associate group and provided crucial guidance to keep the case moving

forward. She was involved in every aspect of the case, including developing the claims, revising draft court filings, providing local practice guidance, drafting and reviewing discovery requests and responses, participating in meet and confers, reviewing key documents, and assisting with mediation and settlement negotiations.

- Adam Wolfson was the next highest biller. He is Chair of the firm's Plaintiff's Litigation Practice and specializes in class-action cases. He has tried multiple class-action cases to verdict and helped our clients obtain more than $15 billion in recoveries. He brought this expertise to the case, joining shortly after the complaint was filed. Mr. Wolfson helped prepare court filings, revised discovery requests and responses, and reviewed key documents produced by Amazon. All along the way, he helped adjust our strategy and theory of the case to fit what we were seeing in Amazon's discovery responses. Mr. Wolfson also played a key role in negotiating this settlement.

33. *ZLG.*

- Mr. Zigler has led the case for ZLG since its inception (1,357.5 hours). He directed the pre-suit investigation and the research into the claims, drafted and revised the complaints and ZLG's leadership briefing, set litigation and discovery strategy with Quinn Emanuel, worked with Plaintiffs' expert on the analysis of Amazon's data and the valuation of the practice changes, attended the mediation, negotiated the term sheet, the Settlement Agreement, and the notice program, drafted the preliminary approval papers, and argued the motion for preliminary approval.
- Lawrence Ashe (1,918.0 hours), a complex-litigation lawyer for more than 30 years, 20 of them as a partner at Boies Schiller Flexner LLP, joined the case in July 2024 as document discovery began. He led ZLG's review of Amazon's rolling document productions, identifying and coding the key documents that supported Plaintiffs' motions to compel, meet-and-confer positions, mediation submissions, and trial plan, and he prepared analyses used in mediation.

- Ms. Zigler (860.1 hours, at non-attorney rates of $325 to $400 per hour) conducted the pre-suit investigation, including the customer interviews described above; identified, vetted, and maintained contact with the Class Representatives; assisted with Plaintiffs' discovery responses; and attended the mediation and the preliminary approval hearing.
- Nidya Gutierrez (658.4 hours) researched the claims and drafted portions of the original complaint, worked on the leadership briefing and the joint status report and discovery plan, prepared the Class Representatives' discovery responses, and drafted mediation materials.
- Mary Jane Fait (248.2 hours), a class-action litigator with more than 40 years of experience, and Robin Horton Silverman (167.7 hours) worked on the original and consolidated complaints, the leadership briefing, Plaintiffs' first interrogatories, and the ESI protocol in 2023 and 2024.
- Kevin McCormack (310.9 hours) researched discovery issues, including Amazon's requests directed at Plaintiffs' counsel's communications with putative class members.
- George Taub (107.5 hours) reviewed Amazon's document productions in 2025.
- Paralegals Candice Aguirre (851.4 hours) and Sara Formichelli (204.2 hours) managed communications with, and documents from, the Class Representatives and putative class members, assembled Plaintiffs' document productions and discovery responses, and prepared subpoenas. Three other ZLG timekeepers recorded a combined 4.8 hours.

34. *Staffing and efficiency.* The two firms held weekly calls throughout the case to divide work, set deadlines, and avoid duplication. Dkt. 45 ¶¶ 27, 31, 38. In staffing the case, our consistent question was whether and how a team member could add to the collective effort. Having reviewed our firms' records, we believe that each timekeeper whose time is included provided necessary services to the class. If the Court would like to review contemporaneous time records for any timekeeper, we will provide them.

**J. Expenses**

35. Class Counsel incurred $510,779.57 in unreimbursed expenses: $491,949.09 by Quinn Emanuel and $18,830.48 by ZLG. These expenses are reflected in each firm's books and records, which are prepared from receipts, invoices, check records, and other source materials. They are summarized by category below.

| Category | Quinn Emanuel | ZLG | Total |
|---|---|---|---|
| E-discovery document collection, hosting and processing | $211,145.11 | $0.00 | $211,145.11 |
| Experts and consultants (incl. Symphony Consulting) | $65,455.00 | $0.00 | $65,455.00 |
| Mediation fees | $83,868.75 | $0.00 | $83,868.75 |
| Travel, lodging, and meals | $9,428.88 | $7,662.29 | $17,091.17 |
| Filing, service, and pro hac vice fees | $5,653.05 | $1,078.00 | $6,731.05 |
| Computerized legal research | $110,740.40 | $0.00 | $110,740.40 |
| Other (QE: PACER, reproduction, printing, and shipping; ZLG: investigation and background checks; online outreach to affected customers) | $5,657.90 | $10,090.19 | $15,748.09 |
| Total | **$491,949.09** | **$18,830.48** | **$510,779.57** |

36. Total expenses fall within the $1,000,000 cap in Section 7.3 of the Settlement Agreement.

**K. Contingent Representation**

37. Class Counsel took this case on a fully contingent basis. Neither firm has been paid anything for its work, and both firms advanced expenses, knowing that if the case failed they would recover nothing.

**L. The Class Representatives**

38. The ten Class Representatives are Laura Abbott, Jill Cappel, Michelle Estep, Maria Khangi, Joshua Soto Lopez, Melissa Urbancic, Heriberto Valiente, Katherine Vojtko, Vince Vojtko, and Dianne Walton-Williams. Ms. Abbott, Ms. Cappel, and Ms. Urbancic have been plaintiffs since

the original complaint in September 2023. Ms. Estep, Ms. Khangi, Mr. Soto Lopez, Mr. Valiente, and Mr. Vojtko joined in the consolidated complaint in March 2024, and Ms. Vojtko and Ms. Walton-Williams joined in the operative complaint in May 2025. Dkts. 1, 58, 116. Six Class Representatives hold both Subclass A and Subclass B claims, and four hold Subclass B claims only. Tr. 11:16-21. Each of the Class Representatives provided documents and information about their returns, reviewed the complaint in which they appear, stayed in regular contact with Class Counsel, was informed of the Settlement's terms, and supports it. *Id.* Each also carried the burden of discovery. Amazon served each of the eight Class Representatives who were plaintiffs in 2024 with 37 requests for production and eight interrogatories in June 2024, two more interrogatories in February 2025, and another request for production in June 2025. Each responded in July 2024, served supplemental interrogatory responses in December 2024 and May 2025, responded to the later requests in March and July 2025, and verified their interrogatory answers. Dkt. 171-1 at 13-14. Each of those eight also submitted to a forensic collection of their email accounts and mobile phones by Plaintiffs' e-discovery vendor, so that their communications about their Amazon returns could be searched and produced. Ms. Vojtko and Ms. Walton-Williams, who joined after that discovery was underway, each answered ten interrogatories and 38 requests for production within a month of being served, verified their answers, and served interrogatories of their own on Amazon. Each Class Representative put their name on a public lawsuit against one of the largest companies in the world.

We each declare under penalty of perjury that the foregoing is true and correct.

Executed on November 17, 2026, at Chicago, Illinois.

*S/ Andrew H. Schapiro*
Andrew H. Schapiro

*S/ Aaron M. Zigler*
Aaron M. Zigler



QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 FIRST AVENUE, SUITE 210
SEATTLE, WA 98101
TEL: (206) 905-7000